IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| JONATHAN VILLAREAL,<br>individually and derivatively on behalf<br>of ZROBLACK, LLC.<br><br>**Plaintiffs,**<br><br>v.<br><br>**JOHN SAENZ, MIGUEL<br>VILLARREAL, JR., and GUNN,<br>LEE, & CAVE, P.C.**<br><br>**Defendants** | §§§§§§§§§§§§§§ | CIVIL ACTION NO. _____ |

### DECLARATION OF JONATHAN VILLAREAL

1. My name is Jonathan Villareal. I am above the age of 18 and competent to make this unsworn declaration. Except as otherwise indicated, the following facts are within my personal knowledge and true and correct. I am an individual and resident of Boerne, Kendall County, Texas.

2. I developed proprietary technology which allows one to access cell phones, including iPhones. This technology can be used to access a cell phone wirelessly and wipe the data. This is useful, in that if a user's phone is stolen, the owner can wipe its data remotely even if the security password has been changed. My company, Plaintiff ZroBlack, LLC ("ZroBlack"), is one of the few companies in the world that can do this.

3. In January of 2019, I was negotiating with a technology company in Finland for the licensing of the technology. John Saenz ("Saenz"), who is married to my cousin, claimed that he could fill voids my previous partner could not. Saenz represented to me that he had the business experience and government contacts to market the technology to the government. He represented


PLAINTIFF'S EXHIBIT 1

that he could use his "contacts" in the military and technology business sectors to bolster sales and proposed forming a company as a vehicle to market the technology. That company was to be ZroBlack. I believed him and, as a family member, trusted him. I relied on the representations he made, and as a result we agreed to form a limited liability company to market the software to the company in Finland. Saenz was to be CEO and I took on the technology role as Security Engineer.

4.      On January 11, 2019, Saenz purchased ZroBlack's domain name, www.zroblack.com, from GoDaddy. He did this in anticipation of our forming ZroBlack, and he was to hold the domain name on behalf of ZroBlack. GoDaddy hosted ZroBlack's website and email server. The login and password information for accessing ZroBlack's GoDaddy account and for accessing the laptop was confidential and not shared with anyone.

5.      On January 14, 2019, we formed ZroBlack, LLC, organized under the laws of the State of Delaware. Exhibit 2 is a true and correct copy of the company's Certificate of Formation. Saenz and I were ZroBlack's founding members and each owned fifty percent. ZroBlack was founded as an IT company to provide applications and services regarding cell phone data capture and erasure. We planned to offer two different types of software, one for commercial use and one for governmental use. I was to perform all the in-house coding and servicing of the technology. Saenz was responsible for client engagement and promoting the company.

6.      Saenz and I executed a Limited Liability Company Operating Agreement for ZroBlack, LLC (hereinafter, "Operating Agreement"). Exhibit 3 is a true and correct copy of the Operating Agreement. Section 4.7 of the Operating Agreement states:

> Title to the Company's assets will be held in the Company's name or in the name of any nominee designated by the Members. The Members have power to enter into a nominee agreement with any person, and that agreement may contain provisions indemnifying the nominee, except for his or her willful misconduct.

7. I also assigned my intellectual property rights in the software technology, which included the code for accessing cell phones wirelessly, to ZroBlack. Exhibit 4 is a true and correct copy of my Assignment of Intellectual Property Rights. However, I do not have a signed copy. Saenz has the signed assignment and has never given me a copy. ZroBlack's trade secrets consist of my code for accessing and wiping information from cell phones.

8. In connection with his duties as CEO, on May 2, 2019, Saenz purchased a 15-inch Apple MacBook Pro for $2,631.00. The purchase order reflects that the laptop was ordered "John Saenz, Zroblack, at 1150 N. Loop 1604-W, Ste 108-259, San Antonio, Texas 78248," which was ZroBlack's address. It was purchased with a debit card ending with the number 8032, which was a debit card issued in ZroBlack's name. Exhibit 5 is composed of true and correct copies of the purchase order, receipt, and ZroBlack's bank statement showing the debit amount to its bank account. The laptop computer's part number was MR94LL/a and the serial number is C02YF1Y9JG5J. The laptop is located at Saenz's residence, 28710 Estin Height St., San Antonio, Texas 78260.

9. In addition to the code described above, ZroBlack's trade secrets also consist of the login and password information for ZroBlack's GoDaddy account and for accessing the laptop.

10. On March 15, 2019, ZroBlack executed a non-disclosure agreement ("NDA") with the technology company located in Finland and with whom I had been negotiating. The purpose of the NDA was to allow ZroBlack to disclose trade secrets to the Finnish company during contract negotiations while maintaining the secrecy of those trade secrets. The trade secrets included the software code. Exhibit 6 is a true and correct copy of the NDA. A copy of that code is located on the ZroBlack laptop that Saenz purchased.

11. On or about April 15 2019, ZroBlack entered into a Professional Services Agreement ("PSA") with the Finnish company (referred to in the Complaint and Application for Seizure and Injunctive Relief as ZroBlack's "Foreign Customer"), wherein ZroBlack would pass down its knowledge of mobile devices, consult with the customer on its software development and coding, hardware development, and organize and document the process of supporting the ability to identify, diagnose, clear, and validate certain devices. The contract price was One Million Five Hundred Thousand Dollars ($1,500,000.00) to be paid up front and a fourteen and one-half percent (14.5%) earn out on new customer revenue and existing customer growth. Exhibit 7 is a true and correct copy of the PSA. After procuring a contract from the Finnish company, ZroBlack grew to as many as ten employees.

12. Saenz had the $1.5 million transferred into a Wells Fargo business account that he had established for ZroBlack. Saenz then transferred $740,000 of those funds to his personal account. Exhibit 8 is a true and correct copy of the Bank Statements for the account showing the deposit of $1,500,000 and Saenz's withdrawal of $740,000.

13. ZroBlack retained the services of Gunn, Lee & Cave (hereinafter, "Gunn Lee law firm") and specifically attorney Mike Villareal (hereinafter, "Mike") to advise on the contract negotiations with the Finnish company. Mike Villareal and I are not related. Shortly before signing the PSA, on or about April 12, 2019, I emailed Mike and discussed negotiations with the Finnish company. In the mail, I stated:

> John and I went through it [PSA] last night, he had concerns, but at the end of our talks we worked out the logic behind the revenue sharing. I hope this closes today too, hard lessons have been learned for sure. If we sign today, it's basically as though we are getting a $750,000 salary each for 2019. Do you have a recommendation for an attorney that can setup a trust for me?

Exhibit 9 is a true and correct copy of the email. The email demonstrates that $1.5 million dollars

was to constitute salary for us through the end of 2019. The money was not a gift, nor was it deemed earned upon the signing of a contract with ZroBlack's Foreign Customer.

14. The PSA included confidentiality provisions. Section 7.1 provided that all deliverables and inventions and all other information (including computer programs, technical drawings, algorithms, know-how, formulas, processes, ideas, inventions (whether patentable or not), schematics, and other technical, business, financial, and customer and product development plans, forecasts, strategies and information) that ZroBlack, Saenz, or I developed, learned, or obtained in connection with the services they rendered under the PSA constituted the proprietary information of the Foreign Customer. ZroBlack, Saenz, and I were required to hold that information in confidence and not use or disclose it. Section 7.2 of the PSA stated that upon termination of the PSA or as otherwise requested by the Finnish company, ZroBlack, Saenz, and I would promptly return all items and copies containing or embodying proprietary information including all deliverables and work-in-progress.

15. After ZroBlack signed NDA and PSA, Saenz tried to shop the technology to others, including an individual named Roger Graham, who was formerly with UBS Financial and, at the time, employed by Wells Fargo; he is currently a Senior Vice President-Investment Officer and PIM Portfolio Manager. I warned Saenz that he was in violation of the NDA and the confidentiality provisions of the PSA. Saenz threatened to continue to try to market the code.

16. After signing the PSA, Saenz took half of the upfront payment ($740,000) and then performed very little work for ZroBlack.

17. In May 2019, the ZroBlack's customer required both Saenz and I to travel to Finland. Saenz refused to leave at the same time as I did, but he eventually showed one week late. Two days after arriving in Finland, Saenz sent an email to the customer's VP of Technology stating

that I would take care of 100% of the technical and that he (Saenz) would no longer be attending morning meetings but would check up from time to time:

> I wanted to send you a note to clarify my role on these calls. I will be on from time to time as an observer and to offer guidance from ZroBlack's point of view. Jonathan can handle all the technical side of the conversations.

Exhibit 10 is a true and correct copy of the email Saenz sent.

18. I was required to return to Finland during the week of June 8 to 15, 2019; Saenz refused to accompany me. Saenz went to Finland only once. Saenz was also charged with completing tax returns and paying the quarterly business taxes, but he did not.

19. Saenz used most of the $740,000 he took from ZroBlack. Saenz invested around $305,000 into the stock market. Saenz also used around $423,850 in property renovations. As a result of Saenz's refusal to perform his work, I grew very frustrated. On June 26, 2019, I notified Saenz by text message that I wished to dissolve our partnership. Exhibit 11 is a true and correct copy of the text message I sent to Saenz. In the notification, I took him to task for not doing any work, stating:

> You can't sit back and expect a paycheck. You can't say you front loaded the contract then dip out. Besides, I did a huge part to close out the contract, I did the entire due diligence and put the entire BRIX document together. I expected you to do work after we got paid, this isn't a free ride man. [Foreign Customer] only wants to go forward with me for a reason and I don't know what happened to you. I don't know why you stopped working after getting paid $750k.

*Id*.

20. When Mike and the Gunn Lee law firm represented ZroBlack, the representation began as a normal corporate representation, where the law firm and the Mike were advising Saenz and I on matters regarding the company. Though unsigned, Exhibit 12 is a true and correct copy of the Engagement Agreement. Soon after ZroBlack executed the PSA, however, Saenz and I came to cross purposes over Saenz's lack of performance and misappropriation of company funds.

21.     After I threatened to dissolve the partnership, Saenz got Mike involved further. Mike and the Gunn Lee law firm undertook to represent both me and Saenz in negotiations to settle our dispute. One of my main concerns was the $740,000 John Saenz withdrew from the $1.5 million paid to ZroBlack. Those monies were paid in advance, and ZroBlack's customer expected ZroBlack, Saenz, and I to perform under the contract, but Saenz refused to perform his obligations to ZroBlack and its customer. Furthermore, Saenz would not agree to take steps to ensure his performance, despite being told by Mike during a meeting in Mike's office in July 2019 that he (Saenz) had breached his fiduciary duty to the company.

22.     To salvage the relationship, on or about July 27, 2019, Mike suggested that I set tasks for Saenz. Saenz refused to have the tasks incorporated into any agreement, sending a text message stating he would not "agree to tie a contract to daily tasks because that could be easily manipulated." Exhibit 13 is a true and correct copy of that text message. I responded, "Seriously. Please dude. That's not fair. I literally have my work planned out for an entire year I'm asking you for one month. Hello? How can I help you with it?" Saenz also refused Mike's suggestion that his CEO duties be incorporated into the company operating agreement.

23.     After Saenz took the $740,000, ZroBlack was forced to cut salaries of its employees. Saenz refused to assist ZroBlack in paying bills and I was not able to make the tax payment. I was forced to incur serious debt to get the capital to complete the deal with ZroBlack's customer in Finland. I began selling my personal property including electronics and my wife's wedding ring to ensure that ZroBlack could maintain working capital.

24.     Because Saenz is married to my cousin, our falling out began to cause strife in the family. The family relationship was very important to me. My dispute with Saenz was causing stress and hard feelings between my father and his brother, cousins, and others in the family. Mike

began emphasizing to me that I needed to settle with Saenz by "thinking about the family." Saenz began demanding that the $740,000 he took from ZroBlack be characterized as a "gift" for tax purposes. I refused to do this as I believed it would violate the law. On July 17, 2019, Saenz offered to assign all of his interest in ZroBlack to me if ZroBlack would characterize the $740,000 as a gift. Exhibit 27 is a true and correct copy of the text message.

25. After Saenz and I disagreed on how to qualify the $740,000 from ZroBlack, we decided it was time to part ways. The money that Saenz had taken from the company was to be returned, on a basis to be structured by Mike and the Gunn Lee law firm. Mike did not adequately advise me or ZroBlack as to the consequences of what we were doing and structured an agreement that hurt both me and ZroBlack.

26. On or about July 17, 2019, I sent a text message to Saenz, saying:

> Thanks for the call, it's disappointing that you had no idea we had a product released already. It's disappointing that you were not on the phone call this morning for our morning meeting. It's disappointing that you never responded to may emails letting me know what you did for our client that paid our company $1.5 million, it's disappointing that you say you're going to taking [*sic*] legal action against [Foreign Customer], it's disappointing that you cannot provide me with what you have done for our client for the last 2 months.

Exhibit 14 is a true and correct copy of the text message.

27. Mike and the Gunn Lee law firm eventually prepared a document titled "Release." Exhibit 15 is a true and correct copy of the Release. The Release made no express provision for the return of the $740,000 to ZroBlack, despite my continued requests that the money be returned. The Release also contained no express requirement that Saenz return property to ZroBlack, which included not only the $740,000 and a laptop computer belonging to ZroBlack, but also ZroBlack's proprietary and trade secret information. I did not have an express provision requiring the return of ZroBlack's domain name, webpage, and email server. The Release also provided that Saenz would receive 2% and ZroBlack 12.5% of the 14.5% Earn-Out Obligation under the PSA.

28.     Saenz and I executed the Release on August 9, 2019 while negotiations regarding the $740,000 were on going. Section 7 of the Release states that "Each Party hereto fully releases the other Parties from all claims and demands, known or unknown." Section 7 goes on the discuss claims that are known and unknown. It does not address inchoate claims or claims that have not yet accrued.

29.     Saenz and I also executed a Unanimous Written Consent in Lieu of Meeting by ZroBlack's membership (hereinafter, "Consent").  Exhibit 16 is a true and correct copy of the Consent. The second "WHEREAS" in the Consent states, "the undersigned wish to memorialize John Saenz's assignment of his entire interest in ZroBlack LLC to Jonathan Villareal." The first "RESOLVED" states that "John Saenz hereby assigns his entire interest in ZroBlack LLC to Jonathan Villareal pursuant to Article VII of the 'Limited Liability Company Operating Agreement for ZroBlack LLC' dated January 14, 2019 and applicable laws, …" Saenz assigned all of his ownership interest to me, and relinquished all claims of any ownership of ZroBlack's property, including the laptop and proprietary code contained therein.

30.     Just prior to execution of the Release and Consent, on or about August 1, 2019, Saenz, myself, ZroBlack, and its Finnish customer executed a First Amendment to Professional Services Agreement (hereinafter, "First Amendment"). Exhibit 17 is a true and correct copy of the First Amendment. The First Amendment releases Saenz from his obligations under the PSA, save and except the obligations of confidentiality in Section 7 of the PSA, which would survive.

31.     Nonetheless, after the deal for Saenz's to exit ZroBlack was struck, Saenz continued to want the money he had taken from the company to be construed as a "gift." This was an ongoing dispute between Saenz and me. I anticipated providing service to the United States federal government and I told Saenz that I would never agree to qualify the $740,000 Saenz took

as a gift. In fact, I gave Saenz an ultimatum: return the money, or face the harsh consequences. This was the same discussion I had with attorney Mike and the Gunn Lee law firm.

32.     On August 15, 2019, I asked Saenz to release ZroBlack's webpage. Saenz said he would "look into it." Exhibit 18 is a true and correct copy of my text exchange to him requesting transfer of website. Exhibit 19 is a true and correct copy of an email I sent Saenz requesting transfer of website. Despite my requests for return, Saenz continues to hold the domain name. Later, Saenz demanded I pay him $7,000 for the domain name, webpage, and email server.

33.     Since then, Saenz has taken the website down effectively terminating ZroBlack's ability to gain new clients. Saenz also deleted the email server, thereby destroying emails and documents related to the Finnish technology company project and other projects. Saenz currently holds access to ZroBlack's GoDaddy domain name, so I have no access to the site and no opportunity to attempt to recover the webpage and emails.

34.     I also asked Saenz to return the laptop computer belonging to ZroBlack. This is the laptop computer that was purchased with ZroBlack's debit card, on or about May 2, 2019, and described above. Saenz refused this request also and he still maintains control over it even though I have requested its return multiple times. This computer contains proprietary code related to ZroBlack's phone security project.

35.     On September 12, 2019, I emailed Mike advising him that Saenz had deleted all the emails from ZroBlack's email server. Exhibit 20 is a true and correct copy of the email I sent. Then, on September 13, 2019, I emailed Mike begging for help:

> I'm beside myself right now, and really struggling with everything, I can't eat, I can't sleep, my anxiety and stress is so high, and for the next 3 years if I continue like this I'll end up losing my contracts and not be able to work.
>
> I have worked too hard to allow myself to slip like this. I need help Mike, this is not right. I've done nothing wrong. John got $750,000 cash, and there has to be a way for me to stop

this madness, get him to give up the 2%, get my company website, my company documents, and my company computer. Like I said, I have a company that pays real taxes, has 10 real employees, we have a real physical location, and I can't even put up my company website.

Exhibit 21 is a true and correct copy of the email sent. Mike continued to try to negotiate a resolution between Saenz, myself, and ZroBlack.

36. On or about September 19, 2019, I again emailed Saenz, copying Mike, demanding the return of ZroBlack's property, including the laptop containing proprietary code, ZroBlack's web domain and webpage, and ZroBlack's emails. I also demanded return of the $740,000 Saenz misappropriated from ZroBlack. Exhibit 22 is a true and correct copy of that email. I sent a similar email to Saenz and Mike on September 20, 2019, explaining why I believed Saenz should return the $740,000 and other property of ZroBlack. Exhibit 23 is a true and correct copy of that email.

37. On or about September 26, 2019, Mike tried to arrange a meeting between Saenz and myself to discuss settling our dispute and offered his offices as a place to have the discussions. Mike gave his available days and stated that "we are trying to resolve your difference, not attempting to take advantage of each other. I appreciate you both willing to show good faith on both your parts in coming together and seeing if a resolution can be reached." Exhibit 24 is a true and correct copy of the email I received from Mike trying to arrange the meeting.

38. Despite promises to appear for a meeting, Saenz kept putting it off until I decided it was time to take our dispute in a different direction. I emailed Mike and stated as much. Exhibit 25 is a true and correct copy of the email chain between Mike and me.

39. Saenz has not returned the money he took from ZroBlack. He has not returned the web domain and webpage, emails, laptop, and other proprietary information belonging to ZroBlack. Saenz continues to hold on to ZroBlack's property and refuses to return it. The ZroBlack laptop that Saenz took contains proprietary information and trade secrets belonging to ZroBlack.

Saenz also threatened me that he would "muck up" my life if I did not turn over the company and assign it to him.

40. I trusted Mike and the Gun Lee law firm. I am not an attorney and am not familiar with legal issues. I trusted and relied on Mike and his firm to guide me and navigate the dispute with Saenz. I placed my trust in Mike and the Gun Lee law firm, just as ZroBlack trusted them as ZroBlack's corporate counsel.

41. Mike failed to disclose the extent of his relationship with Saenz. Mike continued to pressure me to resolve the dispute for "the sake of the family."

42. On or about February 22, 2020, I attempted to contact Saenz to collect back the money that he had took at the close of the deal with ZroBlack's Foreign Customer. After we signed the Release, Saenz failed to turn in all company assets to including, money, computers, email servers, website, non-disclosure agreements, company contacts, original documents, and everything else that belonged to ZroBlack.

43. ZroBlack is the owner of trade secrets. The trade secrets relate to products and services used in interstate and foreign commerce, mainly in the contract with ZroBlack's Foreign Customer in Finland. ZroBlack's trade secrets are composed of its proprietary software code built and maintained by me and which can be used to access cell phones wirelessly. The login and password to access ZroBlack's GoDaddy account are also trade secrets of ZroBlack.

44. The software code has economic value by not being generally known to others. Because the code is not known to others, ZroBlack can use the code to provide cell phone data erasure services to clients. ZroBlack is one of the few companies in the world that can perform the erasure services wirelessly. The economic value of ZroBlack's trade secrets is evidenced by its contract with if Foreign Customer in Finland, which paid $1,500,000 upfront for access to the

technology, as well as a 14.5% payout on new and existing customers during the lift of the contract.

45. ZroBlack took steps to maintain the secrecy of the software code. The software code was known only to those in managerial positions; as the chief executive officer and a trusted employee, Saenz had access to the code. This information was not shared with others outside of management and was secured and password protected.

46. The login and password to ZroBlack's GoDaddy account also derives independent economic value because it is not generally known to ZroBlack's competitors. The login and password allow ZroBlack to access its webpage and (at one time) its emails that contained confidential documents and other information related to ZroBlack's customers. The login and password were also know only to Saenz to maintain their confidentiality.

47. After Saenz assigned all his interest in ZroBlack to me, he was no longer authorized to use the laptop or access the information on it. He also no longer had authorization to access ZroBlack's domain name or its email server and emails; nor did he have authorization to delete the webpage and email server.

48. I made several attempts to regain possession of the laptop and the code it contained, as well as access to ZroBlack's domain name, webpage, and email server. ZroBlack and I have spent over $5,000 in attorney's fees paid to Gunn, Lee, & Cave trying to get the laptop and domain name back. Those fees include negotiations for the Release, wherein Saenz assigned all of his interest in ZroBlack to me, and fees trying to resolve the issue post-execution of the Release. Exhibit 25 is true and correct copies of the Gunn, Lee law firm's invoices to me showing the money spent trying to recover the laptop and domain name. ZroBlack has also lost data because of Saenz's deletion of the email server. The value of the information exceeds $5,000. ZroBlack has also spent more than $5,000 trying to recover from the data loss, establishing new lines of communications

with its primary customer and attempting to recover documents and information from alternate sources.

49. Exhibits 2, 3, 5, 6, 7, 8, 9, 15, 16, 17, and 25 are part of the business records of ZroBlack. I am the custodian of the business records of ZroBlack. I am familiar with the way ZroBlack created and maintained its records by virtue of my duties and responsibilities as a founding member. The exhibits are exact duplicates of the original records. The records were made at or near the time of each act, event, condition, opinion, or diagnosis set forth. The records were made by, or from information transmitted by, persons with knowledge of the matters set forth. The records were kept in the course of regularly conducted business activity. It is the regular practice of the business activity to make the records.

50. Additionally, Exhibits 9, 10, 19, 20, 21, 22, 23, and 24 which are emails, and Exhibits 11, 13, 14, 18, and 27 which are text messages between me and John Saenz, are also business records of ZroBlack. The emails and text messages were made at or near the time of each act, event, condition, or opinion contained therein, were made by, or from information transmitted by, persons with knowledge of the matters set forth, and were kept by me in the regular course of ZroBlack's business. It is my regular practice to keep such records.

51. Pursuant to 28 U.S.C. § 17.46, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 7, 2020.

_____
Jonathan Villareal