**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **JONATHAN VILLAREAL, individually** | § | |
| **and derivatively on behalf of** | § | |
| **ZROBLACK, LLC.** | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CIVIL ACTION NO. 5:20-cv-00571-OLG** |
| | § | |
| **JOHN SAENZ, MIGUEL** | § | |
| **VILLARREAL, JR., and GUNN, LEE,** | § | |
| **& CAVE, P.C.** | § | |
| **Defendants** | § | |

## PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

Plaintiff, JONATHAN VILLAREAL, individually and derivatively on behalf of ZROBLACK, LLC, (collectively the "Plaintiffs"), files this *Plaintiff's First Amended Verified Complaint*, to bring direct and derivative claims against Defendants, JOHN SAENZ, MIGUEL VILLARREAL, Jr., and GUNN, LEE, & CAVE, P.C. (collectively, the "Defendants") and would respectfully show as follows:

### I.  NATURE OF THE ACTION

1.      This lawsuit involves patented computer software and hardware technology that can wirelessly copy and securely delete data from password protected cell phones, tablets, and other portable electronic devices. The software was designed solely by Plaintiff Jonathan Villareal and is owned by Plaintiff ZroBlack, LLC (pronounced "ZeroBlack"). Because of its nature, this software has implications for national security.

2.      Defendant John Saenz is the former CEO of ZroBlack and has misappropriated that technology by refusing to return a ZroBlack laptop, purchased with company funds, on which the code, hardware schematics, hardware drawings, and other patented, trademarked, sensitive, and confidential ZroBlack proprietary information is located. After parting ways with ZroBlack, Saenz

also refused to release ZroBlack's GoDaddy account, which hosts ZroBlack's domain name, webpage, email server, and allows access to ZroBlack's LinkedIn business account, leaving Jonathan and ZroBlack without access to thousands of emails documents, client contact information, future company plans, business banking statements, business expense receipts, NDA's with 3rd parties, signed contracts with 3rd party electronics resellers such as Walmart, Best Buy, Target, Amazon and much more critical data that ZroBlack has needed for over 16 months to operate, file taxes, apply for the paycheck protection program (to no avail). Saenz has also intentionally destroyed and is currently compromising data owned by ZroBlack, including ZroBlack's webpage which has been unsecured for 16 months, further damaging ZroBlack's reputation as a security engineering firm. Saenz has deleted jv@zroblack.com, and info@zroblack.com, actions that were confirmed by emails from GoDaddy. See Appendix, Exhibit 41. Saenz has only kept je@zroblack.com active, which is the email address Saenz used when he was employed by ZroBlack. Saenz has also renewed the ZroBlack.com domain name for another year.

3.      Further proof of Saenz's actions can be seen by going to http://email.zroblack.com and clicking the forgot password link. If the user types in the email address je@zroblack.com as the email address for which he has forgotten the password, he is given 3 different options to reset the password; one of the options is to send a password reset link to Saenz's personal Gmail account. If the user were to try and click forgot password, however, for jv@zroblack.com and info@zroblack.com the GoDaddy email servers say, "The email address does not exist in our system."

4.      Additionally, because Saenz has not released the GoDaddy account ZroBlack, cannot update its contact and ownership information for its Dun & Bradstreet number (known as

a (DUNS number) which is critical for establishing business credit, bidding on government contracts, and filing business taxes. ZroBlack is not able to access, verify ownership of or update information for the following Government Issued IDs that can only be accessed on official US Government Websites: CAGE number (Commercial and Government Entity" code), NCAGE (NATO Commercial and Government Entity), USPTO (United States Patent and Trademark Office), Federal Service Desk (FSD.gov), United States Grants (Grants.gov), U.S. Small Business Administration (sba.gov), Texas Comptroller of Public Accounts, ZroBlack Wells Fargo Business Banking Login, and access to Restricted FOUO (For Official Use Only) government contracts listed on SAM.gov (System for Award Management), The Official United States Government portal for verified and vetted business entities allowed to bid on US Government contracts. Saenz setup these accounts for ZroBlack using his personal cellphone number as a contact number, and Jonathan's physical home address as the place of business for ZroBlack since the government would not take PO Boxes for business addresses. ZroBlack also cannot obtain an Apple Business Developer's account. For security purposes Apple needs to verify the phone number associated with ZroBlack's DUNS phone number. This phone number is Saenz's personal cell phone number. The Apple Business account for ZroBlack was established the day that Saenz purchased the company MacBook Pro at the Apple store with company funds. Apple has made several attempts have Saenz change his phone number, and emails from Apple state that Saenz has refused. To further add insult to injury Saenz even refused to return the keys to ZroBlack's mailbox that Jonathan paid a year for and signed a contract stating that fees will be incurred if mailbox keys are not returned.

5.      These actions have already caused ZroBlack significant damages, including loss of several multi-million-dollar contracts with the ████████████████████████████ ████████

## II.   JURISDICTION AND VENUE

6.      This Court has original federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiff has asserted a cause of action arising under the laws of the United States, specifically 18 U.S.C. § 1836 (Defend Trade Secrets Act), 18 U.S.C. § 1030(g) (Computer Fraud and Abuse Act), and 15 U.S.C. § 1125(d) (Anti-cybersquatting Consumer Protection Act).

7.      This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 to hear Plaintiffs' other causes of action, all of which are so related that they form part of the same case or controversy under Article III of the United States Constitution.

8.      This Court has personal jurisdiction over Defendants as Defendants are in and carry on their business in the State of Texas. Defendants John Saenz and Miguel Villareal, Jr. both reside within the Western District of Texas and Gunn, Lee, & Cave, P.C. is headquartered in Bexar County within the Western District of Texas.

9.      Venue in this Judicial District is proper under 28 U.S.C. § 1391(b).

## III.   PARTIES

10.      Plaintiff, Jonathan Villareal ("Jonathan") is an individual with his place of residence in Boerne, Kendall County, Texas. Jonathan brings this suit individually and derivatively as the sole member on behalf of ZroBlack, LLC ("ZroBlack").

11.      Defendant John Saenz ("Saenz") is an individual who has appeared in this suit through undersigned counsel.

12.     Defendant Miguel Villarreal, Jr. ("Mike") is an individual who has appeared in this suit through undersigned counsel.

13.     Defendant Gunn, Lee, & Cave, P.C. ("Gunn Law Firm") is a corporation who has appeared in this suit through undersigned counsel.

### IV.     FACTUAL BACKGROUND

**A.     Formation of ZroBlack, LLC**

14.     Jonathan Villarreal is a talented programmer who suffers from agoraphobia, a condition which, due to acute anxiety, prohibits him from having too many people around him. Even so, Jonathan obtained a master's degree in computer science, specializing in security engineering, and is a doctoral candidate working on his thesis, "The Weaponization of Data Clearing".

15.     As the practical application of his academic studies, Jonathan developed proprietary technology which allows the user of that tech to access cell phones and tablets, including iPhones and iPads. This technology can be used to access a cell phone wirelessly and wipe the data. This is useful in that, if a user's phone is stolen, he can wipe its data remotely even if the security password has been changed. Jonathan's software and hardware inventions have been met with wide praise in publications that report on cutting edge technology. As part of Jonathan's doctoral studies, ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ Unfortunately, Jonathan's outstanding reputation for this type of work can never be translated into a profitable business as long as Saenz has ZroBlack in a vice grip, turning the vice everyday he holds ZroBlack data, and funds hostage.

16.     Not only does Jonathan's software delete and erase data from secure cell phones, but it can also copy the cell phone data wirelessly and can even recover data that has supposedly been deleted. This includes data from Apple, Inc. iPhones and iPads. As the Court may be aware, Apple, Inc. resists government efforts to "crack" cell phone security. As recently as January 2020, CNBC reported that U.S. Attorney General William Barr was alleging Apple had not helped the FBI break into password-protected phones used by Mohammed Saeed Alshamrani, the suspect accused of killing three people in December 2019 at a Pensacola, Florida navy base.[1] Apple also caught flak for opposing a federal court order to access encrypted cellphone data on iPhones belonging to the terrorist couple who killed 14 people in San Bernardino in  2015.[2] Jonathan Villarreal's software and hardware solutions solve that problem and is thus of significant interest to the U.S. government.

17.     ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████ ██████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[1] https://www.cnbc.com/2020/01/13/barr-says-apple-not-providing-substantive-assistance-on-locked-iphone.html.
[2] https://www.latimes.com/local/lanow/la-me-ln-fbi-apple-san-bernardino-phone-20160216-story.html.

████████████████████████████████████████████████████████

████████████████████████████████████████████

18.     In October of 2018 Jonathan was negotiating with ████████████████, a subsidiary of ██████████ for the licensing of the technology (hereinafter, ████████). ████████ ████████████████████████████████████ ██████ specializes in data erasure for governments and businesses. According to cybersecurityintelligence.com, ████████ is a leading global provider of mobile device diagnostics and secure data erasure solutions and is the industry standard in data erasure and mobile device diagnostics. The site also states that ████████ data erasure solutions have been tested, approved, certified, and recommended by more than 15 governments.

19.     Although Jonathan had created these products all on his own, he knew he would need help with marketing his technology for sale, whether to ██████ or some other company. Unfortunately, the associate he was attempting to work with initially was not able to perform and they parted ways before the technology could be sold.

20.     After speaking with Jonathan about his tech inventions in the last week of December 2018 John Saenz ("Saenz"), who is married to Jonathan's cousin, decided he wanted a piece of the action, stating to Jonathan in a text message, "How can I ride this train." Saenz claimed that he could fill voids Jonathan's previous associate could not fill. Saenz falsely represented to Jonathan that he had the business experience and government contacts to market the technology to the government. He falsely represented that he could use his "contacts" in the military and technology business sectors to bolster sales and proposed forming a company as a vehicle to market the technology. That company was to be ZroBlack. Jonathan believed him and, as a family member, trusted him. Relying on those representations, and others, Jonathan agreed to form a

limited liability company with Saenz to market the software to ███████, with Saenz as CEO and Jonathan taking on the technology role. *See* Appendix, Exhibit 1 (Declaration of Jonathan Villareal).

21.     Jonathan paid the registered agent for the formation of Zroblack LLC and for a year's worth of service for a post office box for ZroBlack, LLC . Jonathan agreed to pay for these larger upfront company expenses because he was the only one able to. Since Jonathan purchased the registration and the first year of service at the post office box, Saenz agreed to purchase ZroBlack's domain name, www.zroblack.com, from GoDaddy. After Jonathan walked him through the process and explained to Saenz what a "Zero-day" vulnerability was, and how it related to "Black" ops, Saenz reserved the www.zroblack.com domain name on behalf of ZroBlack. Saenz had given Jonathan access to the GoDaddy account where the domain was being held, but that access was later revoked, and the password was changed once Saenz and Jonathan signed the Release. Login records, password change, and email deletion records for all Zroblack.com activity live on Godaddy.com. The login and password information for accessing ZroBlack's GoDaddy account is a trade secret of ZroBlack. *See* Appendix, Exhibit 1.

22.     On January 14, 2019, Jonathan and Saenz formed ZroBlack, LLC, organized under the laws of the State of Delaware. *See* Appendix, Exhibit 2. They were its founding members and each owned fifty percent disregarding their original agreement. ZroBlack was founded as a security engineering firm established to provide applications and services regarding cell phone data capture and erasure. ZroBlack planned to offer two different types of software, one for commercial use and one for governmental use. Jonathan Villareal was charged with performing all the in-house coding, hardware engineering, and servicing of the technology. Saenz was charged with client engagement and promoting the company. *See* Appendix, Exhibit 1.

23.    Jonathan and Saenz executed a Limited Liability Company Operating Agreement for ZroBlack, LLC ("Operating Agreement"). *See* Appendix, Exhibit 3. A key term of that agreement pertained to ZroBlack's ownership of property. Section 4.7 of the ZroBlack's Limited Liability Company Agreement states:

> Title to the Company's assets will be held in the Company's name or in the name of any nominee designated by the Members. The Members have power to enter into a nominee agreement with any person, and that agreement may contain provisions indemnifying the nominee, except for his or her willful misconduct.

24.    After the formation of ZroBlack, on March 31, 2019, Jonathan assigned to ZroBlack his intellectual property rights in the software code he developed. *See* Appendix, Exhibit 4.

25.    ZroBlack's trade secrets included Villareal's code for wirelessly wiping or downloading information from cell phones and tablets, recovering erased data from cell phones and tablets, as well as the drawings and schematics for the hardware that makes the aforementioned possible.

26.    The code for the software is identified in Exhibit 4, the intellectual property assignment. *See* Appendix, Exhibit 1. After Jonathan assigned his software and hardware inventions to ZroBlack as his capital contributions, ZroBlack became one of the few companies in the world that can perform the remote penetration of passcode protected mobile electronic devices.

27.    In connection with his duties as CEO, Saenz purchased a 15-inch Apple MacBook Pro on May 2, 2019 for $2,631.00. A copy of the purchase order and receipt is attached as Exhibit 5. The purchase order reflects that the laptop was ordered "John Saenz, ZroBlack, at 1150 N. Loop 1604-W, Ste 108-259, San Antonio, Texas 78248," which was ZroBlack's post office address. It

was purchased with a debit card ending with the number 8032, which was a debit card issued in ZroBlack's name. *See* Appendix, Exhibit 5.

28.    After procuring a contract with ███████, ZroBlack grew to having as many as ten employees. *See* Appendix, Exhibit 1.

**B.    ZroBlack Signs a Contract**

29.    On March 15, 2019, ZroBlack and ███████ executed a non-disclosure agreement ("NDA"). *See* Appendix, Exhibit 6. The purpose of the NDA was to allow ZroBlack to disclose trade secrets to ███████ during contract negotiations while maintaining the secrecy of those trade secrets. The trade secrets included the software code. *See* Appendix, Exhibit. 1.

30.    ZroBlack and ███████ entered into a Professional Services Agreement ("PSA") on April 15, 2019, wherein ZroBlack would pass down its knowledge of mobile devices, consult with ███████ on its software development and coding, hardware development, and organize and document the process of supporting ability to identify, diagnose, clear, and validate certain devices. *See* Appendix, Exhibit 7.

31.    The ███████ contract price was One Million Five Hundred Thousand Dollars ($1,500,000.00) up front and a fourteen and one-half percent (14.5%) earn out on new customer revenue and existing customer growth.

32.    The $1.5 million was transferred into a Wells Fargo business account. Saenz then transferred $740,000 of those funds to his own personal account.

33.    Jonathan, on the other hand, opened a new account at Wells Fargo listing ZroBlack, LLC as his employer and declaring the newly opened account his distribution account.

34.    Jonathan transferred $740,000 to his newly formed distribution account according to the terms of the LLC agreement and then setup a meeting with a payroll service to ensure proper

distribution of funds. Saenz refused to attend the meeting with the payroll service, and the cut all communications. *See* Appendix, Exhibit 8.

35.     ZroBlack retained the services of Gunn, Lee & Cave (hereinafter, "Gunn, Lee law firm") and specifically attorney Miguel "Mike" Villareal (hereinafter, "Mike")[3] to advise them on the contract negotiations. Shortly before signing, on or about April 12, 2019, Jonathan emailed Mike discussing negotiations. In the mail, Jonathan stated:

> John and I went through it last night, he had concerns, but at the end of our talks we worked out the logic behind the revenue sharing. I hope this closes today too, hard lessons have been learned for sure. If we sign today, it's basically as though we are getting a $750,000 salary each for 2019. Do you have a recommendation for an attorney that can setup a trust for me?

36.     *See* Appendix, Exhibit 9 (email). The email demonstrates that $1.5 million dollars was to constitute salary for Jonathan and Saenz through the end of 2019. The money was not a gift, nor was it deemed earned upon the signing of the contract.

37.     Before the PSA was signed ███████ required a legal document that identified all of ZroBlack's assets.

38.     This document entitled IP Due Diligence was filled out by Saenz and emailed to ███████ executives, ███████ legal counsel, and Mike Villarreal.

39.     The IP Due Diligence document lists ZroBlack.com among other domains, and as intellectual property ZroBlack owns. The IP document also includes the ZroBlack LinkedIn business account as an asset. See Appendix, Exhibit 39.

40.     The PSA included confidentiality provisions. Section 7.1 provided that all deliverables and inventions and all other information (including computer programs, technical

---

[3] There is no familial relationship between Plaintiff Jonathan Villareal and defendant Miguel Villarreal.

drawings, algorithms, know-how, formulas, processes, ideas, inventions (whether patentable or not), schematics, and other technical, business, financial, and customer and product development plans, forecasts, strategies and information) that ZroBlack, Jonathan, and Saenz developed, learned, or obtained in connection with the services they rendered under the PSA constituted the proprietary information of ███. *See* Appendix, Exhibit 7.

41.     ZroBlack, Jonathan, and Saenz were required to hold that information in confidence and not use or disclose it. Section 7.2 of the PSA stated that upon termination of the PSA or as otherwise requested by ███, ZroBlack, Jonathan, and Saenz would promptly return to ███ all items and containing or embodying proprietary information including all deliverables and works-in-progress. *See* Appendix, Exhibit 7.

42.     When Mike and the Gunn, Lee law firm represented ZroBlack, the representation began as a normal corporate representation, where the law firm and the attorney ("Michael" or "Mike") were advising the members on matters regarding the company, including the contract with ███. *See* Appendix, Exhibit 12.

43.     Soon after ZroBlack executed the PSA with ███, however, Jonathan and Saenz came to cross purposes over Saenz's lack of performance, misappropriation of company funds, and efforts to shop the tech to others in violation of the ███. *See* Appendix, Exhibit 1.

**C.     Saenz Attempts to Shop Secret Code to Others**

44.     Although ZroBlack had signed the NDA and later the PSA (with its own confidentiality provisions) with ███,

45.     Saenz tried to shop the technology to others, including an individual named Roger Graham, who was formerly with UBS Financial and, currently, employed by Wells Fargo.

Jonathan warned Saenz that he was in violation of the NDA and the confidentiality provisions of the PSA. Saenz threatened to continue to try to market the code. *See* Appendix, Exhibit 1.

**D.      Saenz Misappropriated $740,000 while Missing Key Meetings with Customer and Providing No Services to ZroBlack**

46.      While Saenz talked big, he did little to help the company. After ZroBlack signed the contract with ▮▮▮▮, Saenz took half of the upfront payment ($740,000) and failed to perform any more work for ZroBlack. *See* Appendix, Exhibit 1, Exhibit 8.

47.      Pursuant to Article VI Bookkeeping, Section: 6.2 – Member's Accounts of the ZroBlack Company Agreement, Saenz is required to return all money paid in advance by the company upon leaving the company.

48.      Saenz and Jonathan agreed to these provisions when they signed the LLC Agreement.

49.      May 2019, ▮▮▮▮ required both Jonathan and Saenz to travel to ▮▮▮▮. Saenz refused, but eventually showed seven-days late. Two days after arriving in ▮▮▮▮, Saenz sent ▮▮▮▮ an email stating that Jonathan would take care of 100% of the technical and that he (Saenz) would no longer be attending morning meetings but would check up from time to time:

> I wanted to send you a note to clarify my role on these calls. I will be on from time to time as an observer and to offer guidance from ZroBlack's point of view. Jonathan can handle all the technical side of the conversations.

*See* Appendix, Exhibit 10.

50.      Jonathan was required to return to ▮▮▮▮ during the week of June 8 to 15, 2019; Saenz refused to accompany him. Saenz was also charged with completing tax returns and paying the quarterly business taxes; he did not.

51.     Rather than working to promote ZroBlack, Saenz was living the high life. Upon information and belief, Saenz used most of the $740,000 he took from ZroBlack. Saenz invested around $305,000 into the stock market.

52.     Saenz also used around $423,850 in property renovations. *See* Appendix, Exhibit 1.

53.     As a result of Saenz's refusal to perform his work, on or about June 26, 2019, Villareal notified Saenz by text message that he wished to dissolve ZroBlack. *See* Appendix, Exhibit 11. In the notification, Jonathan took Saenz to task for not doing any work, stating:

> You can't sit back and expect a paycheck. You can't say you front loaded the contract then dip out. Besides, I did a huge part to close out the contract, I did the entire due diligence and put the entire BRIX document together. I expected you to do work after we got paid, this isn't a free ride man. ███████ only wants to go forward with me for a reason and I don't know what happened to you. I don't know why you stopped working after getting paid $750k.

*See* Appendix, Exhibit 11.

**E.     Gunn, Lee, & Cave, P.C. and Michael Villareal's Further Involvement**

54.     After Jonathan threatened to dissolve ZroBlack, Saenz got Mike further involved. Though an obvious conflict of interest existed, Mike undertook to represent both Jonathan and Saenz in negotiations to settle their dispute.

55.     One of the main concerns was the $740,000 Saenz withdrew from the $1.5 million deposit that ███████ paid under the PSA.

56.     Those monies were paid in advance, and ███████ expected ZroBlack, Saenz, and Jonathan Villareal to perform under the contract.

57.     Although Saenz initially agreed to perform services to each the $740,000, he ultimately refused to perform his obligations to ZroBlack under the ███████ scope of work.

58.     Nor would Saenz to agree to steps to ensure his performance, despite being told by Mike during a meeting in Mike's office in July 2019 that he (Saenz) had breached his fiduciary duty to the company.

59.     On or about July 27, 2019, Mike suggested that Jonathan set tasks for Saenz (the putative CEO of ZroBlack).

60.     Saenz refused to have the tasks incorporated into any agreement, sending a text message to Jonathan stating he would not "tie a contract to daily tasks because that could be easily manipulated." *See* Appendix, Exhibit 13.

61.     Jonathan responded, "Seriously. Please dude. That's not fair. I literally have my work planned out for an entire year I'm asking you for one month. Hello? How can I help you with it?" *See* Appendix, Exhibit 13.

62.     Saenz also refused Mike's suggestion that his CEO duties be incorporated into the company operating agreement. Once he had $740,000 in his pocket, Saenz simply did not want to do any more work for ZroBlack or ▮▮▮▮▮.

63.     After Defendant Saenz took the $740,000, ZroBlack was forced to cut salaries of its employees, and eventually let go ZroBlack's CTO, whom Saenz acknowledge in text that without him, it would be almost impossible to complete the ▮▮▮▮ PSA. *See* Appendix, Exhibit 40.

64.     Although Saenz took half of the project funds for the ▮▮▮▮ project, Saenz refused to assist ZroBlack in covering day to day operating costs.

65.     So much so that Jonathan was not able to make the tax payment, and was forced to incur significant debt in order to get the capital to complete obligations required under the PSA.

Jonathan began selling his personal property including electronics and his wife's wedding ring to ensure that ZroBlack could maintain working capital. *See* Appendix, Exhibit 1.

66.     Because Saenz was married to Jonathan's cousin, their falling out began to cause strife in the family. The family relationship was very important to Jonathan, and Mike began pressuring Jonathan that he needed to settle with Saenz by "thinking about the family."

67.     After Jonathan and Saenz disagreed on how to qualify his theft of $740,000 from ZroBlack, the two members decided it was time to part ways.

68.     The money that Saenz had stolen from the company was to be returned, on a basis to be structured by Mike and the Gunn, Lee law firm. Although Mike represented Jonathan, ZroBlack, and Saenz, no reasonable lawyer could believe that such representation of each client would not be materially affected.

69.     Moreover, he did not advise Jonathan or ZroBlack as to the consequences of what they were doing and structured an agreement that hurt both Jonathan Villarreal and ZroBlack.

70.     On or about July 17, 2019, Jonathan sent a text message to Saenz, saying:

> Thanks for the call, it's disappointing that you had no idea we had a product released already. It's disappointing that you were not on the phone call this morning for our morning meeting. It's disappointing that you never responded to my emails letting me know what you did for our client that paid our company $1.5 million, it's disappointing that you say you're going to taking [*sic*] legal action against ██████, it's disappointing that you cannot provide me with what you have done for our client for the last 2 months.

*See* Exhibit 14 (Text message dated July 17, 2019).

71.     Saenz began demanding that the $740,000 he took from ZroBlack be characterized as a "gift" for tax purposes; this, Jonathan refused to do as it would violate the law. *See* Exhibit 1 (Declaration of Jonathan Villareal). For example, in a text message July 27, 2019 Saenz offered to

assign all interest in ZroBlack to Jonathan if the $740,000 would be characterized as a gift. *See* Appendix, Exhibit 27.

72.    Mike and the Gunn, Lee law firm eventually prepared a document titled "Release." *See* Appendix, Exhibit 15. The Release stated that Saenz would receive as consideration 2% (and ZroBlack 12.5%) of the 14.5% Earn-Out Obligation under the PSA.

73.    Although the Release assigned all of Saenz's interest in ZroBlack to Jonathan, it made no express provision for the return of the $740,000 to ZroBlack, despite continued requests by Jonathan that the money be returned.

74.    The Release also contained no express requirement that Saenz return personal property to ZroBlack, which included not only the $740,000 and a laptop computer belonging to ZroBlack, but also ZroBlack's proprietary and trade secret information, as well as ZroBlack's domain name, webpage, and email server.

75.    The Release contained no provision that the parties would cooperate in the transfer of intangible assets, such as ZroBlack's DUNs and CAGE numbers, or the ZroBlack domain.

76.    By failing to include these provisions, Mike and Gunn, Lee create a vague and ambiguous document that made it unclear ZroBlack still owned these things and that Saenz was required to return them.

77.    The Release did require the execution of a Unanimous Written Consent in Lieu of Meeting by ZroBlack's membership (hereinafter, "Consent") wherein the parties agreed that Saenz's would assign all of his ownership interest in ZroBlack.

78.    The Consent is part of the Release and requires return of the money, the computer and trade secrets, and the domain name, webpage, and email server.

79.     The Release's vagueness about ZroBlack's ownership of these items, however, has necessitated this lawsuit because Saenz has refused to return all of these things.

80.     The Release involved 4 parties and required specific provisions from ▮▮▮▮

81.     ▮▮▮▮ was not involved with the Release, and there were not signatures from ▮▮▮▮ on the Release.

82.     Jonathan and Saenz executed the Release on August 9, 2019. Section 7 of the Release states that "Each Party hereto fully releases the other Parties from all claims and demands, known or unknown." Section 7 goes on the discuss claims that are known and unknown. It does not address inchoate claims or claims that have not yet accrued. *See* Appendix, Exhibit 15.

83.     Jonathan and Saenz also executed a Unanimous Written Consent in Lieu of Meeting by ZroBlack's membership (hereinafter, "Consent"). *See* Appendix, Exhibit 16.

84.     The Consent further stated that "the undersigned wish to memorialize John Saenz's assignment of his entire interest in ZroBlack LLC to Jonathan Villareal."

85.     The Release states that  "RESOLVED" . . . [that] "John Saenz hereby assigns his entire interest in ZroBlack LLC to Jonathan Villareal pursuant to Article VII of the 'Limited Liability Company Operating Agreement for ZroBlack LLC' dated January 14, 2019 and applicable laws, …" Thus, Saenz assigned all his ownership interest to Jonathan, and relinquished all claims of any ownership of ZroBlack's property. *See* Appendix, Exhibit 16.

86.     After Saenz agreed to leave ZroBlack, he refused to return the $740,000, which Saenz took as an advance on services to be performed for ZroBlack.

87.     When Jonathan stated this money was necessary for the company to operate, Saenz continued to want the advance he took against services from ZroBlack to be construed as a "gift."

88.     This was an ongoing dispute between Saenz and Jonathan, who anticipated providing service to the United States federal government. Jonathan told Saenz that he (Jonathan) would never agree to qualify $740,000 Saenz embezzled as a gift.

89.     In fact, Jonathan gave Saenz an ultimatum: return the money, or face the harsh consequences. This was the same discussion he had with attorney Mike Villareal and his law firm, Gunn, Lee. *See* Appendix, Exhibit 1.

90.     On August 15, 2019, Jonathan asked Saenz to release ZroBlack's webpage. Saenz said he would "look into it." *See* Appendix, Exhibit 18 and Exhibit 19. Saenz had already deleted jv@zroblack.com on August 14th, 2019.

91.     Jonathan received an email from GoDaddy to his backup address showing that jv@zroblack.com has been deleted. See Appendix, Exhibit 41. John had no intention of looking into anything or assigning anything over to ZroBlack or Jonathan.

92.     Despite multiple requests for over 16 months for return, Saenz continues to hold the domain name. Adding insult to injury, Saenz blackmailed ZroBlack over the domain name, webpage, and email server, offering to sell it back to ZroBlack for $7,000.

93.     Now, Saenz has taken the website down effectively terminating ZroBlack's ability to gain new clients.

94.     Saenz also deleted the email server, thereby destroying thousands of emails and documents supporting Jonathan's claims, ZroBlack's projects for ███████ and other matters.

95.     Saenz currently holds ZroBlack's domain name hostage, so Jonathan has no access to the site and no opportunity to attempt to recover the webpage and emails. GoDaddy is the service provider. *See* Appendix, Exhibit 1.

96.     Jonathan asked Saenz to return the laptop computer belonging to ZroBlack. Saenz refused this request also. This computer contains proprietary code related to ZroBlack's phone security project. *See* Appendix, Exhibit 1.

97.     On September 13, 2019, Jonathan emailed Mike advising him that Saenz had deleted all his emails. *See* Appendix, Exhibit 20. Then, on September 13, 2019, Jonathan emailed Mike pleading for help:

> I'm beside myself right now, and really struggling with everything, I can't eat, I can't sleep, my anxiety and stress is so high, and for the next 3 years if I continue like this I'll end up losing my contracts and not be able to work.
>
> I have worked too hard to allow myself to slip like this. I need help Mike, this is not right. I've done nothing wrong. John got $750,000 cash, and there has to be a way for me to stop this madness, get him to give up the 2%, get my company website, my company documents, and my company computer. Like I said, I have a company that pays real taxes, has 10 real employees, we have a real physical location, and I can't even put up my company website.

*See* Appendix, Exhibit 21. Mike continued to try to negotiate a resolution between Jonathan and Saenz.

98.     On or about September 19, 2019, Jonathan again emailed Saenz, copying Mike, demanding the return of ZroBlack's property, including the laptop containing proprietary code, ZroBlack's web domain and webpage, and ZroBlack's emails.

99.     Jonathan also demanded return of the $740,000 Saenz misappropriated from ZroBlack. *See* Appendix, Exhibit 22.

100.     Jonathan sent a similar email to Saenz and Mike on September 20, 2019, explaining why he believed Saenz should return the $740,000 and other property of ZroBlack. *See* Appendix, Exhibit 23.

101.    On or about September 26, 2019, Mike Villareal tried to arrange a meeting between Jonathan and Saenz to discuss settling their disagreement and offered his offices as a place to have the discussions.

102.    Mike gave his available days and stated that "we are trying to resolve your differences, not attempting to take advantage of each other. I appreciate you both willing to show good faith on both your parts in coming together and seeing if a resolution can be reached." *See* Appendix, Exhibit 24.

103.    Despite promises to appear for a meeting, Saenz kept putting it off with a litany of excuses until Jonathan, fed up, stated he would not be attending a meeting and had decided to go in a different direction. *See* Appendix, Exhibit 25.

104.    As of the filing of the complaint, Saenz has not returned the money he took from ZroBlack, nor has he returned the web domain and webpage, emails, laptop, and proprietary information belonging to ZroBlack.

105.    Saenz continues to hold on to ZroBlack's property and refuses to return it, including the ZroBlack laptop that contains proprietary information and trade secrets belonging to ZroBlack. Saenz also threatened Jonathan that he would "muck up" his life if Jonathan did not turn over the company and assign it to him. Jonathan begged Saenz not to do this to him. *See* Appendix, Exhibit 1.

106.    Furthermore, Jonathan Villareal rightfully placed his absolute trust in Mike Villareal and his law firm, the Gunn, Lee law firm.

107.    Jonathan Villareal is not an attorney and is not familiar with legal issues. He is, however, highly skilled in IT matters. He trusted and relied on Mike Villareal and his firm to guide him and navigate the transaction with Saenz. At all times relevant and material to this lawsuit,

Jonathan Villareal rightfully placed his trust in his lawyer and law firm, just as ZroBlack did with its corporate counsel.

108.    Unfortunately, Mike Villareal had a conflict of interest that he ignored. He also failed to disclose the extent of his relationship with Saenz to Jonathan.

109.    Mike's relationship with Saenz was so cozy that Mike was cutting Saenz a discount of the share of fees he charged Saenz, while charging Jonathan for the full amount of Jonathan's share. Mike continued to pressure Jonathan to resolve the dispute for "the sake of the family." *See* Appendix, Exhibit 1.

110.    Neither Jonathan Villareal nor ZroBlack anticipated they would be betrayed by the law firm, Gunn or Mike Villarreal in the way they were.

**F.    Final Attempts to get Saenz to Return Money and Property Owed to ZroBlack**

111.    On or about February 22, 2020, Jonathan Villareal attempted to contact Defendant Saenz to collect back the money that he had taken at the close of the deal with ████ .

112.    After the Parties agreed to sign ZroBlack over to Jonathan, Saenz failed to turn over all company assets including money, computers, GoDaddy domain with email server and website, non-disclosure agreements, company contacts, original documents, and everything else that belonged to ZroBlack. *See* Appendix, Exhibit 1.

**G.    Saenz Thwarts ZroBlack and ███████ Attempt to Contract with the ███████ ███████████████████████████**

113.    After the Release was executed and Saenz and ZroBlack and Jonathan parted ways, Jonathan, ZroBlack, and ████ pursued a contract with the ███████████ .



119.    Furthermore, because iPhones make up more than a 40% share of the U.S. market, obtaining an Apple Developer account was critical to the success of this endeavor. An Apple Developer account requires a business to have a valid DUNS number.

120.    A DUNS number is a unique nine-digit identifying number issued by Dun & Bradstreet. ZroBlack obtained a DUNS number while Saenz was still with the business.

121.    Because at the time Saenz was the contact person for ZroBlack, his cell phone number is the number listed for contacting ZroBlack.

122.    Saenz, however, has refused all requests to confirm with Dun & Bradstreet that he is no longer a member of ZroBlack or to update the contact information for ZroBlack on its DUNS account.

123.  Dun & Bradstreet will not update the DUNS number information without confirmation from Saenz.

124.  Without being able to confirm ZroBlack and Jonathan are the owner of the DUNS number, Apple would not issue them an Apple business developer account, making it impossible for Jonathan, ZroBlack, and ███████ to compete for this ███████ contract. See Appendix, Exhibit 1.

125.  Because Apple could not confirm ZroBlack's ownership, Apple would not provide ZroBlack with a Business developer account, which is necessary to access Apple's iOS API—the code that is under the hood of the iOS operating system. See Appendix, Exhibits 29 and 30 (communications between Jonathan and ███████ ).

126.  Jonathan sought the release of ZroBlack's domain name information, from which he could himself update the Dun & Bradstreet information. Saenz refused Jonathan's requests to release the ZroBlack domain name to him so that he could update ZroBlack's information for Apple and Dun & Bradstreet.

127.  Saenz then blocked Jonathan's email address. Exhibit 31.

128.  Because Jonathan could not update ZroBlack's DUNS information, he could not confirm to Apple's satisfaction that he owned ZroBlack and so Apple refused him a developer's account.

███  █████████████████████████████████████████████████

████████████████████

130.  However, given Jonathan, ZroBlack, and ███████ specialty in retrieving data from cellular devices, including Apple, Inc. products, any new contracts they compete for will likely also require that ZroBlack have an Apple developer account. Exhibit 32. But for Saenz's

actions, there was a reasonable probability the ███████ would have entered into a contract with Jonathan, ZroBlack, and ███████.

131.    Saenz's actions were a proximate cause of Jonathan, ZroBlack, and ███████ losing the contract, and their damages.

## H.    Saenz Refuses ███████ Demand for Return of the Code and Blocks ZroBlack from ███████ Work by Withholding Its Account Credentials

132.    John Saenz also continues to refuse to return to ZroBlack its proprietary code. Some of that code, through ZroBlack's contract with ███████, is proprietary to ███████ as well. On July 9, 2020, ███████ sent Saenz a demand letter reminding him of his obligation to return the proprietary property. Saenz has not done so. Exhibit 33.

133.    In addition to the DUNS information, Saenz has refused to return or allow access to ZroBlack's SAM.gov account and CAGE number. "SAM" stands for System Award Management and is a U.S. government portal for bidding on government contracts. It is managed by the Department of Transportation.

134.    Current and potential government vendors must obtain a SAM registration in order to be awarded contracts by the government. SAM.gov requires companies to obtain a SAM registration, which consists of a login name and password.[4]

135.    SAM also issues what is known as a CAGE number. CAGE stands for "Commercial and Government Entity Code" and likewise allows businesses to qualify for federal contracts and grants.

136.    ZroBlack has had to file complaints with the Federal Help Desk and Defense Logistics Agency because Saenz is effectively holding the SAM.gov login information and CAGE

---

[4] https://www.transportation.gov/osdbu/system-award-management-sam.

number hostage and has prevented ZroBlack from competing for government contracts. Furthermore, on information and belief, Saenz is holding himself out as ZroBlack using the SAM.gov login and CAGE number. Attached as Exhibits 34 and 35 are ZroBlack's communications with the Federal Help Desk and Defense Logistics Agency regarding ZroBlack's complaint. These exchanges show that both agencies have forwarded ZroBlack's complaints to their legal and fraud departments.

V.    CAUSES OF ACTION

**Count 1: Violations of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, and the Texas Uniform Trade Secrets Act ("TUTSA")**

137.    Plaintiffs hereby adopt and re-allege the allegations previously set forth in this Complaint as if fully set forth herein.

138.    The Defend Trade Secrets Act defines trade secrets to encompass "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C §1839(3).

139.    The Texas Uniform Trade Secrets Act defines trade secrets to mean "all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." TEX. CIV. PRAC. & REM. CODE § 134A.002(6).

140.    Under both statutes the owner must have taken steps reasonable under the circumstances to keep the information secret and the information must derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from disclosure. 18 U.S.C §1839(3)(A), (3)(B); TEX. CIV. PRAC. & REM. CODE § 134A.002(6)(A), (6)(B).

141.    An owner of a trade secret that is misappropriated may bring a civil action under the Defend Trade Secrets Act if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce. 18 U.S.C. § 1836(b)(1). Likewise, Texas' Uniform Trade Secrets Act authorized a private cause of action for trade secret misappropriation. TEX. CIV. PRAC. & REM. CODE § 134A.001 et seq.

142.    Misappropriation means acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a trade secret of another without express or implied consent by a person who used improper means to acquire knowledge of the trade secret. 18 U.S.C §1839(5). Improper means includes theft or breach of a duty to maintain secrecy. 18 U.S.C §1839(6). Misappropriation of a trade secret under the Texas Uniform Trade Secrets Act includes acquiring the trade secret with knowledge it was acquired by improper means. TEX. CIV. PRAC. & REM. CODE § 134A.002(3)(B)(i). Improper means includes theft.

143.    ZroBlack is the owner of trade secrets related to a product or services used in interstate and foreign commerce.

144.    ZroBlack's trade secrets were comprised of its proprietary software code and hardware built and maintained by Jonathan and which could be used to access cell phones

wirelessly, its login and password information for accessing its GoDaddy account (where its webpage and email server were hosted), and other information.

145.    ZroBlack derived independent economic value from its trade secrets not being generally known or readily ascertainable by legal means.

146.    ZroBlack is one of the only companies in the world that can perform the erasure services giving them an economic advantage over competitors in similar markets. The economic value of ZroBlack's trade secrets is evidenced by its contract with ██████.

147.    ZroBlack derived independent economic value from its trade secrets not being generally known or readily ascertainable by legal means. ZroBlack is one of the only companies in the world that can perform the erasure services giving them an economic advantage over competitors in similar markets.

148.    The economic value of ZroBlack's trade secrets is evidenced by its contract with ██████

149.    Without any experience in information technology, coding, or encryption protocols, Saenz used his familial relationship with Villarreal to worm his way into Villarreal's confidence, and engage in offering Villarreal the false promises of what Saenz could do with his alleged contacts in government and the military.

150.    Saenz made material misrepresentations to Villarreal as to his experience and expertise to obtain military contracts to utilize Villarreal's trade secrets.

151.    In exchange, Saenz wanted to own a part of the nascent company that Villarreal was founding to exploit his valuable trade secrets.

152.    Villarreal, who is a software engineering / coder had developed software protocols that allowed him to hack into hand-held devices and operating systems, even though those devices

were password protected. Villarreal reasonably relied on Saenz representations that he could obtain the United States Military's interest in Villarreal software, and allowed Saenz to take the helm of Zroblack, as its CEO.

153.    Unbeknownst to Villarreal, Saenz had limited contacts in the U.S. military, and could not deliver on any of the contacts that were promised.

154.    Villarreal was damaged by such reasonable reliance, losing business opportunity, money, access to Zroblack's email server with valuable passwords and other access information.

155.    Saenz misappropriated the trade secrets through fraud. Saenz falsely represented to Jonathan that he had the business experience and government contacts to market the technology to the government. He falsely represented that he could use his "contacts" in the military and technology business sectors to bolster sales and proposed forming a company as a vehicle to market the technology.

156.    Then, after receiving access to the proprietary information, with money in his pocket, he agreed to leave ZroBlack. At the time, Saenz knew of the opportunity ZroBlack presented him and took full advantage of it and still does to this day.

157.    Saenz also misappropriated trade secrets through breach of a duty of confidence imposed upon him by law. At the time of his disclosure or use, Saenz knew he was breaching his duty to maintain secrecy, and knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy or limit the use of the trade secret. Saenz was a managing member of ZroBlack, he was the CEO of ZroBlack, and he occupied a position of trust and confidence at ZroBlack. At the time he used or disclosed the trade secret, he knew he had acquired it in confidence, that he had a duty to maintain its secrecy, and his use or disclosure was in violation of that duty.

158.     Now, Saenz has refused to return the ZroBlack laptop that contained the software code and schematics for the hardware. Per ZroBlack's Operating Agreement the assets are held in the Company's name. Per the terms of the Release, Saenz relinquished all interest in ZroBlack, including all interest in any property owned by ZroBlack. That property included the laptop and the proprietary code and other proprietary data on the laptop. The laptop also had the software that controlled the emails and website URL for ZroBlack.

159.     After Saenz parted ways with ZroBlack, his authorization to use the laptop and access the information on it was revoked. Furthermore, the Release and assignment of all his rights in ZroBlack included the assignment of rights in ownership of the laptop and the proprietary code on that laptop. Saenz refused requests to return the laptop, and his continued possession is unauthorized. Saenz knew he used improper means to acquire the trade secrets, thus misappropriating the trade secrets. Those trade secrets included the software code created and maintained by ZroBlack and ZroBlack's login and password information for its GoDaddy account.

160.     In the interim, Saenz has disclosed the trade secrets and tried to shop the technology to others and continues to try to market the code without receiving ZroBlack or Jonathan's consent. See Appendix, Exhibit 1.

161.     Saenz's actions have caused ZroBlack to lose major contracts because he holds the key to the domain name. The domain name contains the DUNS information that is still currently in Saenz's name. Jonathan has been unable to update the DUNS information confirming ZroBlack's ownership causing it to lose contracts.

**Count 2: Violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(g)**

162.     Plaintiffs hereby adopt and re-allege the allegations previously set forth in this Complaint as if fully set forth herein.

163.    Any person who suffers damage or loss by reason of a violation of 18 U.S.C. § 1030 may maintain a civil action against the violator to obtain compensatory damages and injunctive relief. 18 U.S.C. § 1030(g). A civil action may only be brough if the conduct involves one of the factors set forth in 18 U.S.C. § 1030(c)(4)(A)(1)(I-V), including loss to one or more persons during any 1-year period aggregating at least $5,000 in value. 18 U.S.C. § 1830(g); 18 U.S.C. § 1030(c)(4)(A)(1)(I). "Loss" is defined under the CFAA as "any reasonable cost to [the] victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). The term "loss' encompasses only two types of harm: costs to investigate and respond to a computer intrusion, and costs associated with a service interruption. *Quantlab Technologies Ltd. (BVI) v. Godlevsky*, 719 F. Supp. 2d 766, 776 (S.D.Tex 2010); *see also Frisco Medical Center, L.L.P. d/b/a Baylor Medical Center at Frisco v. Bledsoe,* 147 F. Supp. 3d 646, 659 (E.D. Tex. 2015).

164.    Saenz's access and deletion of ZroBlack's webpage and email server interrupted GoDaddy's service to ZroBlack, causing a loss of more than $5,000. Furthermore, Saenz's access and deletion of the email server and webpage caused a loss of more than $5,000 in data. Finally, ZroBlack has spent in excess of $5,000 trying to obtain return of the lap top computer and domain name and trying to resolve the loss of emails and documents resulting from the deletion.

165.    If the above threshold is met, civil liability may be imposed under the CFAA where a defendant:

> a)    Intentionally accesses a computer without authorization or exceeds authorization and obtains information from that computer, 18 U.S.C. § 1030(a)(2)(c);

b)      knowingly (and with intent to defraud) accesses a protected computer without authorization, or exceeds authorized access, and obtains anything of value, 18 U.S.C. § 1030(a)(4);

c)      intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage (18 U.S.C. § 1030(a)(5)(B)); or,

d)      intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage, 18 U.S.C. § 1030(a)(5)(B); or

e)      intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage or loss,

18 U.S.C. § 1030(a)(5)(C).

*See also Frisco*, 147 F. Supp. 3d at 658-659; *eBay Inc. v. Digital Point Solutions, Inc.*, 608 F. Supp. 2d 1156, 1163-64 (N.D. Cal. 2009).

166.    After execution of the Release and Consent, Saenz was required to return ZroBlack's property to it upon request as it was the property of ZroBlack. At this juncture, Saenz's authorization to access the laptop was revoked as it was no longer his property but the property of ZroBlack in accordance with the Company Agreement.

167.    Saenz refused to return the laptop and proprietary information and refused to release ZroBlack's domain name.

168.    Instead, Saenz intentionally accessed the computer without authorization or exceeded authorized access and thereby obtained information from a protected computer.

169.    Such information was ZroBlack's proprietary information, including its code. Once Saenz and ZroBlack parted ways, his authorization to access the laptop was revoked. Saenz' theft and withholding of the computer violates 28 U.S.C. § 1030(a)(2)(c). That conduct also violated 18 U.S.C. § 1030(a)(4) because Saenz intended to defraud.

170.     Saenz also intentionally accessed ZroBlack's domain on GoDaddy and deleted ZroBlack's webpage and email server. The domain, including the webpage and email server, were the property of ZroBlack.

171.     Saenz held the domain as nominee or an agent of ZroBlack. Once ZroBlack and Saenz parted ways, Saenz's authorization to hold the domain as ZroBlack's nominee or agent was no longer authorized and he was required to hand over all access rights to ZroBlack.

172.     Because he no longer had authorization to access the domain, his access and deletion of the webpage and email server was unauthorized and violated 18 U.S.C. § 1030(a)(2)(c). His unauthorized access to the domain also violated 18 U.S.C. § 1030(a)(5)(B) and 18 U.S.C. § 1030(a)(5)(C) because it caused damage when he deleted the webpage and email server.

173.     Saenz's actions have caused ZroBlack to lose major contracts because he holds the key to the domain name. The domain name contains the DUNS information that is still currently in Saenz's name. Jonathan has been unable to update the DUNS information confirming ZroBlack's ownership causing it to lose contracts.

**Count 3: Violations of the Anti-cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).**

174.     Plaintiffs hereby adopt and re-allege the allegations previously set forth in this Complaint as if fully set forth herein.

175.     In order to prevail on an ACPA claim, Plaintiff must show that (1) its mark is a distinctive or famous mark entitled to protection; (2) the domain names are identical or confusingly similar to Plaintiff's mark; and (3) the defendant uses the domain name with bad faith intent to profit from them. 15 U.S.C. § 1125(d)(1)(A); *See Southern Co. v. Dauben Inc.*, 324 Fed. Appx. 309, 314 (5th Cir. 2009).

176.    In order to determine whether someone has acted in bad faith under the ACPA the court considers the following factors:

a.    the trademark or other intellectual property rights of the person, if any, in the domain name;

the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

b.    the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

c.    the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

177.    ZroBlack has a common law interest in its name under section 43(a) of the Lanham Act. 15 U.S.C. § 1125. The "ZroBlack" name is a distinctive identifier for the products and services

ZroBlack provides. The www.zroblack.com domain is identical or confusingly similar to ZroBlack's mark. Saenz has no trademark or other intellectual property rights in the domain name. Saenz maintains control and use of the ZroBlack website with a bad faith intent. Saenz no longer has any intellectual property rights in the domain name after he was removed from the company. The domain name consists of the exact same legal name of ZroBlack as it was maintained prior to his removal from the Company. After his termination, Saenz intended to divert consumers from ZroBlack's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site. Saenz continues to provide material and misleading false contact information and fails to maintain accurate contact information for the domain name.

178.    Saenz has not released the GoDaddy account to ZroBlack. Therefore ZroBlack cannot update its contact and ownership information for its Dun & Bradstreet  number (known as a (DUNs number), its CAGE number (Commercial And Government Entity" code), and its access to its SAM.gov account (System Award Management), a U.S. government portal for bidding on government contracts. Saenz blackmailed ZroBlack over the domain name, webpage, and email server, offering to sell it back to ZroBlack for $7,000. Saenz has taken the website down effectively terminating ZroBlack's ability to gain new clients. Saenz also deleted the email server, thereby destroying hundreds of emails and documents supporting Jonathan's claims, ZroBlack's projects for ▮▮▮▮ and other matters. Saenz has even gone as far as attempting to shop the technology to others and threatens to continue to try to market the code.

**Count 4: Breach of Contract**

179.   Plaintiffs hereby adopt and re-allege the allegations previously set forth in this Complaint as if fully set forth herein.

180.   The elements of a cause of action for breach of contract are (1) a valid contract exists, (2) the plaintiff performed or tendered performance as contractually required, (3) the defendant breached the contract by failing to perform or tender performance as contractually required, and (4) the plaintiff sustained damages due to the breach. Both Saenz and Jonathan Villareal signed the Release. The Release is a settlement which is enforced as a contract under Texas law.

181.   The Release specifically recited that Saenz and Jonathan wished to memorialize the assignment of Saenz's entire interest in ZroBlack to Jonathan. Section 6 of the Release, titled "Assignment" imposed on Jonathan and Saenz an obligation to execute a Unanimous Written Consent in Lieu of a Meeting of the Members of ZroBlack, LLC ("Consent"). That Consent itself showed the Members entered a resolution that Saenz was assigning his entire interest in ZroBlack, LLC to Jonathan. The Release and Consent were executed on the same day, and upon their execution, Saenz became obligated to release all rights he had in ZroBlack, including any rights to the ownership to ZroBlack property, including the laptop, proprietary code and information, and rights as ZroBlack's nominee in ZroBlack's domain name, which were the property of ZroBlack. Post-Release ZroBlack requested return of that property, and Saenz refused, thereby breaching the terms of the Release.

182.   Furthermore, the Company Agreement expressly states that title to the Company's assets will be held in the Company's name or in the name of any nominee designated by the Members. Saenz refusal to return ZroBlack's assets constitutes a breach of the ZroBlack company agreement.

183.    Saenz also breached the Release by failing and refusing to return the $740,000 he took from ZroBlack. The Release specifically recited that Saenz was assigning all his interest in ZroBlack to Jonathan. The money paid to ZroBlack under the terms of the PSA was money belonging to ZroBlack. Once he assigned all his rights to ZroBlack to Jonathan, Saenz was obligated to return the $740,000 that belonged to ZroBlack. Nor was the $740,000 consideration for the Release. Section 2 of the Release discusses the consideration, which is the 2% of the earn-out from the contract Saenz was to receive. No mention is made of the $740,000. By failing and refusing to return the $740,000 Saenz breached the Release.

184.    Jonathan and ZroBlack performed as contractually required. Saenz breached the contract by failing to return property owned by ZroBlack. Plaintiff has suffered damages as a result of Saenz' breach.

**Count 5: Breach of Formal Fiduciary Duties Against Saenz.**

185.    Plaintiffs hereby adopt and re-allege the allegations previously set forth in this Complaint as if fully set forth herein.

186.    As a CEO and Managing Member of ZroBlack, Defendant Saenz was a fiduciary of ZroBlack at all times material to this action.

187.    Defendant Saenz breached his fiduciary duty to ZroBlack by engaging in transactions that benefited him, personally, at the expense of ZroBlack.

188.    Such breaches of Saenz's duty of loyalty and duty of care resulted in direct injury to Plaintiff, caused lost revenue (and income), lost contract opportunities, and prevented the company from entering into valuable contracts with the United States federal government.

189.    Corporate officers and directors owe fiduciary duties, including a duty of loyalty and a duty of care to the company. Section 4.1 of the Company Operating Agreement provided

that the ZroBlack would be managed by its managers, who would appoint a Chief Executive Manager who would have primary responsibility for the operations of the business.

190.    Section 4.5 of the Company Operating Agreement states that the Chief Executive Member had primary responsibility for managing the operations of the ZroBlack and carrying out the decisions of the members. Saenz was the Chief Executive Member and styled himself as CEO of ZroBlack.

191.    And yet, Saenz continued to act in his own self-interest, withholding company property and trade secrets; withholding monies from the company that were allocated for Saenz and Villarreal to work on projects for their customers; and refusing, due to spite, ignorance, and / or malfeasance, to allow ZroBlack's managers to access confidential information the company could use to build its business.

192.    Section 4.7 of the Company Operating Agreement stated that members could hold ZroBlack property in their name as a nominee of ZroBlack. Saenz purchased ZroBlack's domain name in his capacity as Chief Executive Member/CEO and thus purchased it as ZroBlack's nominee.

193.    Saenz has no right to pursue business under the name of ZroBlack and may not hold himself out as being affiliated with ZroBlack.

194.    And yet, he continued to maintain dominion and control over ZroBlack's domain (URL), email server, and other electronic access point that were an essential avenue of commerce.

195.    Although these requests were made of Saenz after Saenz departed the company, and he could not have any personal use of the domain or email server, he continues to deny access to IT access points of ZroBlack, which directly caused ZroBlack to lose valuable contracting opportunities.

196.     Additionally, subject to a declaration pursuant to 28 U.S.CA. § 2201 setting aside the Release (see below), Plaintiffs further allege that Saenz breached his fiduciary duty by engaging in self-dealing by taking payment for his own personal gain and not performing any work associated with ZroBlack.

197.     Also subject to a declaration setting aside the Release, Plaintiff's further allege that Saenz engaged in conduct which defeated the reasonable expectation of Plaintiffs. Specifically, that Saenz would provide services to ZroBlack if he kept the $740,000 services contract advance for services paid to ZroBlack by its customer.

198.     Yet Defendant Saenz held on to a services contract advance, utterly failed to provide continuing services for which that money was allocated, and refused to return ZroBlack's money, which caused the company to expend valuable resources out of its operating revenues to pay for services to complete the contract.

199.     To further exacerbate matters, Saenz then wanted Jonathan Villarreal to qualify the $740,000 as a "gift" to evade income taxes.

**Count 6: Jonathan and ZroBlack's Professional Negligence against Gunn Law Firm**

200.     Plaintiffs hereby adopt and re-allege the allegations previously set forth in this Complaint as if fully set forth herein.

201.     The case against Gunn and Mike Villarreal is shrouded in both professional negligence and breaches of fiduciary duties.

202.     It is undisputed the Gunn and Mike Villarreal provided legal representation to Jonathan Villarreal in his dealings with John Saenz.

203.    It is undisputed that Gunn and Mike Villarreal provided legal representation to ZroBlack with respect to John Saenz' departure from ZroBlack and transactions to memorialize such transactions.

204.    However, it is also undisputed the law firm and attorney bypassed their basic ethical rules that binds every Texas attorney: do not take matters representing two parties (or three, in this case) to the same transaction.

205.    The issue is there was never a meaningful waiver of conflict, and there was never actions taken by either the law firm or attorney to delineate representation.

206.    In this case, Gunn and Mike Villarreal had three masters:  Jonathan Villarreal, John Saenz, and ZroBlack, providing legal services, and the promise of competent advice to each.

207.    Yet, where the loyalty to one ended and the other began is indecipherable.

208.    It is undisputed that the law firm (Gunn) and attorney (Mike Villarreal) owed a legal duty to Jonathan Villarreal; a duty to ensure that they looked out for his interest and advised him on any actions that would harm his interest.

209.    It is undisputed that the law firm (Gunn) and attorney (Mike Villarreal) owed a legal duty to ZroBlack; a duty to ensure that they looked out for its interest, and advised it on actions taken by Saenz that would hurt ZroBlack.

210.    Both Gunn and Mike Villarreal failed to do so.

211.    By failing to include an integration clause; by failing to clearly specify rights and responsibilities in the Release; by incorporating documents into the Release, the drafting created an ambiguity that invites parol evidence, multiple and inconsistent interpretations, and has led to the much of the underlying disputes in this case.

212. Not only did they not look out for Jonathan Villarreal's interest and ZroBlack's interest, but they actively sought to enhance Saenz's position with respect to his negotiations to leave ZroBlack.

213. In their negligence, they did not protect ZroBlack to ensure that it recouped its money, trade secrets, URL, and confidential information.

214. They either failed to take steps to understand the extend and value of Jonathan Villarreal's trade secrets; the application it could have within the United States government; and the value of having ZroBlack's email server returned to ZroBlack when Saenz left the company.

215. They were negligent in failing to advise  Jonathan Villarreal to sign incomplete agreements, including the Release; failing to obtain the trade secrets Jonathan Villarreal had developed; and allowed Saenz to abscond with $740,000 which ZroBlack desperately needed for its operations.

216. The breach of Gunn and Mike Villarreal's legal duty to Jonathan Villarreal and ZroBlack proximately and directly caused damages to each, for which relief is sought.

217. Even in drafting the Release at issue in this case, Gunn and Mike Villarreal were wholly and astonishingly negligent with respect to Jonathan Villarreal and ZroBlack.

218. Mike Villareal and the Gunn, Lee law firm breached the duty owed to Plaintiff by taking actions an ordinarily prudent attorney would not have taken under the same or similar circumstances. Here, the Gunn, Lee law firm failed to:

> a.      Include a carve-out provision in the Release that except from the Release Saenz's ongoing obligations to preserve the confidentiality of ZroBlack's trade secrets;

> b.      Include a requirement in the Release that Saenz return all intellectual property to ZroBlack;

     c.     Include a requirement in the Release that Saenz return all of ZroBlack's physical personal property, including the laptop computer;

     d.     Include a requirement that Saenz released to ZroBlack the ZroBlack domain name, web page, and email server; and

     e.     Include a requirement in the Release that Saenz return the $740,000 he took from ZroBlack.

219.     Gunn Law Firm's breach proximately caused Plaintiff injury.

220.     Had Gunn Law Firm included the above provisions, the laptop, code, domain, and $740,000 would have been returned to ZroBlack and Saenz would have been prevented from attempting to sell and market the software. Plaintiff has incurred unnecessary attorney's fees in obtaining the undersigned counsel to file the lawsuit.

221.     ZroBlack's damages from Gunn Law Firm's breach include the $740,000.00 they allowed to be embezzled from the company, the value of ZroBlack's proprietary information, the laptop computer Saenz refuses to return, and ZroBlack's domain name for its webpage and email server.

**Count 7: Breach of Fiduciary Duty against the Gunn Law Firm and Michael Villareal**

222.     Plaintiffs hereby adopt and re-allege the allegations previously set forth in this Complaint as if fully set forth herein. Mike Villareal and the Gunn, Lee law firm owed a formal fiduciary duty to its clients, Saenz, Jonathan, and ZroBlack.

223.     Michael Villareal is an agent of the Gunn, Lee law firm, and acted in the course and scope of his agency at all times material to this action.

224.     At all times material to the events giving rise to his claim, Michael Villareal was an attorney with the Gunn, Lee law firm, and represented himself to be backed by the knowledge and expertise of the Gunn, Lee law firm.

225.    Any malfeasance or wrongdoing found against Michael Villareal was done under the supervision or in conjunction with his role at the Gunn, Lee law firm. His actions are therefore attributable to the firm under both *respondeat superior* and as an agent of the Gunn, Lee law firm. The Gunn, Lee law firm is fully liable for all damages assessed against Michael Villareal.

*i.Breach of Fiduciary Duty*

226.    Michael Villarreal and the Gunn, Lee law firm owed a formal fiduciary duty to Jonathan and ZroBlack.

227.    The duty, the highest recognized law, required the attorney and law firm to put the interest of its clients, Jonathan Villareal and ZroBlack, ahead of itself, or not take on representation of another client that would directly and adversely affect the representation of Jonathan Villareal and ZroBlack.

228.    Mike Villareal and Gunn, Lee law firm not only ignored their professional responsibility and duty to plaintiffs but negotiated agreements between Jonathan Villareal and Saenz and ZroBlack that put the Plaintiffs in a worse position than they were in prior to the agreements.

229.    They chose to represent one client's interest – Saenz's – over the other two.

230.    The attorney and law firm also ignored the discussions between the members of ZroBlack with respect to qualifying the $740,000 that Saenz wrongfully took from the business.

231.    Both the attorney and the law firm were clearly aware of Saenz's position with ZroBlack and they knew or should have known about the fiduciary duty that Saenz owed ZroBlack.

**Count 8: Tortious Interference with Prospective Business Relations**

232.    Plaintiffs hereby adopt and re-allege the allegations previously set forth in this Complaint as if fully set forth herein.

233.    The elements for tortious interference with prospective relations are (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third person, (2) the defendant intentionally interfered with the relationship, (3) the defendant's conduct was independently tortious or unlawful, (4) the interference proximately caused the plaintiff's injury, and (5) the plaintiff suffered actual damage or loss.

234.    Jonathan, ZroBlack, and ██████ pursued a contract with the ████████ to help ████████████████████████████████████████████████████.

235.    Furthermore, obtaining an Apple Developer account was critical to the success of this endeavor. An Apple Developer account requires a business to have a valid DUNS number. A DUNS number is a unique nine-digit identifying number issued by Dun & Bradstreet. ZroBlack obtained a DUNS number while Saenz was still with the business. Because at the time Saenz was the contact person for ZroBlack, his cell phone number is the number listed for contacting ZroBlack.

236.    Saenz, however, has refused all requests to confirm with Dun & Bradstreet that he is no longer a member of ZroBlack or to update the contact information for ZroBlack on its DUNS account. Dun & Bradstreet will not update the DUNS number information without confirmation from Saenz. And without being able to confirm ZroBlack and Jonathan are the owner of the DUNS number, Apple will not issue them a developer account, making it impossible for Jonathan, ZroBlack, and ██████ to compete for this ████████ contract.

237.    Because Apple could not confirm ZroBlack's ownership, Apple would not provide ZroBlack with a developer account, which is necessary to access Apple's iOS API—the code that is under the hood of the iOS operating system. Jonathan sought the release of ZroBlack's domain name information, from which he could himself update the Dun & Bradstreet information.

238.    Saenz refused Jonathan's requests to release the ZroBlack domain name to him so that he could update ZroBlack's information for Apple and Dun & Bradstreet.

239.    Because Jonathan could not update ZroBlacks' DUNS information, he could not confirm to Apple's satisfaction that he owned ZroBlack; Apple refused him a developer's account.

240.    As a direct result of Saenz's actions, Jonathan, ZroBlack, and █████████ lost the contract with ████████████████.

241.    But for Saenz's actions, there was a reasonable probability ████ ██████████ would have entered into a contract with Jonathan, ZroBlack, and ████████. Saenz's actions were a proximate cause of Jonathan, ZroBlack, and ████████ losing the contract, and their damages.

242.    There is a reasonable probability that ZroBlack would have entered a business relationship with prospective businesses to sell its services.

243.    Saenz knew that his withholding of the website and email server would interfere with ZroBlack's prospective clients or knew that his actions were certain or substantially certain to cause interference.

244.    Saenz has stolen a ZroBlack laptop and maintains the only access to the ZroBlack website and email server. Saenz' actions proximately caused damage to ZroBlack. As shown above, his conduct was independently tortious or unlawful.

245.    Saenz's acts proximately caused ZroBlack injury. Saenz destroyed emails and documents pertaining to ZroBlack's business and that ZroBlack needed to fulfill obligations under an existing contract and to promote its products and services to other clients.

246.    Finally, ZroBlack has suffered damages or loss, including potential loss of profits.

**Count 9: Conversion**

247.    Plaintiffs hereby adopt and re-allege the allegations previously set forth in the Complaint as if fully set forth herein.

248.    The elements for conversion are (1) the plaintiff owned, possessed, or had the right to immediate possession of property, (2) the property was personal property, (3) the defendant wrongfully exercised dominion or control over the property, and (4) the plaintiff suffered injury.

249.    Plaintiff ZroBlack was the owner of the laptop at the time Saenz refused to return it. The laptop was the personal property of ZroBlack. Saenz has exercised dominion and control over the laptop to the exclusion of the rightful owner, ZroBlack. Saenz has and continues to wrongfully exercise dominion or control over the laptop. Jonathan Villareal has made several attempts and demanded that Saenz return the laptop to no avail.

250.    ZroBlack has suffered injury due to Saenz' conversion of the laptop and trade secrets in at least an amount equal to the value of the laptop and trade secrets. Saenz's access and deletion of the email server and webpage caused a loss of more than $5,000 in data.

**Count 10: Violation of Texas Theft Liability Act.**

251.    Plaintiffs hereby adopt and re-allege the allegations previously set forth in this Compliant as if fully set forth herein.

252.    ZroBlack has a possessory right to the ZroBlack laptop.

253.    Although Saenz knew the laptop contained information that was sensitive, which could be utilized by data gathering companies and agencies of the United States government, Saenz decided to withhold the device with such information stored on it.

254.    It is undisputed that ZroBlack is the owner of the laptop.

255.    Defendant Saenz unlawfully appropriated the property by taking it and withholding it after demands were made to return it. Saenz appropriated the laptop without ZroBlack's effective consent and with the intent to derive ZroBlack of the property. ZroBlack sustained damages as a result of the theft. ZroBlack has suffered damages due to Saenz' conversion of the laptop and trade secrets in at least an amount equal to the value of the laptop and trade secrets. Saenz's access and deletion of the email server and webpage caused a loss of more than $5,000 in data.

**Count 11: Fraud**

256.    Plaintiffs hereby adopt and re-allege the allegations previously set forth in this Compliant as if fully set forth herein.

257.    Prior to the formation of ZroBlack, Saenz represented to Jonathan that he had the business acumen and government contacts to market the technology to the government.

258.    It is undisputed that Jonathan Villarreal has an inability to discuss matters in any high stress environment.

259.    John Saenz, knowing this, told Jonathan that he could develop business for the company, especially with his military contacts.

260.    This was a critical next step for the proprietary software and trade secrets developed by Jonathan Villarreal.

261.    Saenz, seeing the opportunity, falsely represented that he could use his "contacts" in the military and technology business sectors to bolster sales and proposed forming ZroBlack as a vehicle to market the technology.

262.    In reliance on this representation, Jonathan trusted Saenz and formed ZroBlack, gave Saenz access to ZroBlack's software and allowed him to control the marketing and business operations of ZroBlack. Now, that Saenz has received his paycheck and is allegedly released from

any liability, he still maintains control over the software and operations of ZroBlack which has caused ZroBlack to lose contracts.

## VI. REQUEST FOR DECLARATORY RELIEF TO SET ASIDE THE ZROBLACK OPERATING AGREEMENT AND RELEASE

263.     Plaintiff hereby adopts and re-alleges the allegations previously set forth in this Complaint as if fully set forth herein.

264.     Plaintiff seeks a declaration, pursuant to 28 U.S.CA. § 2201 that:

265.     The ZroBlack, LLC Operating Agreement is void and/or unenforceable and should be set aside as it was induced by fraud; and

266.     The Release is void and/or unenforceable and should be set aside as it was induced by fraud and a breach of fiduciary duty by both Saenz and the law firm and attorneys preparing the document.

## A.     The ZroBlack, LLC Operating Agreement is void and/or unenforceable as it was induced by John Saenz's fraudulent misrepresentations

267.     A company operating agreement is a contract.

268.     Saenz represented to Jonathan that he had the skill, training, experience, and expertise to act as CEO of ZroBlack, and obtain valuable military and commercial contracts for the company.

269.     In fact, Saenz had none of the skill, training, experience, and expertise to act as the CEO of a technology company, and no government or military contacts with any authority or input into contract procurement.

270.     Saenz representations were false, and at the time he made them, Saenz knew the representations were false.

271.     Such representations were critical to allow Jonathan and Saenz to enter into the ZroBlack operating agreement, and for Jonathan Villarreal to consent to give Saenz any part of the company.

272.     Jonathan reasonably and materially relied on everything Saenz told him.

273.     Saenz's representations were material to Jonathan's decision to part with any portion of the company.  Indeed, Saenz represented that he could do something that Jonathan, as a near recluse, could not – reach out to his high level contacts and sell the technology in very short order to the military.

274.     But Saenz's representations were false.  He had not meaningful contacts.  He did not set up any meeting with military intelligence or military procurement.

275.     He simply lied.

276.     Even though Jonathan already had a partner, Saenz told Jonathan that he (Saenz) could do a better job than Jonathan's (now former) partner, and he had the experience and training and contacts to grow ZroBlack.

277.     In trusting Saenz, both as a family member and someone who was supposed to have deep ties to military procurement, Jonathan gave p much of him company to Saenz.

278.     The result was the execution of the ZroBlack Operating Agreement between Jonathan and Saenz.

279.     But not only did Saenz not perform, Saenz literally pocketed money paid to the company for a services contract, promising to perform required work, but used that money to purchase expensive cars and accoutrements for himself.

280.     Saenz actions caused both Jonathan and ZroBlack in incur financial harm.

281.    Jonathan had to keep pumping money into the company to try and offset the damage caused by Saenz.

282.    At the Operating Agreement was induced and procured by fraud, it should be set aside, and Saenz's interest in ZroBlack will also be voided.

**B.      The Release Is Illegal Because Michael Villareal Had a Clear Conflict of Interest and His Breach of Fiduciary Duty was as an Agent of Saenz**

283.    At all times material to this claim, regarding setting aside the Release, Mike Villarreal was an agent of Saenz.

284.    His actions, as an authorized agent of Saenz was to negotiate the Release, advise Jonathan of what Saenz would do under the Release, and advised Jonathan to proceed with executing a grossly subpar and ambiguous document.

285.    The statements and actions of Mike, as Saenz's authorized agent, acting within the scope of his representation, is binding on Saenz.

286.    The fraudulent statements Mike made as to how the $740,000 would be treated, what Saenz would do, and how the parties to the Release would proceed after the execution were false.

287.    Such statements by Mike were reasonably relied on by Jonathan to his detriment.

288.    Mike was also a fiduciary to Jonathan.

289.    He owed Jonathan the highest duty under the law.

290.    Mike Villarreal had a clear conflict of interest, simultaneously representing Jonathan, Saenz, and ZroBlack.

291.    Such conflict, with him know knowing his master, resulted in a release that was drafted to favor one of his clients – Saenz – over Jonathan and ZroBlack.

292.    Rule 1.06 of the Texas Rules of Professional Disciplinary Conduct states "A lawyer shall not represent a person if the representation … involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm." TEX. PROF. R. DISC. CON. § 1.06(b)(1).

293.    A lawyer shall also not represent a person when it "reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests." TEX. PROF. R. DISC. CON. § 1.06(b)(2). An exception exists, however, when an attorney obtains a conflict of interest waiver, so long as "the lawyer reasonably believes the representation of each client will not be materially affected." TEX. PROF. R. DISC. CON. § 1.06(c)(2).

294.    Settlement Agreements have been set aside where a violation of the Professional Rules of Disciplinary Conduct (or their predecessor rules) have occurred. *See Quintero v. Jim Walter Homes, Inc.*, 709 S.W.2d 225 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.).

295.    Here, Jonathan, ZroBlack's and Saenz's interests were adverse under Rule 106 of the Texas Rules of Professional Disciplinary Conduct, and no attorney could reasonably believe under these facts that his representation of both clients would not be materially affected.

296.    At the heart of Jonathan's claim was Saenz's taking $740,000 from the ZroBlack contract and not doing any further work on the customer's project, other than being a from "time to time" as an "observer" or to offer "guidance." Nor did he do anything to develop new customers.

297.    Jonathan's pleas for the return of the $740,000 so that ZroBlack could perform under its contract continued even after execution of the Release. Saenz, for his part, wanted Jonathan to characterize the $740,000 as a gift for tax purposes, something clearly illegal under

the Internal Revenue Code. Their interests were so adverse that the dispute continued after execution of the Release.

298.    Additionally, the Gunn, Lee law firm continued to profit from the deal because the firm would act as the escrow agent for funds paid by ZroBlack's customer under the PSA. Mike Villareal put the Gunn, Lee firm directly in the center of the deal, the conflict of interest notwithstanding.

299.    The conflict of interest also resulted in an unequal release. Mike Villareal failed to include express provisions in the Release for the return of ZroBlack's personal property, maintenance of the confidentiality of proprietary information, while Saenz would continue to receive a 2% earn-out for the life of the PSA.

300.    Because the Release was procured through Mike's fraud and a breach of his fiduciary duty, and failure to adhere to the Rules of Professional Disciplinary Conduct, the Release, procured by such bad acts, should and must be set aside.

301.    At all times material to this claim, Mike was acting in the scope of course of his duties as an attorney with Gunn.  As such, Gunn is fully liable for any malfeasance on his part, specifically for the breaches of his fiduciary duty, and the fraudulent misrepresentations he made to Jonathan as to the return of the $740,000; Saenz's continued services to ZroBlack, and the return of all intellectual property and website of the company to ZroBlack.

**C.    The Release should be set aside due to mutual mistake.**

302.    Alternatively, the Release should be set aside due to a mutual mistake. A contract may be set aside based on mutual mistake. To set a contract aside based on a mutual mistake, three criteria must be met.

303.     First, both parties must have the same misunderstanding. Here, the mutual mistake was disposition of the $740,000, with Saenz believing he could keep it, and Jonathan believing it would be returned to ZroBlack.

304.     Second, the mistake must involve a material part of the contract. Disposition was a material part of the Release.

305.     Finally, risk of the mistake must not be allocated to the defendant. A general release does not allocate the risk of mistake. Because of the existence of a mutual mistake, the Release should be set aside.

## VII. DAMAGES & ATTORNEYS' FEES

306.     Plaintiffs seek to recover their actual and consequential damages in this suit, in an amount within the jurisdictional limits of this Court. Plaintiffs seek exemplary damages against Defendants as Defendants' actions were committed with malice as defined by Chapter 41 of the Texas Civil Practice & Remedies Code.

307.     Plaintiffs also seek to recover their attorney's fees and costs under the following statutory provisions:

a.      18 U.S.C. § 1836(b)(3)(D) [Defend Trade Secrets Act];

b.      15 U.S.C. § 1117(a) [Lanham Act and Anti-cybersquatting Consumer Protection Act];

c.      Tex. Civ. Prac. & Rem. Code Ann. § 38.001;

d.      TEX. CIV. PRAC. & REM CODE ANN. § 134.005(b) [Texas Theft Liability Act];

e.      TEX. CIV. PRAC. & REM. CODE ANN. § 134A.005 [Texas Uniform Trade Secrets Act]; and,

f.      TEX. BUS. ORG. CODE ANN. § 21.561 [Derivative Proceeding].

308.     Plaintiffs are entitled to an award of attorney's fees under 18 U.S.C. § 1836(b)(3)(D) as Plaintiffs have shown that the misappropriation was made in bad faith and the trade secret was willfully and maliciously misappropriated. Additionally, exceptional circumstances exist justifying an award under TEX. CIV. PRAC. & REM. CODE ANN. § 134A.005.

309.     As a result of Defendants' conduct, Plaintiffs were forced to retain the undersigned counsel to pursue these causes of action. Plaintiffs seek to recover their reasonable attorneys' fees and costs, along with pre-judgment and post-judgment interest, under the statutes cited above or as otherwise allowed by law.

## VIII. CONSTRUCTIVE TRUST

310.     Additionally, because Defendant Saenz has leached assets of ZroBlack, and used these assets to build a profit for himself in violation of federal and state statutes, Plaintiffs ask that the Court impose a constructive trust on the assets of Defendant to protect any interest in those assets which may belong to Plaintiffs.

311.     Saenz took cash of ZroBlack, while he served as a fiduciary of the company.

312.     He did so under the guise of providing continuing services to ZroBlack.

313.     Saenz occupied a position of trust and confidence as the chief executive officer of ZroBlack. As CEO, he had authority to negotiate sales on behalf of ZroBlack.

314.     Saenz breached his fiduciary duty by engaging in self-dealing and misappropriating ZroBlack's property, placing his interest ahead of ZroBlack's.

315.     Saenz breached his fiduciary duty with the company to obtain the cash of $740,000.

316.     He promised to work to earn that money for ZroBlack, performing tasks that Jonathan, for a variety of reasons, could not perform.

317.     Jonathan reasonably and detrimentally relied on these representations, as it was critical for ZroBlack to survive and thrive.

318.    In fact, it was solely on this basis that Jonathan allowed him to remove that much money from ZroBlack's accounts.

319.    ZroBlack was damaged as a result of such reliance.

320.    The constructive trust requested by Plaintiff, ZroBlack extends to whatever cash, property, or assets acquired by Saenz using ZroBlack's funds.

321.    Such constructive trust is requested, as Saenz most likely wasted those monies, and without a constructive trust, ZroBlack may not be able to recoup what is due.

322.    Because of Saenz' breach of his duty of trust and confidence, Defendant was unjustly enriched because he acquired compensation for which he was not entitled to retain. Moreover, the *res* is easily traceable through records of his use of the money he stole from ZroBlack. Therefore, ZroBlack asks that a constructive trust be placed on the money received from ZroBlack to which Saenz was not entitled to keep for himself.

Respectfully submitted,

THE VETHAN LAW FIRM, PC

By: /s/ *Joseph L. Lanza*

Charles M. R. Vethan
Attorney-in-Charge
Texas Bar No.  00791852
Steven A. Costello
Texas Bar No. 24062677
VETHAN LAW FIRM - HOUSTON
Two Memorial City Plaza
820 Gessner, Suite 1510
Houston, Texas 77024
Tel: (713) 526-2222
Fax: (713) 526-2230
Email: edocs@vwtexlaw.com

Joseph L. Lanza
Texas bar No. 00784447
VETHAN LAW FIRM – SAN ANTONIO

11459 Huebner, Suite 101
San Antonio, Texas 78230
Tel: (210) 824-2220
Fax: (713) 526-2230
Email: edocs@vwtexlaw.com
***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically filed with the Court on the 17th day of November 2020, and electronically served on the date reflected in the ECF system upon all parties registered to receive notice pursuant to the Court's CM/ECF system.

David A. Vanderhinder
State bar No. 24070787
DVanderhinder@dykema.com
Ryan J. Sullivan
State Bar No. 24102548
RSullivan@dykema.com
DYKEMA GOSSETT PLLC
112 East Pecan St., Suite 1800
San Antonio, Texas 78205

**Attorney for Defendant John Saenz**

George R. Spencer, Jr.
State Bar. No. 18921001
gspencer@langleybanack.com
Natalie F. Wilson
State Bar. No. 24067769
nwilson@langleybanack.com

**Attorneys for Defendants Gunn, Lee & Cave, P.C.
And Miguel Villarreal, Jr.**

/s/ *Joseph L. Lanza*

Joseph L. Lanza