## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **JONATHAN VILLAREAL,** | § | |
| **individually and derivatively on behalf** | § | |
| **of ZROBLACK, LLC.** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 5:20-cv-00571-OLG** |
| | § | |
| **JOHN SAENZ, MIGUEL** | § | |
| **VILLARREAL, JR., and GUNN, LEE,** | § | |
| **& CAVE, P.C.** | § | |
| | § | |
| **Defendants** | § | |

## PLAINTIFF'S FIRST AMENDED APPLICATION FOR SEIZURE, TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTIVE RELIEF

Plaintiff, JONATHAN VILLAREAL, individually and derivatively on behalf of ZROBLACK, LLC (collectively the "Plaintiffs"), by and through their undersigned counsel, file this their verified application for seizure of a laptop computer owned by Plaintiff ZroBlack, LLC (hereafter "ZroBlack") which contains ZroBlack's trade secrets and, therefore, the software necessary to remotely access any personal, confidential, or proprietary data and information that is stored on a cellular device anywhere in the world, and for a temporary restraining order, preliminary injunction, and permanent injunctive relief. In addition to the seizure of the ZroBlack laptop in his possession, Plaintiffs seek an order from this Honorable Court requiring Defendant John Saenz to return control of and access to ZroBlack's domain, email server, website, and the business and government accounts ZroBlack needs to be able to operate.

# I.   TABLE OF CONTENTS

I.  TABLE OF CONTENTS .................................................................................................2

II.  TABLE OF AUTHORITIES ........................................................................................3

III.  FACTUAL BACKGROUND .........................................................................................7

    A.  Introduction.............................................................................................................7

    B.  Formation of ZroBlack ..........................................................................................9

    C.  ZroBlack Signs a Contract ..................................................................................14

    D.  Saenz Attempts to Shop Secret Code to Others.................................................17

    E.  Saenz Misappropriates $740,000 while Missing Key Meetings
       with Customer and Providing No Services to ZroBlack............................................17

    F.  Gunn, Lee, & Cave, P.C. and Michael Villareal's Further
       Involvement ............................................................................................................18

    G.  Final Attempts to get Saenz to Return Money and Property
       owed to ZroBlack....................................................................................................25

    H.  Saenz Thwarts ZroBlack and ████████ Attempt to Contract
       with the ████████████████████████████ ..........25

    I.  Saenz Refuses ████████ Demand for Return of the Code and Blocks
       ZroBlack from Government Work by Withholding Account Credentials..............27

IV.  APPLICATION FOR CIVIL SEIZURE ........................................................................28

    A.  Plaintiffs are Entitled to a Civil Seizure of the Laptop Computer..........................28

    B.  An Order Pursuant to Fed. R. Civ. P. 65 Is Inadequate ...........................................30

    C.  Plaintiff Has and Will Continue to Suffer Immediate Irreparable Injury ................31

    D.  Balance of Hardships Favors Seizure .....................................................................32

    E.  Plaintiff Owns Trade Secrets and Saenz Misappropriated Them ............................33

          a.  ZroBlack Possessed Trade Secrets...........................................................33

          b.  Defendant Saenz Misappropriated the Trade Secrets ...............................35

    F.  Saenz Has Control of the Laptop .............................................................................36

    G.  The Matter to Be Seized and its Location................................................................36

    H.  Saenz May Destroy, Remove, Hide, or Make the Matter Inaccessible
       to the Court .............................................................................................................36

    I.  Applicant Has Not Publicized the Requested Seizure .............................................37

V.  APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND

   PERMANENT INJUNCTION .......................................................................................37

    A.  Grounds for Injunctive Relief .................................................................................38

    B.  Likelihood of Success on the Merits – Standard .....................................................39

    C.  Likelihood of Success on the Merits—Trade Secret Misappropriation...................40

    D.  Likelihood of Success on the Merits—Computer Fraud and Abuse Act.................44

          a.  Saenz Accessed a Computer in Violation of the CFAA ..............................45

          b.  Loss Aggregating More than $5,000 ........................................................46

    E.  Likelihood of Success on the Merits—Anti-Cybersquatting Consumer

       Protection Act .........................................................................................................46

          a.  The ZroBlack Name is Distinctive, Entitling It to Protection ....................46

          b.  The Doman Name is Identical or Confusingly Similar to ZroBlack's

Mark.................................................................................................48
   c.  Saenz is Using the Domain Name in Bad a Faith Attempt to Profit
      Therefrom ...............................................................................48
F.  Likelihood of Success on the Merits – Tortious Interference with Prospective
    Contractual Relations....................................................................................50
G.  Likelihood of Success on the Merits – Conversion ......................................51
H.  Likelihood of Success on the Merits – Civil Theft (TTLA) .........................53
I.  Irreparable Harm ..........................................................................................53
J.  No Adequate Remedy at Law ......................................................................55
K.  Balance of Hardships Favors an Injunction .................................................55
L.  Public Interest ...............................................................................................56
M. Bond..............................................................................................................57
N.  Relief Requested ..........................................................................................57

VI.   PRAYER .................................................................................................................58
     APPENDIX OF EXHIBITS.........................................................................ATTACHED

## II.   TABLE OF AUTHORITIES

### U.S. Supreme Court Cases

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)...........................................46, 47

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) .................................................38

### U.S. Circuit Courts of Appeals Cases

*Aspen Technology, Inc. v. M3 Technology, Inc.*,
  569 Fed. Appx. 259, 273 (5th Cir. 2014)....................................................................56

*Daniel Health Scis., LLC v. Vascular Scis., LLC*,
  710 F.3d 579, 585 (5th Cir. 2013) ..............................................................................53

*E. & H. Gallo Winery v. Spider Webs Ltd.*,
  286 F.3d 270, 275-276 (5th Cir. 2002)........................................................................48

*FMC Corp. v. Varco Intern., Inc.*,
  677 F.2d 500, 503-504 (5th Cir. 1982)........................................................................43

*Heil Trailer Intern. Co. v. Kula*,
  542 Fed. Appx. 329, 336 (5th Cir. 2013).............................................................53, 54

*Janvey v. Alguire*,
  647 F.3d 585, 595-96 (5th Cir. 2011) ..........................................................................39

*Panavision Intern., L.P. v. Toeppen,*
    141 F.3d 1316, 1325 (9th CIR. 1998)..........................................................48

*Shields v. Zuccarini,*
    2001 WL 671607, *3 (3d Cir.2000) ..........................................................47

*Southern Co. v. Dauben Inc.,*
    324 Fed. Appx. 309, 314 (5th Cir. 2009)..................................................46

*Virtual Works, Inc. v. Volkswagen of America, Inc.,*
    238 F.3d 264, 268 (4th Cir.2001) ............................................................50

## U.S. District Court Cases

*AHS Staffing, LLC v. Quest Staffing Group, Inc.,*
    335 F. Supp. 3d 856, 874 (E.D. Tex. 2018)..............................................57

*Am. Auto. Ass'n (Inc.) v. AAA Ins. Agency, Inc.,*
    618 F. Supp. 787, 792 (W.D. Tex. 1985) ..................................................47

*Axis Steel Detailing, Inc. v. Prilex Detailing LLC,*
    No. 2:17–cv–00428–JNP, 2017 WL 8947964, at *2 (D. Utah, June 29, 2017) .................. 31-32

*AVX Corporation v. Kim,*
    No. 6:17-00624-MGL, 2017 WL 11316598, at *2 (D. S.C., March 13, 2017).........................32

*Blue Star Land Services v. Coleman,*
    No. CIV-17-931-C, 2017 WL 11309528, at *1 (W.D. Okla., August 31, 2017) ......................31

*Courtroom Sci., Inc. v. Andrews,*
    No. 3:09-CV-251-o, 2009 WL 1313274, AT *3 (N.D.Tex. May 11, 2009) .............................39

*eBay Inc. v. Digital Point Solutions, Inc.,*
    608 F. Supp. 2d 1156, 1163-64 (N.D. Cal. 2009).......................................................45

*Emerald City Mgmt., LLC v. Khan,*
    No. 4:14-cv-358, 2016 WL 98751 *13 (E.D. Tex. Jan. 8, 2016) .........................................48, 49

*Frisco Medical Center, L.L.P. d/b/a Baylor Medical Center at Frisco v. Bledsoe,* 147 F.
    Supp. 3d 646, 659 (E.D. Tex. 2015) .................................................................... 44-45

*Lamparello v. Falwell,*

420 F.3d 309, 319 (4th Cir. 2005) ..................................................................49, 50

*Sirius Computer Solutions, Inc. v. Sparks*,
138 F. Supp. 3d 821, 836 (W.D. Tex. 2015) ...............................................38

*Sporty's Farm L.L.C. v. Sportman's Market, Inc.*, 202 F.3d 489, 497 n. 10 (2d Cir.2000) ........47

*Texas Intern. Property Associates v. Hoerbiger Holding AG*,
642 F. Supp. 2d 582, 589-590 (N.D. Tex. 2009) .....................................................50

*TMX Funding, Inc. v. Impero Technologies, Inc.*,
No. C10-00202 JF (PVT), 2010 WL 2509979 at * 4 (N.D. Cal. Jun. 17, 2010)............34, 35, 43

## State Appellate Court Cases

*American Derringer Corp. v. Bond*,
924 S.W.2d 773, 777 (Tex. App.—Waco 1996, no pet.) ..........................................41

*Crutcher-Rolfs-Cummings, Inc. v. Ballard*,
540 S.W.2d 380, 387 (Tex. Civ. App.—Corpus Christi 1976, writ ref'd n.r.e.) ......................42

*Miller Paper Co. v. Roberts Paper Co.*,
901 S.W.2d 593, 600 (Tex.App.—Waco 1995, no writ)..........................................41

*Rhodia, Inc. v. Harris County*,
470 S.W.2d 415, 419 (Tex. Civ. App.—Houston [1st Dist.], no writ)......................................39

*RP&R, Inc. v. Territo*,
32 S.W.3d 396, 400-01 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ...............................39

*Rugen v. Interactive Business Systems, Inc.*,
864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no pet.)..........................................44

*T-N-T- Motorsports, Inc. v. Hennessey Motorsports, Inc.*,
965 S.W.2d 18, 24 (Tex. App.—Houston[1st Dist.] 1998, no pet.) ..................................... 43-44

*Weed Eater, Inc. v. Dowling*,
562 S.W.2d 898, 902 (Tex. Civ. App.—Houston 1978, writ ref'd n.r.e.).................................44

*Zelios v. City of Dallas*,
568 S.W.2d 173, 175 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.) ...............................39, 56

## Federal Statutes and Rules

FED. R. CIV. P. 65...............................................................................................30, 37
15 U.S.C. 1125(a)......................................................................................................46
15 U.S.C. § 1125(c)(1).............................................................................................47
15 U.S.C. § 1125(d)..................................................................................................39
15 U.S.C. § 1125(d)(1)(A).......................................................................................46
15 U.S.C. § 1125(d)(1)(B)(i)...................................................................................50
15 U.S.C. § 1125(d)(1)(C).......................................................................................46
18 U.S.C. § 1030.......................................................................................................44
18 U.S.C. § 1030(a)(2)(c)....................................................................................44, 45
18 U.S.C. § 1030(a)(4).........................................................................................44, 45
18 U.S.C. § 1030(a)(5)(B)....................................................................................45, 46
18 U.S.C. § 1030(a)(5)(C)....................................................................................45, 46
18 U.S.C. § 1030(c)(4)(A)(1)(I)..............................................................................44
18 U.S.C. § 1030(c)(4)(A)(1)(I)-(V)......................................................................44
18 U.S.C. § 1030(g)..................................................................................................44
18 U.S.C. § 1836(b)..................................................................................................31
18 U.S.C. § 1836(b)(2).............................................................................................29
18 U.S.C. § 1836(b)(2)(A)(i)...................................................................................29
18 U.S.C. § 1836(b)(2)(A)(ii)............................................................................29-30
18 U.S.C. § 1836(b)(2)(A)(ii)(III)...........................................................................32
18 U.S.C. § 1836(b)(2)(A)(ii)(VII).........................................................................36
18 U.S.C. § 1836(b)(2)(A)(ii)(VIII)..................................................................36, 37
18 U.S.C. § 1836(b)(2)(A)(IV).................................................................................33
18 U.S.C. § 1836(b)(3).............................................................................................38
18 U.S.C. § 1836(b)(3)(A)(i)...................................................................................38
18 U.S.C. § 1836(b)(3)(A)(ii).............................................................................38, 43
18 U.S.C §1839(3)...............................................................................................33, 40
18 U.S.C §1839(3)(A), (3)(B)............................................................................34, 40
18 U.S.C §1839(5).....................................................................................................42
18 U.S.C §1839(6).....................................................................................................42

## State Statutes and Rules

TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(2)........................................42, 53
TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(3)............................................42
TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6)............................................40
TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6)(A), (6)(B)..........................40
TEX. CIV. PRAC. & REM. CODE ANN. § 134A.003.............................................38, 53
TEX. CIV. PRAC. & REM CODE ANN. § 134A.003(a)........................................38, 53
Tex. Civ. Prac. & Rem Code Ann. § 134A.003(c)...................................................38
Tex. Tex. Civ. Prac. & Rem Code Ann. § 134A.005(a)...........................................53

Tex. Pen. Code Ann. §§ 31.03(a), B(1), 34.01(a).........................................................................53

**Secondary Sources**

Charles Alan Wright, Arthur R. Miller, Mary Kay Kane,
   11A Federal Practice & Procedure § 2948.3 (2d ed. 1995).........................................................39

### III.    FACTUAL BACKGROUND

#### A.    Introduction

1.      This lawsuit involves patented computer software and hardware technology that can wirelessly copy and securely delete data from password protected cell phones, tablets, and other portable electronic devices. The software was designed solely by Plaintiff Jonathan Villareal and is owned by Plaintiff ZroBlack, LLC (pronounced "ZeroBlack"). Because of its nature, this software has implications for national security.

2.      Defendant John Saenz is the former CEO of ZroBlack and has misappropriated that technology by refusing to return a ZroBlack laptop, purchased with company funds, on which the code, hardware schematics, hardware drawings, and other patented, trademarked, sensitive, and confidential ZroBlack proprietary information is located. After parting ways with ZroBlack, Saenz also refused to release ZroBlack's GoDaddy account, which hosts ZroBlack's domain name, webpage, email server, and allows access to ZroBlack's LinkedIn business account, leaving Jonathan and ZroBlack without access to thousands of emails documents, client contact information, future company plans, business banking statements, business expense receipts, NDA's with 3rd parties, signed contracts with 3rd party electronics resellers such as Walmart, Best Buy, Target, Amazon and much more critical data that ZroBlack has needed for over 16 months to operate, file taxes, apply for the paycheck protection program (to no avail). Saenz has also intentionally destroyed and is currently compromising data owned by ZroBlack, including ZroBlack's webpage which has been unsecured for 16 months, further damaging ZroBlack's

reputation as a security engineering firm. Saenz has deleted jv@zroblack.com, and info@zroblack.com, actions that were confirmed by emails from GoDaddy. See Appendix, Exhibit 41. Saenz has only kept je@zroblack.com active, which is the email address Saenz used when he was employed by ZroBlack. Saenz has also renewed the ZroBlack.com domain name for another year.

3.      Further proof of Saenz's actions can be seen by going to http://email.zroblack.com and clicking the forgot password link. If the user types in the email address je@zroblack.com as the email address for which he has forgotten the password, he is given 3 different options to reset the password; one of the options is to send a password reset link to Saenz's personal Gmail account. If the user were to try and click forgot password, however, for jv@zroblack.com and info@zroblack.com the GoDaddy email servers say, "The email address does not exist in our system."

4.      Additionally, because Saenz has not released the GoDaddy account ZroBlack, cannot update its contact and ownership information for its Dun & Bradstreet number (known as a (DUNS number) which is critical for establishing business credit, bidding on government contracts, and filing business taxes. ZroBlack is not able to access, verify ownership of or update information for the following Government Issued IDs that can only be accessed on official US Government Websites: CAGE number (Commercial and Government Entity" code), NCAGE (NATO Commercial and Government Entity), USPTO (United States Patent and Trademark Office), Federal Service Desk (FSD.gov), United States Grants (Grants.gov), U.S. Small Business Administration (sba.gov), Texas Comptroller of Public Accounts, and access to Restricted FOUO (For Official Use Only) government contracts listed on SAM.gov (System for Award Management), The Official United States Government portal for verified and vetted business

entities allowed to bid on US Government contracts. Saenz setup these accounts for ZroBlack using his personal cellphone number as a contact number, and Jonathan's physical home address as the place of business for ZroBlack since the government would not take PO Boxes for business addresses. ZroBlack also cannot obtain an Apple Business Developer's account. For security purposes Apple needs to verify the phone number associated with ZroBlack's DUNS phone number. This phone number is Saenz's personal cell phone number. The Apple Business account for ZroBlack was established the day that Saenz purchased the company MacBook Pro at the Apple store with company funds. Apple has made several attempts have Saenz change his phone number, and emails from Apple state that Saenz has refused. To further add insult to injury Saenz even refused to return the keys to ZroBlack's mailbox that Jonathan paid a year for and signed a contract stating that fees will be incurred if mailbox keys are not returned.

5.      These actions have already caused ZroBlack significant damages, including loss of several multi-million-dollar contracts with the ███████████████████████████ ████████████████ The greater threat, however, which the law and the interests of justice and public safety require this Court to address, is the immediate and irreparable injury that is bound to occur if Saenz is allowed to continue obstructing ZroBlack's data security work, or the real nightmare scenario, what would occur if Saenz, a data security neophyte, allows the ZroBlack software in his possession to fall into the wrong hands which Saenz has proven he would do, when he shopped around ZroBlack software even after signing a contract saying he would not do.

B.      **Formation of ZroBlack, LLC**

6.      Jonathan Villarreal is a talented programmer who suffers from agoraphobia, a condition which, due to acute anxiety, prohibits him from having too many people around him. Even so, Jonathan obtained a master's degree in computer science, specializing in security

engineering, and is a doctoral candidate working on his thesis, "The Weaponization of Data Clearing".

7.      As the practical application of his academic studies, Jonathan developed proprietary technology which allows the user of that tech to access cell phones and tablets, including iPhones and iPads. This technology can be used to access a cell phone wirelessly and wipe the data. This is useful in that, if a user's phone is stolen, he can wipe its data remotely even if the security password has been changed. Jonathan's software and hardware inventions have been met with wide praise in publications that report on cutting edge technology. ███████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████  Unfortunately, Jonathan's outstanding reputation for this type of work can never be translated into a profitable business as long as Saenz has ZroBlack in a vice grip, turning the vice everyday he holds ZroBlack data, and funds hostage.

8.      Not only does Jonathan's software delete and erase data from secure cell phones, but it can also copy the cell phone data wirelessly and can even recover data that has supposedly been deleted. This includes data from Apple, Inc. iPhones and iPads. As the Court may be aware, Apple, Inc. resists government efforts to "crack" cell phone security. As recently as January 2020, CNBC reported that U.S. Attorney General William Barr was alleging Apple had not helped the FBI break into password-protected phones used by Mohammed Saeed Alshamrani, the suspect accused of killing three people in December 2019 at a Pensacola, Florida navy base.[1] Apple also

---

[1] https://www.cnbc.com/2020/01/13/barr-says-apple-not-providing-substantive-assistance-on-locked-iphone.html.

caught flak for opposing a federal court order to access encrypted cellphone data on iPhones belonging to the terrorist couple who killed 14 people in San Bernardino in  2015.[2] Jonathan Villarreal's software and hardware solutions solve that problem and is thus of significant interest to the U.S. government.

9.   ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

10.   In October of 2018 Jonathan was negotiating with █████████████ a subsidiary of ██████████ for the licensing of the technology (hereinafter, "████████"). ██████ is an international data security company headquartered in ██████. ██████ specializes in data erasure for governments and businesses. According to cybersecurityintelligence.com, ██████ is a leading global provider of mobile device diagnostics and secure data erasure solutions and is the industry standard in data erasure and mobile device diagnostics. The site also states that ██████

---

[2] https://www.latimes.com/local/lanow/la-me-ln-fbi-apple-san-bernardino-phone-20160216-story.html.

data erasure solutions have been tested, approved, certified, and recommended by more than 15 governments.

11.     Although Jonathan had created these products all on his own, he knew he would need help with marketing his technology for sale, whether to ███████ or some other company. Unfortunately, the associate he was attempting to work with initially was not able to perform and they parted ways before the technology could be sold.

12.     After speaking with Jonathan about his tech inventions in the last week of December 2018 John Saenz ("Saenz"), who is married to Jonathan's cousin, decided he wanted a piece of the action, stating to Jonathan in a text message, "How can I ride this train." Saenz claimed that he could fill voids Jonathan's previous associate could not fill. Saenz falsely represented to Jonathan that he had the business experience and government contacts to market the technology to the government. He falsely represented that he could use his "contacts" in the military and technology business sectors to bolster sales and proposed forming a company as a vehicle to market the technology. That company was to be ZroBlack. Jonathan believed him and, as a family member, trusted him. Relying on those representations, and others, Jonathan agreed to form a limited liability company with Saenz to market the software to ███████, with Saenz as CEO and Jonathan taking on the technology role. *See* Appendix, Exhibit 1 (Declaration of Jonathan Villareal).

13.     Jonathan paid the registered agent for the formation of Zroblack LLC and for a year's worth of service for a post office box for ZroBlack, LLC . Jonathan agreed to pay for these larger upfront company expenses because he was the only one able to. Since Jonathan purchased the registration and the first year of service at the post office box, Saenz agreed to purchase ZroBlack's domain name, www.zroblack.com, from GoDaddy. After Jonathan walked him

through the process and explained to Saenz what a "Zero-day" vulnerability was, and how it related to "Black" ops, Saenz reserved the www.zroblack.com domain name on behalf of ZroBlack. Saenz had given Jonathan access to the GoDaddy account where the domain was being held, but that access was later revoked, and the password was changed once Saenz and Jonathan signed the release. Login records, password change, and email deletion records for all Zroblack.com activity live on Godaddy.com. The login and password information for accessing ZroBlack's GoDaddy account is a trade secret of ZroBlack. *See* Appendix, Exhibit 1.

14. On January 14, 2019, Jonathan and Saenz formed ZroBlack, LLC, organized under the laws of the State of Delaware. *See* Appendix, Exhibit 2. They were its founding members and each owned fifty percent disregarding their original agreement. ZroBlack was founded as a security engineering firm established to provide applications and services regarding cell phone data capture and erasure. ZroBlack planned to offer two different types of software, one for commercial use and one for governmental use. Jonathan Villareal was charged with performing all the in-house coding, hardware engineering, and servicing of the technology. Saenz was charged with client engagement and promoting the company. *See* Appendix, Exhibit 1.

15. Jonathan and Saenz executed a Limited Liability Company Operating Agreement for ZroBlack, LLC ("Operating Agreement"). *See* Appendix, Exhibit 3. A key term of that agreement pertained to ZroBlack's ownership of property. Section 4.7 of the ZroBlack's Limited Liability Company Agreement states:

> Title to the Company's assets will be held in the Company's name or in the name of any nominee designated by the Members. The Members have power to enter into a nominee agreement with any person, and that agreement may contain provisions indemnifying the nominee, except for his or her willful misconduct.

16.     After the formation of ZroBlack, on March 31, 2019, Jonathan assigned to ZroBlack his intellectual property rights in the software code he developed. *See* Appendix, Exhibit 4. ZroBlack's trade secrets included Villareal's code for wirelessly wiping or downloading information from cell phones and tablets, recovering erased data from cell phones and tablets, as well as the drawings and schematics for the hardware that makes the aforementioned possible. The code for the software is identified in Exhibit 4, the intellectual property assignment. *See* Appendix, Exhibit 1. After Jonathan assigned his software and hardware inventions to ZroBlack as his capital contributions, ZroBlack became one of the few companies in the world that can perform the remote penetration of passcode protected mobile electronic devices.

17.     In connection with his duties as CEO, Saenz purchased a 15-inch Apple MacBook Pro on May 2, 2019 for $2,631.00. A copy of the purchase order and receipt is attached as Exhibit 5. The purchase order reflects that the laptop was ordered "John Saenz, ZroBlack, at 1150 N. Loop 1604-W, Ste 108-259, San Antonio, Texas 78248," which was ZroBlack's post office address. It was purchased with a debit card ending with the number 8032, which was a debit card issued in ZroBlack's name. *See* Appendix, Exhibit 5.

18.     After procuring a contract with ████████, ZroBlack grew to having as many as ten employees. *See* Appendix, Exhibit 1.

## C.     ZroBlack Signs a Contract

19.     On March 15, 2019, ZroBlack and ████████ executed a non-disclosure agreement ("NDA"). *See* Appendix, Exhibit 6. The purpose of the NDA was to allow ZroBlack to disclose trade secrets to ████████ during contract negotiations while maintaining the secrecy of those trade secrets. The trade secrets included the software code. *See* Appendix, Exhibit. 1.

20.     ZroBlack and ████████ entered into a Professional Services Agreement ("PSA") on April 15, 2019, wherein ZroBlack would pass down its knowledge of mobile devices, consult with

███████ on its software development and coding, hardware development, and organize and document the process of supporting ability to identify, diagnose, clear, and validate certain devices. *See* Appendix, Exhibit 7. The contract price was One Million Five Hundred Thousand Dollars ($1,500,000.00) up front and a fourteen and one-half percent (14.5%) earn out on new customer revenue and existing customer growth. The $1.5 million was transferred into a Wells Fargo business account. Saenz then transferred $740,000 of those funds to his own personal account. Jonathan, on the other hand, opened a new account at Wells Fargo listing ZroBlack, LLC as his employer and declaring the newly opened account his distribution account. Jonathan transferred $740,000 to his newly formed distribution account according to the terms of the LLC agreement and then setup a meeting with a payroll service to ensure proper distribution of funds. Saenz refused to attend the meeting with the payroll service, and the cut all communications. *See* Appendix, Exhibit 8.

21.    ZroBlack retained the services of Gunn, Lee & Cave (hereinafter, "Gunn, Lee law firm") and specifically attorney Miguel "Mike" Villareal (hereinafter, "Mike")[3] to advise them on the contract negotiations. Shortly before signing, on or about April 12, 2019, Jonathan emailed Mike discussing negotiations. In the mail, Jonathan stated:

> John and I went through it last night, he had concerns, but at the end of our talks we worked out the logic behind the revenue sharing. I hope this closes today too, hard lessons have been learned for sure. If we sign today, it's basically as though we are getting a $750,000 salary each for 2019. Do you have a recommendation for an attorney that can setup a trust for me?

---

[3] There is no familial relationship between Plaintiff Jonathan Villarreal and defendant Miguel Villarreal.

22.     *See* Appendix, Exhibit 9 (email). The email demonstrates that $1.5 million dollars was to constitute salary for Jonathan and Saenz through the end of 2019. The money was not a gift, nor was it deemed earned upon the signing of the contract.

23.     Before the PSA was signed ███████ required a legal document that identified all of ZroBlack's assets. This document entitled IP Due Diligence was filled out by Saenz and emailed to ███████ executives, ███████ legal counsel, and Mike Villarreal. The IP Due Diligence document lists ZroBlack.com among other domains, and as intellectual property ZroBlack owns. The IP document also includes the ZroBlack LinkedIn business account as an asset. See Appendix, Exhibit 39.

24.     The PSA included confidentiality provisions. Section 7.1 provided that all deliverables and inventions and all other information (including computer programs, technical drawings, algorithms, know-how, formulas, processes, ideas, inventions (whether patentable or not), schematics, and other technical, business, financial, and customer and product development plans, forecasts, strategies and information) that ZroBlack, Jonathan, and Saenz developed, learned, or obtained in connection with the services they rendered under the PSA constituted the proprietary information of ███████. *See* Appendix, Exhibit 7. ZroBlack, Jonathan, and Saenz were required to hold that information in confidence and not use or disclose it. Section 7.2 of the PSA stated that upon termination of the PSA or as otherwise requested by ███████, ZroBlack, Jonathan, and Saenz would promptly return to the customer all items and copies containing or embodying proprietary information including all deliverables and works-in-progress. *See* Appendix, Exhibit 7.

25.     When Mike and the Gunn, Lee law firm represented ZroBlack, the representation began as a normal corporate representation, where the law firm and the attorney (Mike) were

advising the members on matters regarding the company, including the contract with ███. *See* Appendix, Exhibit 12. Soon after ZroBlack executed the PSA with ███, however, Jonathan and Saenz came to cross purposes over Saenz's lack of performance, misappropriation of company funds, and efforts to shop the tech to others in violation of the ███ contract. *See* Appendix, Exhibit 1.

### D.    Saenz Attempts to Shop Secret Code to Others

26.    Although ZroBlack had signed the NDA and later the PSA (with its own confidentiality provisions) with ███, Saenz tried to shop the technology to others, including an individual named Roger Graham, who was formerly with UBS Financial and, currently, employed by Wells Fargo. Jonathan warned Saenz that he was in violation of the NDA and the confidentiality provisions of the PSA. Saenz threatened to continue to try to market the code. *See* Appendix, Exhibit 1.

### E.    Saenz Misappropriated $740,000 while Missing Key Meetings with Customer and Providing No Services to ZroBlack

27.    While Saenz talked big, he did little to help the company. After ZroBlack signed the contract with ███ Saenz took half of the upfront payment ($740,000) and failed to perform any more work for ZroBlack. *See* Appendix, Exhibit 1, Exhibit 8. According the LLC agreement Article VI Bookkeeping, Section: 6.2 – Member's Accounts, Saenz is required to return all money paid in advance by the company upon leaving the company. Saenz and Jonathan agreed to these provisions when they signed the LLC Agreement.

28.    May 2019, ███ required both Jonathan and Saenz to travel to ███. Saenz refused, but eventually showed seven-days late. Two days after arriving in ███, Saenz sent ███ an email stating that Jonathan would take care of 100% of the technical and that he (Saenz) would no longer be attending morning meetings but would check up from time to time:

> I wanted to send you a note to clarify my role on these calls. I will
> be on from time to time as an observer and to offer guidance from
> ZroBlack's point of view. Jonathan can handle all the technical side
> of the conversations.

*See* Appendix, Exhibit 10.

29.     Jonathan was required to return to ███████ during the week of June 8 to 15, 2019;

Saenz refused to accompany him. Saenz was also charged with completing tax returns and paying

the quarterly business taxes; he did not.

30.     Rather than working to promote ZroBlack, Saenz was living the high life. Upon

information and belief, Saenz used most of the $740,000 he took from ZroBlack. Saenz invested

around $305,000 into the stock market. Saenz also used around $423,850 in property renovations.

*See* Appendix, Exhibit 1. As a result of Saenz's refusal to perform his work, on or about June 26,

2019, Villareal notified Saenz by text message that he wished to dissolve ZroBlack. *See* Appendix,

Exhibit 11. In the notification, Jonathan took Saenz to task for not doing any work, stating:

> You can't sit back and expect a paycheck. You can't say you front
> loaded the contract then dip out. Besides, I did a huge part to close
> out the contract, I did the entire due diligence and put the entire
> BRIX document together. I expected you to do work after we got
> paid, this isn't a free ride man. ██████ only wants to go forward
> with me for a reason and I don't know what happened to you. I don't
> know why you stopped working after getting paid $750k.

*See* Appendix, Exhibit 11.

**F.     Gunn, Lee, & Cave, P.C. and Michael Villareal's Further Involvement**

31.     After Jonathan threatened to dissolve ZroBlack, Saenz got Mike further involved.

Though an obvious conflict of interest existed, Mike undertook to represent both Jonathan and

Saenz in negotiations to settle their dispute. One of the main concerns was the $740,000 Saenz

withdrew from the $1.5 million deposit that ██████ paid under the PSA. Those monies were paid

in advance, and ███ expected ZroBlack, Saenz, and Jonathan Villareal to perform under the contract. But Saenz refused to perform his obligations to ZroBlack and to ███. Nor would Saenz to agree to steps to ensure his performance, despite being told by Mike during a meeting in Mike's office in July 2019 that he (Saenz) had breached his fiduciary duty to the company.

32.     To salvage the relationship, on or about July 27, 2019, Mike suggested that Jonathan set tasks for Saenz (the putative CEO of ZroBlack). Saenz refused to have the tasks incorporated into any agreement, sending a text message to Jonathan stating he would not "tie a contract to daily tasks because that could be easily manipulated." *See* Appendix, Exhibit 13. Jonathan responded, "Seriously. Please dude. That's not fair. I literally have my work planned out for an entire year I'm asking you for one month. Hello? How can I help you with it?" *See* Appendix, Exhibit 13. Saenz also refused Mike's suggestion that his CEO duties be incorporated into the company operating agreement. Once he had $740,000 in his pocket, Saenz simply did not want to do any more work for ZroBlack or ███.

33.     After Defendant Saenz took the $740,000, ZroBlack was forced to cut salaries of its employees, and eventually let go ZroBlack's CTO, whom Saenz acknowledge in text that without him, it would be almost impossible to complete the ███PSA. *See* Appendix, Exhibit 40. Saenz refused to assist ZroBlack in paying bills and Jonathan was not able to make the tax payment. Jonathan was forced to incur serious debt in order to get the capital to complete obligations required under the PSA. Jonathan began selling his personal property including electronics and his wife's wedding ring to ensure that ZroBlack could maintain working capital. *See* Appendix, Exhibit 1.

34.     Because Saenz was married to Jonathan's cousin, their falling out began to cause strife in the family. The family relationship was very important to Jonathan, and Mike began pressuring Jonathan that he needed to settle with Saenz by "thinking about the family."

35.     After Jonathan and Saenz disagreed on how to qualify his theft of $740,000 from ZroBlack, the two members decided it was time to part ways. The money that Saenz had stolen from the company was to be returned, on a basis to be structured by Mike and the Gunn, Lee law firm. Although Mike represented both Jonathan and Saenz and issued a waiver of conflict letter, no reasonable lawyer could believe that such representation of each client would not be materially affected. Moreover, he did not advise Jonathan or ZroBlack as to the consequences of what they were doing and structured an agreement that hurt both Jonathan Villarreal and ZroBlack.

36.     On or about July 17, 2019, Jonathan sent a text message to Saenz, saying:

> Thanks for the call, it's disappointing that you had no idea we had a product released already. It's disappointing that you were not on the phone call this morning for our morning meeting. It's disappointing that you never responded to my emails letting me know what you did for our client that paid our company $1.5 million, it's disappointing that you say you're going to taking [*sic*] legal action against ███████ it's disappointing that you cannot provide me with what you have done for our client for the last 2 months.

*See* Exhibit 14 (Text message dated July 17, 2019).

37.     Saenz began demanding that the $740,000 he took from ZroBlack be characterized as a "gift" for tax purposes; this, Jonathan refused to do as it would violate the law. *See* Exhibit 1 (Declaration of Jonathan Villareal). For example, in a text message July 27, 2019 Saenz offered to assign all interest in ZroBlack to Jonathan if the $740,000 would be characterized as a gift. *See* Appendix, Exhibit 27.

38.     Mike and the Gunn, Lee law firm eventually prepared a document titled "Release." *See* Appendix, Exhibit 15. The Release stated that Saenz would receive as consideration 2% (and ZroBlack 12.5%) of the 14.5% Earn-Out Obligation under the PSA.

39.     Although the Release assigned all of Saenz's interest in ZroBlack to Jonathan, it made no express provision for the return of the $740,000 to ZroBlack, despite continued requests by Jonathan that the money be returned. The Release also contained no express requirement that Saenz return personal property to ZroBlack, which included not only the $740,000 and a laptop computer belonging to ZroBlack, but also ZroBlack's proprietary and trade secret information, as well as ZroBlack's domain name, webpage, and email server. The Release contained no provision that the parties would cooperate in the transfer of intangible assets, such as ZroBlack's DUNs and CAGE numbers, or the ZroBlack domain. By failing to include these provisions, Mike and Gunn, Lee create a vague document that made it unclear ZroBlack still owned these things and that Saenz was required to return them.

40.     The Release did require the execution of a Unanimous Written Consent in Lieu of Meeting by ZroBlack's membership (hereinafter, "Consent") wherein the parties agreed that Saenz's would assign all of his ownership interest in ZroBlack. The Consent is part of the Release and requires return of the money, the computer and trade secrets, and the domain name, webpage, and email server. The Release's vagueness about ZroBlack's ownership of these items, however, has necessitated this lawsuit because Saenz has refused to return all of these things. The release involved 4 parties and required specific provisions from ███████ ██████ was not involved with the release, and there were not signatures from ██████ on the release. Jonathan later had to register ZroBlack, LLC as a foreign entity doing business in Texas, a task Saenz refused to perform for the

company while employed. Jonathan was required to spend $1,000.00 to makes sure ZroBlack was able to litigate in the state of Texas.

41.     Jonathan and Saenz executed the Release on August 9, 2019. Section 7 of the Release states that "Each Party hereto fully releases the other Parties from all claims and demands, known or unknown." Section 7 goes on the discuss claims that are known and unknown. It does not address inchoate claims or claims that have not yet accrued. *See* Appendix, Exhibit 15.

42.     Jonathan and Saenz also executed a Unanimous Written Consent in Lieu of Meeting by ZroBlack's membership (hereinafter, "Consent"). *See* Appendix, Exhibit 16. The second "WHEREAS" in the Consent stated, "the undersigned wish to memorialize John Saenz's assignment of his entire interest in ZroBlack LLC to Jonathan Villareal." The first "RESOLVED" stated that "John Saenz hereby assigns his entire interest in ZroBlack LLC to Jonathan Villareal pursuant to Article VII of the 'Limited Liability Company Operating Agreement for ZroBlack LLC' dated January 14, 2019 and applicable laws, …" Thus, Saenz assigned all his ownership interest to Jonathan, and relinquished all claims of any ownership of ZroBlack's property. *See* Appendix, Exhibit 16.

43.     After the deal for Saenz to exit ZroBlack was struck, Saenz refused to return the $740,000. Instead, Saenz continued to want the money he had taken from the company to be construed as a "gift." This was an ongoing dispute between Saenz and Jonathan, who anticipated providing service to the United States federal government. Jonathan told Saenz that he (Jonathan) would never agree to qualify $740,000 Saenz embezzled as a gift. In fact, Jonathan gave Saenz an ultimatum: return the money, or face the harsh consequences. This was the same discussion he had with attorney Mike Villareal and his law firm, Gunn, Lee. *See* Appendix, Exhibit 1.

44.     On August 15, 2019, Jonathan asked Saenz to release ZroBlack's webpage. Saenz said he would "look into it." *See* Appendix, Exhibit 18 and Exhibit 19. Saenz had already deleted jv@zroblack.com on August 14th, 2019. Jonathan received an email from GoDaddy to his backup address showing that jv@zroblack.com has been deleted. See Appendix, Exhibit 41. John had no intention of looking into anything or assigning anything over to ZroBlack or Jonathan. Despite multiple requests for over 16 months for return, Saenz continues to hold the domain name. Adding insult to injury, Saenz blackmailed ZroBlack over the domain name, webpage, and email server, offering to sell it back to ZroBlack for $7,000. Saenz has taken the website down effectively terminating ZroBlack's ability to gain new clients. Saenz also deleted the email server, thereby destroying thousands of emails and documents supporting Jonathan's claims, ZroBlack's projects for ███████ and other matters. Saenz currently holds ZroBlack's domain name hostage, so Jonathan has no access to the site and no opportunity to attempt to recover the webpage and emails. GoDaddy is the service provider. *See* Appendix, Exhibit 1.

45.     Jonathan asked Saenz to return the laptop computer belonging to ZroBlack. Saenz refused this request also. This computer contains proprietary code related to ZroBlack's phone security project. *See* Appendix, Exhibit 1.

46.     On September 13, 2019, Jonathan emailed Mike advising him that Saenz had deleted all his emails. *See* Appendix, Exhibit 20. Then, on September 13, 2019, Jonathan emailed Mike pleading for help:

> I'm beside myself right now, and really struggling with everything, I can't eat, I can't sleep, my anxiety and stress is so high, and for the next 3 years if I continue like this I'll end up losing my contracts and not be able to work.
>
> I have worked too hard to allow myself to slip like this. I need help Mike, this is not right. I've done nothing wrong. John got $750,000 cash, and there has to be a way for me to stop this madness, get him

to give up the 2%, get my company website, my company documents, and my company computer. Like I said, I have a company that pays real taxes, has 10 real employees, we have a real physical location, and I can't even put up my company website.

*See* Appendix, Exhibit 21. Mike continued to try to negotiate a resolution between Jonathan and Saenz.

47.     On or about September 19, 2019, Jonathan again emailed Saenz, copying Mike, demanding the return of ZroBlack's property, including the laptop containing proprietary code, ZroBlack's web domain and webpage, and ZroBlack's emails. He also demanded return of the $740,000 Saenz misappropriated from ZroBlack. *See* Appendix, Exhibit 22. Jonathan sent a similar email to Saenz and Mike on September 20, 2019, explaining why he believed Saenz should return the $740,000 and other property of ZroBlack. *See* Appendix, Exhibit 23.

48.     On or about September 26, 2019, Mike Villareal tried to arrange a meeting between Jonathan and Saenz to discuss settling their disagreement and offered his offices as a place to have the discussions. Mike gave his available days and stated that "we are trying to resolve your differences, not attempting to take advantage of each other. I appreciate you both willing to show good faith on both your parts in coming together and seeing if a resolution can be reached." *See* Appendix, Exhibit 24.

49.     Despite promises to appear for a meeting, Saenz kept putting it off with a litany of excuses until Jonathan, fed up, stated he would not be attending a meeting and had decided to go in a different direction. *See* Appendix, Exhibit 25. As of the filing of the complaint, Saenz has not returned the money he took from ZroBlack, nor has he returned the web domain and webpage, emails, laptop, and proprietary information belonging to ZroBlack. Saenz continues to hold on to ZroBlack's property and refuses to return it, including the ZroBlack laptop that contains proprietary information and trade secrets belonging to ZroBlack. Saenz also threatened Jonathan

that he would "muck up" his life if Jonathan did not turn over the company and assign it to him. Jonathan begged Saenz not to do this to him. *See* Appendix, Exhibit 1.

50.    Furthermore, Jonathan Villareal rightfully placed his absolute trust in Mike Villareal and his law firm, the Gunn, Lee law firm. Jonathan Villareal is not an attorney and is not familiar with legal issues. He is, however, highly skilled in IT matters. He trusted and relied on Mike Villareal and his firm to guide him and navigate the transaction with Saenz. At all times relevant and material to this lawsuit, Jonathan Villareal rightfully placed his trust in his lawyer and law firm, just as ZroBlack did with its corporate counsel.

51.    Unfortunately, Mike Villareal had a conflict of interest that he ignored. He also failed to disclose the extent of his relationship with Saenz to Jonathan. Mike's relationship with Saenz was so cozy that Mike was cutting Saenz a discount of the share of fees he charged Saenz, while charging Jonathan for the full amount of Jonathan's share. Mike continued to pressure Jonathan to resolve the dispute for "the sake of the family." *See* Appendix, Exhibit 1. Neither Jonathan Villareal nor ZroBlack anticipated they would be betrayed in the way they were.

**G.    Final Attempts to get Saenz to Return Money and Property Owed to ZroBlack**

52.    On or about February 22, 2020, Jonathan Villareal attempted to contact Defendant Saenz to collect back the money that he had taken at the close of the deal with ███████. After the Parties agreed to sign ZroBlack over to Jonathan, Saenz failed to turn over all company assets including money, computers, GoDaddy domain with email server and website, non-disclosure agreements, company contacts, original documents, and everything else that belonged to ZroBlack. *See* Appendix, Exhibit 1.

**H.   Saenz Thwarts ZroBlack and ███████ Attempt to Contact with the ███████**
**███████████████████**

53.     After the Release was executed and Saenz and ZroBlack and Jonathan parted ways, Jonathan, ZroBlack, and ███████ pursued a contract with the ████████████. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

  ██     ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

55.     Furthermore, because iPhones make up more than a 40% share of the U.S. market, obtaining an Apple Developer account was critical to the success of this endeavor. An Apple Developer account requires a business to have a valid DUNS number. A DUNS number is a unique nine-digit identifying number issued by Dun & Bradstreet. ZroBlack obtained a DUNS number while Saenz was still with the business. Because at the time Saenz was the contact person for ZroBlack, his cell phone number is the number listed for contacting ZroBlack.

56.     Saenz, however, has refused all requests to confirm with Dun & Bradstreet that he is no longer a member of ZroBlack or to update the contact information for ZroBlack on its DUNS account. Dun & Bradstreet will not update the DUNS number information without confirmation from Saenz. And without being able to confirm ZroBlack and Jonathan are the owner of the DUNS number, Apple will not issue them an Apple business developer account, making it impossible for Jonathan, ZroBlack, and ███████ to compete for this ██████████ contract. See Appendix, Exhibit 1.

57.     Because Apple could not confirm ZroBlack's ownership, Apple would not provide ZroBlack with a Business developer account, which is necessary to access Apple's iOS API—the code that is under the hood of the iOS operating system. See Appendix, Exhibits 29 and 30 (communications between Jonathan and ██████. Jonathan sought the release of ZroBlack's domain name information, from which he could himself update the Dun & Bradstreet information. Saenz refused Jonathan's requests to release the ZroBlack domain name to him so that he could update ZroBlack's information for Apple and Dun & Bradstreet. Saenz even went so far as to block Jonathan's email address. Exhibit 31. Because Jonathan could not update ZroBlack's DUNS information, he could not confirm to Apple's satisfaction that he owned ZroBlack and so Apple refused him a developer's account.

58.     As a direct result of Saenz's actions, Jonathan, ZroBlack, and ████████ lost the contract with the ███████████. However, given Jonathan, ZroBlack, and █████████ specialty in retrieving data from cellular devices, including Apple, Inc. products, any new contracts they compete for will likely also require that ZroBlack have an Apple developer account. Exhibit 32. But for Saenz's actions, there was a reasonable probability the ██████████████ would have entered

into a contract with Jonathan, ZroBlack, and ████. Saenz's actions were a proximate cause of Jonathan, ZroBlack, and ████ losing the contract, and their damages.

**I.   Saenz Refuses ████'s Demand for Return of the Code and Blocks ZroBlack from Government Work by Withholding Its Account Credentials**

59.   John Saenz also continues to refuse to return to ZroBlack its proprietary code. Some of that code, through ZroBlack's contract with ████, is proprietary to ████ as well. On July 9, 2020, ████ sent Saenz a demand letter reminding him of his obligation to return the proprietary property. Saenz has not done so. Exhibit 33.

60.   In addition to the DUNS information, Saenz has refused to return or allow access to ZroBlack's SAM.gov account and CAGE number. "SAM" stands for System Award Management and is a U.S. government portal for bidding on government contracts. It is managed by the Department of Transportation. Current and potential government vendors must obtain a SAM registration in order to be awarded contracts by the government. SAM.gov requires companies to obtain a SAM registration, which consists of a login name and password.[4] SAM also issues what is known as a CAGE number. CAGE stands for "Commercial and Government Entity Code" and likewise allows businesses to qualify for federal contracts and grants.

61.   ZroBlack has had to file complaints with the Federal Help Desk and Defense Logistics Agency because Saenz is effectively holding the SAM.gov login information and CAGE number hostage and has prevented ZroBlack from competing for government contracts. Furthermore, on information and belief, Saenz is holding himself out as ZroBlack using the SAM.gov login and CAGE number. Attached as Exhibits 34 and 35 are ZroBlack's communications with the Federal Help Desk and Defense Logistics Agency regarding ZroBlack's

---

[4] https://www.transportation.gov/osdbu/system-award-management-sam.

complaint. These exchanges show that both agencies have forwarded ZroBlack's complaints to their legal and fraud departments.

## IV.      APPLICATION FOR CIVIL SEIZURE

### J.  Plaintiffs are entitled to a civil seizure of the laptop computer

62.     Plaintiffs hereby adopt and re-allege the allegations previously set forth in this Complaint as if fully set forth herein.

63.     ZroBlack requests a civil seizure of the ZroBlack laptop that contains its trade secrets in accordance with 18 U.S.C. § 1836(b)(2). Defendant Saenz is withholding the laptop and refusing to return it.

64.     18 U.S.C. § 1836(b)(2)(A)(i) provides, in pertinent part, that a civil seizure may be granted upon *ex parte* application but only in extraordinary circumstances.[5] The order may provide for the seizure of property that is necessary to prevent the propagation or dissemination of a trade secret, in this instance, the ZroBlack lap in Saenz's possession and containing ZroBlack's trade secrets.

65.     Prior to issuing an *ex parte* seizure order, the court must find that:

    i.  An order issued pursuant to Rule 65 of the Federal Rules of Civil Procedure or another form of equitable relief is inadequate because the Defendant would evade, avoid, or otherwise not comply with such an order;

    ii. Plaintiff has and will continue to suffer immediate and irreparable injury if seizure is not ordered;

---

[5] Plaintiffs recognize that *ex parte* may be a misnomer under these unusual circumstances. At the time the Complaint was filed, Plaintiffs were seeking a *ex parte* order. No ruling was issued by the Court however, and Defendants quickly responded. Notwithstanding those facts, Plaintiffs believe seizure is appropriate under the factors set forth in the statute and discussed below.

    iii.   The harm the Plaintiff of denying the application outweighs the harm to the legitimate interests of the Defendant and substantially outweighs the harm to any third parties who may be harmed by such seizure;

    iv.   Plaintiff is likely to succeed in showing that the information is a trade secret and the person against whom seizure would be ordered misappropriated the trade by improper means;

    v.   The person against whom seizure would be ordered has actual possession of the trade secret and any property to be seized;

    vi.   Plaintiff can describe with reasonable particularity the matter to be seized and the location where the matter is to be seized;

    vii.   The person against whom seizure would be ordered may destroy, move, hide, or otherwise make such matter inaccessible to the court if Plaintiff were to proceed and notify Defendant; and

    viii.   Plaintiff has not publicized the requested seizure.

18 U.S.C. § 1836(b)(2)(A)(ii).

### K.  An Order Pursuant to Fed. R. Civ. P. 65 Is Inadequate

66.    A preliminary injunction would be inadequate under the circumstances. The evidence offered by the Plaintiff in support of this Application clearly demonstrates that an *ex parte* seizure order is the only adequate means of ensuring that the Defendant will return the Plaintiff's trade secrets. Given the Defendant's practice of deleting the email server, taking down the website, and refusing to return the laptop with trade secrets thereon, it is almost certain that Defendant may evade, avoid, or otherwise fail to return Plaintiff's laptop and trade secrets absent the issuance of an *ex parte* seizure order.

67.     Plaintiff has made numerous requests for the return of ZroBlack's laptop after the parties negotiated Saenz's departure from ZroBlack, however Saenz refused each such request. Instead, Saenz kept the laptop. Further, in retaliation, he took down ZroBlack's website knowing the ZroBlack company email addresses were all still dependent upon that domain. As a result, ZroBlack and Jonathan did not receive important communications from customer representatives and have since had to repair their relationship with their primary customer. ZroBlack still does not have access to communications which are key to their business moving forward.

68.     Courts have also held that seizure is proper when a Defendant could easily copy the information onto another computer or other storage media without the knowledge of the Plaintiff or the Court. *See Blue Star Land Services v. Coleman*, No. CIV-17-931-C, 2017 WL 11309528, at *1 (W.D. Okla., August 31, 2017). Saenz still maintains control over the laptop and trade secrets contained therein even after multiple requests for its return have been made. Saenz could easily copy ZroBlack's trade secrets and software code onto another computer or other storage media without the knowledge of the Plaintiff or Court.

69.     More importantly, the code on the ZroBlack laptop which Saenz refuses to return is the same code ███████████████████████   ████████████ described in Exhibit 28, ███████████████████████████████████████████████ ███████████████████████. Thus, in the wrong hands, this code could be used to compromise ██████████████████████████████████. Unlike Jonathan Villarreal, John Saenz does not have a U.S. government security clearance. Furthermore, as discussed in the Amended Complaint and Amended Application, Saenz has tried to market the code in the past, in violation of the confidentiality agreement he signed with ████████████.

70.     Saenz has shown and continues to show that he will evade, avoid, or otherwise not comply with requests to return the computer. For these reasons, the only adequate means of achieving the purpose of 18 U.S.C. § 1836(b), namely preventing the propagation and dissemination of trade secrets, is to issue an *ex parte* seizure order.

**L. Plaintiff Has and Will Continue to Suffer Immediate Irreparable Injury**

71.     Zroblack is suffering and will continue to suffer immediate and irreparable harm to its business and goodwill because of Saenz' conduct.

72.     Courts have held that injuries may include a continued disadvantage in the marketplace. *Axis Steel Detailing, Inc. v. Prilex Detailing LLC*, No. 2:17–cv–00428–JNP, 2017 WL 8947964, at *2 (D. Utah, June 29, 2017). Furthermore, Courts have held that the possibility of a transfer or conveyance of the property to a third party or a competitor may cause immediate and irreparable harm. *AVX Corporation v. Kim*, NO. 6:17-00624-MGL, 2017 WL 11316598, at *2 (D. S.C., March 13, 2017).

73.     Saenz is in possession of ZroBlack's trade secrets, including software code for accessing cell phones wirelessly and the usernames and passwords to access ZroBlack's GoDaddy account. The software code is located on the laptop, and the username and password for the GoDaddy account are also likely located there. ZroBlack's continues to suffer continued disadvantage in the marketplace by being unable to access its domain on GoDaddy. ZroBlack's webpage is currently down, and its email server has been wiped out, meaning customers and potential customers can't email ZroBlack through ZroBlack's domain name.

74.     Furthermore, if Defendant Saenz continues to knowingly withhold ZroBlack's property and trade secrets, ZroBlack will suffer significant and irreparable financial injury. ZroBlack is deeply concerned that the software contained on the laptop may fall into the wrong

hands or be used for unlawful purposes. The software on the ZroBlack laptop allows access to cell phones. ZroBlack has no control over Saenz's activities or use of the ZroBlack laptop.

**M. Balance of Hardships Favors Seizure**

75.     Before issuing an *ex parte* seizure order, the court must find "that the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered if granting the application and substantially outweighs the harm to any third parties who may be harmed by such seizure." 18 U.S.C. § 1836(b)(2)(A)(ii)(III).

76.     ZroBlack suffers irreparable harm to its consumer goodwill and business reputation each passing day Saenz controls a ZroBlack laptop and email server. Saenz has no legitimate interests or rights in the trade secrets or GoDaddy account, nor does he have a right to withhold them. By contrast, the only harm Saenz will suffer should a seizure order issue is seizure of the laptop computer rightfully owned by ZroBlack.

77.     Additionally, the injury that ZroBlack will suffer outweighs any damage that will potentially be done to Defendant Saenz. Seizing ZroBlack's laptop does not deprive Defendant of any legal remedy should he prevail in this lawsuit. The requested seizure of the laptop in Saenz' possession will not foreseeably harm any third parties.

78.     The balance of hardships clearly favors Plaintiff's position.

**N. Plaintiff Owns Trade Secrets and Saenz Misappropriated Them**

79.     Before issuing an *ex parte* seizure order of trade secrets, the court must find that "the applicant is likely to succeed in showing that—

(aa) the information is a trade secret; and

(bb) the person against whom seizure would be ordered—

(AA) misappropriated the trade secret of the applicant by improper

means; or

(BB) conspired to use improper means to misappropriate the trade

secret of the applicant".

18 U.S.C. § 1836(b)(2)(A)(IV).

### a. ZroBlack Possessed Trade Secrets.

80.  The Defend Trade Secrets Act defines trade secrets to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C §1839(3). Under the statute the owner must have taken steps reasonable under the circumstances to keep the information secret and the information must derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from disclosure. 18 U.S.C §1839(3)(A), (3)(B).

81.  Here, the evidence shows that the laptop in Saenz's possession contains trade secrets. *See* Appendix, Exhibit 1. That information includes proprietary computer code. As evidenced by the contract between ZroBlack and its Foreign Customer ZroBlack's proprietary Code is related to products or services used in interstate and foreign commerce. *See* Appendix, Exhibit 7.

82.  ZroBlack's trade secrets also include the username and password used to access ZroBlack's GoDaddy account. One federal court has concluded that login and password information to access company computers and networks can be a trade secret. *TMX Funding, Inc. v. Impero Technologies, Inc.*, No. C10-00202 JF (PVT), 2010 WL 2509979 at * 4 (N.D. Cal. Jun. 17, 2010). According to the Court in *TMX Funding*, login and password information is generally

not known outside of companies and their economic value is derived from not being generally known to others. *Id.*

83.     The evidence also shows that ZroBlack took steps reasonable under the circumstances to keep the information secret. Although ZroBlack had ten employees, only Saenz and Jonathan had access to the proprietary code, and access to the code was by password. *See* Appendix, Exhibit 1. When dealing with customers and potential customers, ZroBlack used non-disclosure and confidentiality agreements to protect the trade secrets. *See* Appendix, Exhibit 7 and Exhibit 8. Regarding the GoDaddy login and password, only Saenz knew that information.

84.     ZroBlack's trade secrets also derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from disclosure. ZroBlack's contract with █████ demonstrates the economic value of the computer code. *See* Appendix, Exhibit 7 and Exhibit 1. Login and password information also derives independent economic value from not being generally known. *TMX Funding*, 2010 WL 2509979 at * 4.

85.     Finally, the evidence establishes that ZroBlack is the owner of the trade secrets. *See* Appendix, Exhibit 1.

**b. Defendant Saenz Misappropriated the Trade Secrets.**

86.     Saenz misappropriated the trade secrets by refusing to return ZroBlack's laptop that contained the software code and other proprietary information. Per the terms of the Release and Consent, Saenz relinquished all interest in ZroBlack, including all interest in any property owned by ZroBlack. *See* Appendix, Exhibit 15 and Exhibit 16. That property included the laptop and the proprietary code and other proprietary data on the laptop. The laptop also had the login and password information and software that controlled the emails and website URL for ZroBlack.

87.     After Saenz parted ways with ZroBlack, his authorization to use the laptop and access the information on it was revoked. Furthermore, the Release and assignment of all his rights in ZroBlack included the assignment of rights in ownership of the laptop and the proprietary code on that laptop. Saenz refused requests to return the laptop, and his continued possession is unauthorized. *See* Appendix, Exhibit 22 and Exhibit 23. Saenz knew he used improper means to acquire the trade secrets, thus misappropriating the trade secrets. He used improper means by breaching the duty of confidence and trust placed in him by ZroBlack while he was CEO. He also improperly acquired access to the trade secrets by misrepresenting his skill and experience to Jonathan. Those trade secrets included the software code created and maintained by ZroBlack.

88.     Defendant Saenz has the intent to convert the trade secret and knew the offense would injure the owner of the of the trade secret.

**O. Saenz Has Control of the Laptop.**

89.     Defendant Saenz maintains control of the laptop that contains ZroBlack's trade secrets. Defendant Saenz has failed to return the laptop and trade secrets after multiple requests. See Appendix, Exhibit1 and Exhibit 22.

**P. The Matter to Be Seized and Its Location.**

90.     The matter to be seized is a 15-inch Apple MacBook Pro, part number MR94LL/a, serial number C02YF1Y9JG5J. The matter to be seized can be located at 28710 Estin Height St., San Antonio, Texas 78260 as all trade secrets are contained therein.

**Q. Saenz may destroy, move, hide or make the matter inaccessible to the Court.**

91.     Before issuing an *ex parte* seizure order, the court must find "the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person". 18 U.S.C. § 1836(b)(2)(a)(ii)(VII).

92.     As discussed above, Saenz will almost certainly move, hide, or destroy the laptop containing ZroBlack's trade secrets, if he is given notice of this action and the relief sought. Saenz has already deleted the GoDaddy account email server, thereby destroying hundreds of emails and documents supporting Plaintiffs' claims, and hundreds of emails and documents related to Plaintiffs' projects.

93.     Saenz may continue to destroy, move, hide, or make the matter inaccessible to the Court so long as he maintains control of the ZroBlack laptop, and the trade secretes contained therein.

**R.  Applicant Has Not Publicized the Requested Seizure.**

94.     Prior to issuing an *ex parte* seizure order relating to misappropriation of trade secrets, the court must find that the applicant has not publicized the requested seizure. 18 U.S.C. § 1836(b)(2)(A)(ii)(VIII). Plaintiffs have not publicized the requested seizure. *See* Appendix, Exhibit 1.

**V.      APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION**

95.     Plaintiffs hereby adopt and re-allege the allegations previously set forth in this Application as if fully set forth herein.

96.     Plaintiffs request a temporary restraining order and preliminary and permanent injunction ordering Saenz to release the domain for ZroBlack's website and email servers to ZroBlack. FED. R. CIV. P. 65. Plaintiffs also seek a preliminary and permanent injunction order John Saenz to take the actions necessary to establish ZroBlack's ownership of its DUNs number, its SAV.gov account, and its CAGE number.

97.     Furthermore, should the Court deny ZroBlack's request for seizure, ZroBlack requests a temporary restraining order and preliminary and permanent injunction ordering Defendant Saenz to return the ZroBlack-owned laptop that contains ZroBlack's trade secrets. *Id.*

98.     Injunctive relief is necessary to restore the status quo, namely, ZroBlack's use and control of its laptop, email server, website, DUNs and CAGE numbers, and SAV.gov account. Plaintiff has valid causes of action against Defendant Saenz, has a high probability of succeeding on the merits of his causes of action, and would suffer probable, imminent, and irreparable harm if Defendant Saenz is not ordered to return the computer and turn over the login credentials for the ZroBlack, LLC website and email server hosted by GoDaddy.com, and take the steps necessary to establish ZroBlack's ownership of its DUNs number, its SAV.gov account, and its CAGE number.

99.     Furthermore, if Defendant Saenz continues to withhold ZroBlack's laptop, emails server, website, DUNs and CAGE numbers, and SAV.gov account. Plaintiffs will suffer significant financial damages. Accordingly, Plaintiffs specifically ask this Court to enjoin Defendant from withholding any of the property and immediately return it to ZroBlack.

**A. Grounds for Injunctive Relief**

100.     A plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that it has no adequate remedy at law, (4) that the balance of equities tips in its favor, and that (5) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "At the preliminary injunction stage, the procedures in district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence." *Sirius Computer Solutions, Inc. v. Sparks*, 138 F. Supp. 3d 821, 836 (W.D. Tex. 2015).

101.     As the attached evidence shows, ZroBlack owns a laptop that contains its trade secrets. ZroBlack also owns its domain name, which includes its webpage and email server that

Saenz has misappropriated and is under his control. Alternatively, ZroBlack has a greater right of possession to the domain name under the Anti-Cybersquatting Consumer Protection Act. Finally, ZroBlack owns its DUNs and CAGE numbers, and owns its SAV.gov account.

102.    Injunctive relief is proper under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b)(3) and The Texas Uniform Trade Secrets Act, TEX. CIV. PRAC. & REM. CODE ANN. § 134A.003 to preserve ZroBlack's trade secrets until the lawsuit is resolved. Additionally, both Acts authorize injunctive relief to protect against threatened misappropriation. 18 U.S.C. § 1836(b)(3)(A)(i); TEX. CIV. PRAC. & REM. CODE ANN. § 134A.003(a). Both Acts also authorize use of affirmative acts compelled by court order to protect trade secrets. 18 U.S.C. § 1836(b)(3)(A)(ii); TEX. CIV. PRAC. & REM. CODE ANN. § 134A.003(c).

103.    Injunctive relief is also proper under the Computer Fraud and Abuse Act, 18 U.S.C. §1030(g) and the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).

104.    Finally, under Texas law, there is clear case precedent supporting the use of injunctive relief to compel a party to return company assets which the party has wrongfully taken. *See generally RP&R, Inc. v. Territo*, 32 S.W.3d 396, 400-01 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (explaining mandatory injunction is proper to prevent irreparable injury or extreme hardship). Sometimes the status quo is a condition of action, not of rest, and the condition of rest is exactly what will inflict the irreparable injury on the Plaintiff. *Rhodia, Inc. v. Harris County*, 470 S.W.2d 415, 419 (Tex. Civ. App.—Houston [1st Dist.], no writ). Additionally, a mandatory injunction is proper when the defendant acts with full knowledge that his acts are wrongful. *Zelios v. City of Dallas*, 568 S.W.2d 173, 175 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.) (internal citations omitted).

**B.      Likelihood of Success on the Merits -- Standard**

105.    A party seeking injunctive relief need not show certainty of winning on the merits. *Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011); *see also* Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11A Federal Practice & Procedure § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win."). To assess the likelihood of success on the merits, courts look to "standards provided by the substantive law." *Id*. Additionally, "the degree of persuasion necessary on the substantial likelihood of success factor may decrease as the level of persuasion in relation to the other three factors increases." *Courtroom Sci., Inc. v. Andrews*, No. 3:09-CV-251-o, 2009 WL 1313274, AT *3 (N.D.Tex. May 11, 2009) (internal citations omitted)

**C.     Likelihood of Success on the Merits – Trade Secret Misappropriation**

    *ii.     ZroBlack Possessed Trade Secrets.*

106.    The Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act have essentially the same definition for a trade secret. The Defend Trade Secrets Act defines trade secrets to include  "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C §1839(3). The Texas Uniform Trade Secrets Act defines trade secrets to mean "all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers,

whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." TEX. CIV. PRAC. & REM. CODE § 134A.002(6). Under both statutes the owner must have taken steps reasonable under the circumstances to keep the information secret and the information must derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from disclosure. 18 U.S.C §1839(3)(A), (3)(B); TEX. CIV. PRAC. & REM. CODE § 134A.002(6)(A), (6)(B).

107.    Here, the evidence shows that the laptop in Saenz's possession contains trade secrets. *See* Appendix, Exhibit 1. That information includes proprietary computer code and the login and password information to ZroBlack's GoDaddy account. As evidenced by the contract between ZroBlack and its Foreign Customer, ZroBlack's proprietary Code is related to products or services used in interstate and foreign commerce. *See* Appendix, Exhibit 7.

108.    The evidence also shows that ZroBlack took steps reasonable under the circumstances to keep the information secret. Although ZroBlack had ten employees, only Saenz and Jonathan had access to the proprietary code, and access to the code was by password. *See* Appendix, Exhibit 1. When dealing with customers and potential customers, ZroBlack used non-disclosure and confidentiality agreements to protect the trade secrets. *See* Appendix, Exhibit 7 and Exhibit 6.

109.    Furthermore, although Saenz did not sign a non-disclosure agreement, Texas law imposes duties of confidentiality on those persons who know or have reason to know information is a trade secret. *American Derringer Corp. v. Bond*, 924 S.W.2d 773, 777 (Tex. App.—Waco 1996, no pet.) ("Upon the formation of an employment relationship, certain duties arise apart from

any written contract … One of those duties forbids an employee form using confidential or proprietary information acquired during the relationship in a manner adverse to the employer.") (citing *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 600 (Tex. App.—Waco 1995, no writ). This obligation survives termination of the employment relationship. *Miller Paper*, 901 S.W.2d at 600. The rule is the same for those who go into business together. *See Crutcher-Rolfs-Cummings, Inc. v. Ballard*, 540 S.W.2d 380, 387 (Tex. Civ. App.—Corpus Christi 1976, writ ref'd n.r.e.) (applying confidentiality obligation to joint venturers). As CEO of ZroBlack and Jonathan's partner, Saenz was under a duty of confidence not to use ZroBlack's confidential information in a manner adverse to ZroBlack's interests.

110.    ZroBlack's trade secrets also derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from disclosure. ZroBlack's contract with its Foreign Customer demonstrates the economic value of the computer code. *See* Appendix, Exhibit 7 and Exhibit 1.

111.    Finally, the evidence establishes that ZroBlack is the owner of the trade secrets. *Id.*

iii.    Defendant *Saenz Misappropri*ated the *Trade Secrets or Threatens to Misappropriate Trade Secrets.*

112.    Misappropriation under the Defend Trade Secrets Act and Texas Uniform Trade Secrets Act means acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a trade secret of another without express or implied consent by a person who used improper means to acquire knowledge of the trade secret. 18 U.S.C §1839(5); Tex. Civ. Prac. & Rem. Code § 134A.002(3). Improper means includes theft or breach of a duty to maintain secrecy. 18 U.S.C §1839(6); Tex. Civ. Prac. & Rem. Code § 134A.002(2).

113.    Saenz misappropriated the trade secrets by refusing to return a ZroBlack laptop that contained the software code and other proprietary information. Per the terms of the Release and Consent, Saenz relinquished all interest in ZroBlack. *See* Appendix, Exhibit 15 and Exhibit 16. By assigning all his interest in ZroBlack to Saenz effectively transferred any ownership interest he had in ZroBlack's personal and intellectual property to ZroBlack because the Operating Agreement provided that all property to be owned by ZroBlack was to be in its name or the name of a nominee. *See* Appendix, Exhibit 3, § 7; *see also* Exhibit 15 § 6 and Exhibit 16 ("RESOLVED, that John Saenz hereby assigns his entire interest in ZroBlack, LLC to Jonathan Villarreal …"). That property included the laptop and the proprietary code and other proprietary data on the laptop. The laptop also had the software that controlled the emails and website URL for ZroBlack, including passwords and account names. Account names and passwords for accessing its website and email server are confidential and proprietary to ZroBlack. *See TMX Funding, Inc. v. Impero Technologies, Inc.*, No. C10-00202 JF (PVT), 2010 WL 2509979 at * 4 (N.D. Cal. Jun. 17, 2010) (holding login and password information could be a trade secret).

114.    After Saenz parted ways with ZroBlack, his authorization to use the laptop and access the information on it was revoked. The Release and assignment of all his rights in ZroBlack included the assignment of rights in ownership of the laptop and the proprietary code on that laptop. Saenz refused requests to return the laptop, and his continued possession is unauthorized. *See* Appendix, Exhibit 22 and Exhibit 23. Saenz knew he used improper means to acquire the trade secrets, thus misappropriating the trade secrets. Those trade secrets included the software code created and maintained by ZroBlack.

115.    Both the Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act expressly authorize injunctive relief to prevent actual or threatened misappropriation of a trade

secret. 18 U.S.C. § 1836(b)(3)(A)(i); Tex. Civ. Prac. & Rem. Code Ann. § 134A.003(a). Saenz has misappropriated ZroBlack's trade secrets and confidential information and should be enjoined from the further use or disclosure of the trade secrets and confidential information. Alternatively, threatened misappropriation exists because Saenz, as the former CEO of ZroBlack, was charged with marketing ZroBlack and its unique product. Saenz possesses ZroBlack's trade secrets and confidential information and is in a position to use it. *FMC Corp. v. Varco Intern., Inc.*, 677 F.2d 500, 503-504 (5th Cir. 1982) (injunctive relief appropriate where defendant employee would be called upon to decide what he believes he can and cannot properly disclose to his new employer; "even assuming the best of good faith" the employee would "have difficulty preventing his knowledge from infiltrating his work."); *T-N-T- Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 24 (Tex. App.—Houston[1st Dist.] 1998, no pet.) (because defendant possessed proprietary information and was in position to use it, threat of use or disclosure was enough to support injunctive relief); *Rugen v. Interactive Business Systems, Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no pet.) (holding defendant was in possession of plaintiff's confidential information and in position to use it, it was probably defendant would use the information absent injunctive relief); *Weed Eater, Inc. v. Dowling*, 562 S.W.2d 898, 902 (Tex. Civ. App.—Houston 1978, writ ref'd n.r.e.) (Defendant "can hardly prevent his knowledge of his former employer's methods from showing up in his work;" injunction sustained).

**D.     Likelihood of Success on the Merits – Computer Fraud and Abuse Act**

116.    Any person who suffers damage or loss by reason of a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, may maintain a civil action against the violator to obtain compensatory damages and injunctive relief. 18 U.S.C. § 1030(g). A civil action may only be brought if the conduct involves one of the factors set forth in 18 U.S.C. § 1030(c)(4)(A)(1)(I)-(V), including loss to one or more persons during any 1-year period aggregating at least $5,000 in value.

18 U.S.C. § 1830(g); 18 U.S.C. § 1030(c)(4)(A)(1)(I). "Loss" is defined under the CFAA as "any reasonable cost to [the] victim, including the cost of responding to an offense, conducting a damage assessment ..." and courts have held that the costs of a forensic investigation/damage assessment constitute loss under the CFAA. *Frisco Medical Center, L.L.P. d/b/a Baylor Medical Center at Frisco v. Bledsoe,* 147 F. Supp. 3d 646, 659 (E.D. Tex. 2015).

117.    If this requirement is met, civil liability may be imposed under the CFAA where a defendant:

    a.  Intentionally accesses a computer without authorization or exceeds authorization and obtains information from that computer, 18 U.S.C. § 1030(a)(2)(c);

    b.  knowingly (and with intent to defraud) accesses a protected computer without authorization, or exceeds authorized access, and obtains anything of value, 18 U.S.C. § 1030(a)(4);

    c.  intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage, 18 U.S.C. § 1030(a)(5)(B); or,

    d.  intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage, 18 U.S.C. § 1030(a)(5)(B); or

    e.  intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage or loss, 18 U.S.C. § 1030(a)(5)(C).

*See also Frisco*, 147 F. Supp. at 658-659; *eBay Inc. v. Digital Point Solutions, Inc.*, 608 F. Supp. 2d 1156, 1163-64 (N.D. Cal. 2009).

    *a.  Saenz Accessed A Computer in Violation of the CFAA.*

118.    Once Saenz parted ways with ZroBlack, he was no longer authorized to access the laptop owned by ZroBlack; his authorization was revoked. Nonetheless, he has continued to use the laptop, despite being asked to return the computer several times. *See* Appendix, Exhibit 22 and Exhibit 23. Thus, not only did Saenz not have authorization to access the computer, he knew he did not have authorization to access the computer. Defendant Saenz has intentionally accessed a computer without authorization or exceeded authorized access and thereby obtained information

from a protected computer. That information was ZroBlack's proprietary information, including its code. Saenz' theft and withholding of the computer violates 28 U.S.C. § 1030(a)(2)(c). That conduct also violates 18 U.S.C. § 1030(a)(4) because Saenz intended to defraud.

119.    Saenz also intentionally accessed ZroBlack's domain on GoDaddy and deleted ZroBlack's webpage and email server. The domain, including the webpage and email server, were the property of ZroBlack. Saenz held the domain as nominee or an agent of ZroBlack. Once ZroBlack and Saenz parted ways, Saenz's authorization to hold the domain as ZroBlack's nominee or an agent was no longer authorized and he was required to hand over all access rights to ZroBlack. Because he no longer had authorization to access the domain, his access and deletion of the webpage and email server was unauthorized and violated 18 U.S.C. § 1030(a)(2)(c). His unauthorized access to the domain also violated 18 U.S.C. § 1030(a)(5)(B) and 18 U.S.C. § 1030(a)(5)(C) because it caused damage when he deleted the webpage and email server.

> *b. Loss Aggregating More than $5,000.*

120.    After execution of the Release and Consent, Saenz was required to return ZroBlack's property to it upon request. Saenz refused to return the laptop and proprietary information and refused to release ZroBlack's domain name. ZroBlack retained counsel (the Gun, Lee law firm) to obtain return of the computer, data, and domain name. ZroBlack spent in excess of $5,000 in attorney's fees in attempting to resolve the issues between Saenz and ZroBlack and obtain the return of the computer, data, and domain to ZroBlack. *See* Appendix, Exhibit 25. ZroBlack also spent more than $5,000 trying to resolve the problems caused by the loss of data.

**E.    Likelihood of Success on Merits – Anti-Cybersquatting Consumer Protection Act**

121.    In order to prevail on an ACPA claim, Plaintiff must show that (1) its mark is a distinctive mark or famous mark entitled to protection; (2) the domain names are identical or

confusingly similar to Plaintiff's mark; and (3) the defendant uses the domain name with bad faith intent to profit from them. 15 U.S.C. § 1125(d)(1)(A); *See Southern Co. v. Dauben Inc.*, 324 Fed. Appx. 309, 314 (5th Cir. 2009). The ACPA authorizes a court to order the forfeiture or cancellation of a domain name or the transfer of a domain name to the owner of a mark in any civil action brought under the Act. 15 U.S.C. § 1125(d)(1)(C).

> *a. The ZroBlack Name is Distinctive, Entitling It to Protection.*

122.    ZroBlack is entitled to common law trademark protection under the § 43(a) Lanham Act. 15 U.S.C. 1125(a). Trademarks are normally assigned to 'categories of generally increasing distinctiveness': (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Id.*; *see also Am. Auto. Ass'n (Inc.) v. AAA Ins. Agency, Inc.*, 618 F. Supp. 787, 792 (W.D. Tex. 1985) ("[A]n arbitrary or fanciful mark, as the name suggests, is one which neither describes nor suggests the nature of the product or service with which it is used. An arbitrary or fanciful mark is considered inherently distinctive and is entitled to the greatest degree of protection."). The word "ZroBlack" bears no relation to the product or service it identifies. Because it is inherently distinctive, it meets the first requirement under the ACPA for protection.

123.    Alternatively, in determining whether a mark is distinctive under the ACPA, a court may consider (1) the degree of inherent or acquired distinctiveness of the mark; (2) the duration and extent of use of the mark; (3) the duration and extent of advertising and publicity of the mark; (4) the geographical extent of the area in which the mark is used; (5) the channels of trade for which the goods or services with which the mark is used; (6) the degree of recognition of the mark

in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought; (7) the nature and extent of use of the same or similar marks by third parties; and (8) whether the mark is registered. 15 U.S.C. § 1125(c)(1); *see Shields v. Zuccarini*, 2001 WL 671607, *3 (3d Cir.2000); *Sporty's Farm L.L.C. v. Sportman's Market, Inc.*, 202 F.3d 489, 497 n. 10 (2d Cir.2000).

124.    In this case, the mark is arbitrary or distinctive. This factor weighs heavily in favor or ZroBlack. It has been in use for a little over a year. This factor weighs in favor of ZroBlack. Although it has not received much advertising or promotion, it is known, particularly to ZroBlack's Foreign Customer. This factor weighs slightly in favor of ZroBlack. The mark has been used in Texas, in parts of the United States, and in ████████ This factor weighs in favor of ZroBlack. The mark has some recognition in the areas of trade used by ZroBlack; namely, ████████ recognizes the mark. This factor weighs slightly in favor of ZroBlack. No third parties use the same or a similar mark. This factor weighs heavily in favor of ZroBlack. Finally, the mark is not registered, but is entitled to protection under sec. 43(a) of the Lanham Act. This is only factor that is neutral or weighs against ZroBlack. Here again, under this framework, ZroBlack meets the test for distinctiveness and thus the first element under the ACPA.

**b.**    *The Domain Name is Identical or Confusingly Similar to ZroBlack's Mark.*

125.    The name of Plaintiff is ZroBlack, LLC. The domain name Saenz holds is www.zroblack.com. The domain is identical or confusingly similar to ZroBlack's mark. ZroBlack has met the second prong for protection under the ACPA.

**c.**    *Saenz is Using the Domain Name in a Bad Faith Attempt to Profit Therefrom.*

126.    Saenz is holding, and continues to hold, the domain name in a bad faith attempt to profit therefrom. He has demanded $7,000 from ZroBlack for the domain. *See* Appendix, Exhibit 1. Courts have held that intent to sell a domain name to the rightful owner of a mark is a bad faith

attempt to profit from the registration. *E. & H. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 275-276 (5th Cir. 2002) (citing *Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316, 1325 (9th CIR. 1998)). Here, Saenz offered to sell the domain back to ZroBlack for $7,000.

127.    The Court may also consider nine nonexclusive factors to determine whether the Defendant acted in bad faith. *Emerald City Mgmt., LLC v. Khan*, No. 4:14-cv-358, 2016 WL 98751 *13 (E.D. Tex. Jan. 8, 2016). Those nonexclusive factors include, (1) the trademark or other intellectual property rights of the person, if any, in the domain name, (2) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person, (3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services, (4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name, (5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site, (6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct, (7) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct, (8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others

that are famous at the time of registration of such domain names, without regard to the goods or services of the parties, and, (9) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c). 15 U.S.C. § 1125(d)(1)(B)(i); *Emerald City*, 2016 WL 98571 at * 13.

128. "The first four [factors] suggest circumstances that may tend to indicate an absence of bad-faith intent to profit from the goodwill of a mark, and the others suggest circumstances that may tend to indicate that such bad-faith intent exists." *Id.* (citing *Lamparello v. Falwell*, 420 F.3d 309, 319 (4th Cir. 2005). "In addressing these factors, a court is to consider the totality of the circumstances and 'not simply count up which party has more factors in its favor after the evidence is in.'" *Id.* "Because the factors are merely permissive, the court need not consider all factors in every case." *Id.*

129. The most important grounds, however, for determining bad faith "'are the unique circumstances of th[e] case, which do not fit neatly into the specific factors enumerated by Congress, buy which may nonetheless be considered under the statute. *Texas Intern. Property Associates v. Hoerbiger Holding AG*, 642 F. Supp. 2d 582, 589-590 (N.D. Tex. 2009) (citing *Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 268 (4th Cir.2001)). "Describing the analysis another way, other courts have emphasized that a bad faith determination under ACPA should be made with regard to the totality of the circumstances. *Id.* (citing *Virtual Works*, 238 F.3d at 270).

130. Turning to each of the 15 U.S.C. § 1125(d)(1)(B)(i) factors, it is apparent that Defendant Saenz maintains control and use of the ZroBlack website with a bad faith intent. Saenz does not have any the trademark or other intellectual property rights in the domain name.  The "ZroBlack" name is a distinctive identifier for the products and services ZroBlack provides. After

his termination, Saenz intended to divert consumers from ZroBlack's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site. Saenz intentionally failed to maintain accurate contact information.

**F.     Likelihood of Success on the Merits – Tortious Interference with Prospective Contractual Relations**

131.     The elements for tortious interference with prospective relations are (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third person, (2) the defendant intentionally interfered with the relationship, (3) the defendant's conduct was independently tortious or unlawful, (4) the interference proximately caused the plaintiff's injury, and (5) the plaintiff suffered actual damage or loss. *Plotkin v. Joekel*, 304 S.W.3d 455, 487 (Tex. App.—Houston[1st Dist. 2009, pet. denied).

132.     The exhibits attached to this Amended Application show that Plaintiffs were pursuing a contract with the ███████████████. ███████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████ ██████████████ However, because Apple could not confirm ZroBlack's ownership, Apple would not provide ZroBlack with a developer account, which is necessary to access Apple's iOS API— the code that is under the hood of the iOS operating system. Exhibits 31 and 32 (communications between Villarreal and ███████. Jonathan sought the release of ZroBlack's domain name information, from which he could himself update the Dun & Bradstreet information. John Saenz refused Jonathan's requests to release the ZroBlack domain name to him so that he could update ZroBlack's information for Apple and Dun & Bradstreet. Saenz even went so far as to block

Jonathan's email address. Exhibit 31. Because Jonathan could not update ZroBlacks's DUNS information, he could not confirm to Apple's satisfaction that he owned ZroBlack; Apple refused him a developer's account. As a result, ZroBlack (and ███████) lost the contract. Exhibit 32. But for Saenz's actions, there was a reasonable probability the ███████ would have entered into a contract with Jonathan, ZroBlack, and ██████. John Saenz's actions were a proximate cause of Jonathan, ZroBlack, and ██████ losing the contract, and their damages.

## G.     Likelihood of Success on the Merits – Conversion

133.    The elements of a cause of action for conversion are (1) the plaintiff owned, possessed, or had the right to immediate possession of property, (2) the property was personal property, (3) the defendant wrongfully exercised dominion or control over the property, and (4) the plaintiff suffered injury. *NXCESS Motor Cars, Inc. v. JPMorgan Chase Bank*, 317 S.W.2d 462, 470 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

134.    The evidence attached to Plaintiffs' Complaint (Doc. 1), Application for Seizure, Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction (Doc. 2), and this supplement to the application, show that ZroBlack is the undisputed owner of the laptop and ZroBlack.com domain. See Appendix, Exhibits 1, 3, 5. The fact that the domain name was "ZroBlack.com" is an additional indicium of ownership, given the position Saenz held at the time of the purchase of the domain. The laptop is personal property. Although no court has addressed whether a domain name is "personal property," it is analogous to intellectual property, which has been characterized as personal property. The evidence also shows that Saenz had no right to exercise dominion and control over that property. *See* Appendix, Exhibit 15. Nothing in the release transfers ownership of ZroBlack property to Saenz. In fact, the Release requires Saenz to assign all of his interest in ZroBlack to Jonathan Villarreal. By foregoing any right of ownership to ZroBlack, Saenz necessarily foregoes any claim of ownership in ZroBlack property.

135.     Saenz's argument that the Release discharges any obligation he has to return ZroBlack property is misguided. The Release make no mention of ZroBlack's property and contains no hint of an assignment or transfer of ownership in that property from ZroBlack to Saenz. In fact, it requires Saenz to assign all interest in ZroBlack to Villarreal. To contend that ZroBlack's post-Release request for a return of its property is a "claim" extinguished by the Release turns the Release on its head. Saenz can't be expected to assign his ownership of ZroBlack to Villarreal but not return ZroBlack's property to ZroBlack. Nor would any reasonable person read the Release in that manner. Thus, Saenz's exercise of dominion and control over the property is wrongful.

136.     Finally, as the exhibits show, ZroBlack was injured. It does not have its laptop. Its webpage has been removed, and it cannot access its email server, which has been deleted but which may be recoverable if ZroBlack can gain access to the domain. The exhibit also shows damage in the form of at least one lost contract.

## H.     Likelihood of Success on the Merits – Civil Theft (TTLA)

137.     Finally, the elements of a cause of action under the TTLA are (1) the plaintiff had a possessory right to the property or was the provider of services, (2) the defendant unlawfully appropriated, secured, or stole the plaintiff's property or services, (3) the unlawful taking was made with the intent to (a) deprive the plaintiff or the property, or (b) avoid payment for services, and (4) the plaintiff sustained damages as a result of the theft.  TEX. CIV. PRAC. & REM. CODE §§ 134.002(2), 134.003, 134.005(a), TEX. PEN. CODE ANN. §§ 31.03(a), (B)(1), 31.04(a).

138.     As demonstrated, ZroBlack has a possessory right to the laptop, Saenz unlawfully appropriated that laptop with the intent to deprive ZroBlack of that property, and ZroBlack sustained damage as a result. The fact that Saenz deleted ZroBlack's webpage and email server is further an indicium that Saenz intended to deprive ZroBlack of ownership of its property.

## I.     Irreparable Harm

139.    To successfully obtain injunctive relief, a plaintiff must show that it is likely to suffer irreparable injury, for which there is no adequate remedy at law. *Daniel Health Scis., LLC v. Vascular Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013). State law determines whether harm is irreparable. *Heil Trailer Intern. Co. v. Kula*, 542 Fed. Appx. 329, 336 (5ᵗʰ Cir. 2013).[6]

140.    Generally, irreparable injury is one that cannot be undone by monetary damages or one for which monetary damages would be "especially difficult to calculate." *Id*. However, when a defendant is in possession of trade secrets and in a position to use them, state courts have presumed irreparable harm will result absent injunctive relief. *Id*. As observed by the Fifth Circuit in *Heil Trailer*, Texas courts have frequently found irreparable harm in such cases, further noting that the Fifth Circuit itself had upheld similar findings by federal district courts. *Id*. at 336 (and cases cited therein). Texas law presumes irreparable harm where trade secrets are concerned. *Id*.

141.    Even without a presumption of irreparable harm, ZroBlack has nonetheless demonstrated irreparable harm. The evidence shows:

> a)      After ZroBlack executed an NDA with its Foreign Customer (and after execution of the PSA) Saenz nonetheless attempted to shop the technology to others. Saenz also threatened to do so despite the fact ZroBlack had signed an NDA. Furthermore, Saenz has repeatedly refused to return the computer on which a copy of the code is stored. Under these circumstances ZroBlack has demonstrated that use or disclosure of the trade secrets is threatened and do irreparable injury to ZroBlack.
>
> b)      Saenz has refused to return the domain for ZroBlack's webpage and email server to ZroBlack despite repeated requests that he do so. Saenz deleted the webpage and email server, destroying

---

[6] This rule is generally applied in state law diversity cases. However, where a federal court is analyzing state law under a pendant jurisdiction claim, the same principle applies. Here, however, the Court is presented with a horse of a slightly different color—the inclusion of a federal trade secrets misappropriation claim. Nonetheless, because the reasoning behind state law decisions on irreparable harm is equally compelling under the Defend Trade Secrets Act, Plaintiff respectfully suggests that the same rule should apply to injunctive relief sought under the Defend Trade Secrets Act.

valuable ZroBlack records. Finally, Saenz attempted to extort money from ZroBlack by offering to "sell" the domain back to ZroBlack for $7,000.

142.    Over and beyond the trade secrets issue, the harm done due to Saenz's continued interference with ZroBlack's business relations by refusing to resolve the DUNS number issue precludes him from obtaining government contracts, the value of which may be especially difficult to calculate. His continued withholding of ZroBlack's domain name is irreparable because diminishes ZroBlack's chances of recovering its email server, and his continued possession of a laptop belonging to ZroBlack, increases the risk the trade secrets thereon are used of disclosed.

**J.    No Adequate Remedy at Law**

143.    The injury cannot be prevented or fully rectified by a final judgment following a trial, nor can Plaintiff be adequately compensated by damages. The inability of ZroBlack to access its laptop that contains its trade secrets and emails from its Foreign Customer and potential customers will continue to cause ZroBlack to lose potential contracts and cause continuing injury to ZroBlack's goodwill and reputation, for which ZroBlack has no adequate remedy at law. While the product and contracts do have monetary value, the painstaking process undertaken by Plaintiff in the development and an award of monetary damages alone cannot fully compensate ZroBlack for its injuries and ZroBlack's lack an adequate remedy at law.

144.    As stated in the original Application, the inability of ZroBlack to access its laptop that contains its trade secrets and emails from its Foreign Customer and potential customers will continue to cause ZroBlack to lose potential contracts and cause continuing injury to ZroBlack's goodwill and reputation, for which ZroBlack has no adequate remedy at law. While the product and contracts do have monetary value, the painstaking process undertaken by Plaintiff in the

development and an award of monetary damages alone cannot fully compensate ZroBlack for its injuries and ZroBlack's lack an adequate remedy at law.

**K.      Balance of Hardships Favors an Injunction**

145.    ZroBlack has lost its webpage and email server while Saenz holds the domain hostage. ZroBlack has lost the use of the laptop appropriated by Saenz. ZroBlack also faces the risk that Saenz will use or disclose ZroBlack's trade secrets and confidential information.

146.    On Plaintiffs side of the ledger, however, the hardship is great. ZroBlack and its partner, ▮▮▮▮▮▮▮▮▮▮, continue to lose government contracts. ZroBlack and Jonathan continue to suffer harm their reputations. Defendant John Saenz's refusal to return the laptop and ZroBlack's domain name to ZroBlack is, as Defendants' Gunn, Lee & Cave expressed in their Rule 12(b) Motion to Dismiss (Doc. 11), nothing more than spite. There can be no hardship to him in returning what rightfully belongs to ZroBlack. This is equally true with his refusal to rectify the situation with ZroBlack's DUNS number. The DUNS number was assigned to ZroBlack, not John Saenz. Dun & Bradstreet does not issue DUNS numbers to individuals.

147.    For his part, Saenz will only be required to return to ZroBlack that to which Saenz has no legal right or interest, and to release the domain name. The injury that ZroBlack will suffer and has suffered outweighs any damage that will potentially be done to Defendant Saenz. Additionally, Enjoining the Defendant from withholding ZroBlack's laptop, email server, and website, and requiring him to release it to ZroBlack does not deprive Defendant of any legal remedy should he prevail in this lawsuit. Furthermore, the balance of hardships cannot be used by a party guilty of intentional wrong. *Zelios*, 568 S.W. 2d at 175. (internal citations omitted).

148.    If an injunction is not granted, ZroBlack will continue to suffer from the inability to access its domain and reestablish its webpage.  ZroBlack will also be prevented from trying to recover deleted emails.

149.    The balance of hardships clearly favors Plaintiff's position. Plaintiff will not only suffer monetary damages, but also damages to its business and reputation.

**L.    Public Interest**

150.    The public interest weighs heavily in favor of issuance of an injunction. It is in the interest of public policy to prohibit the sale and use of products that were derived from the improper misappropriation of trade secrets. *Aspen Technology, Inc. v. M3 Technology, Inc.*, 569 Fed. Appx. 259, 273 (5th Cir. 2014). A preliminary injunction serves the public interest by depriving Defendants of the benefit of the misappropriated trade secret and enforces better business ethics by depriving the wrongdoers of the benefit of their wrongdoing. *AHS Staffing, LLC v. Quest Staffing Group, Inc*., 335 F. Supp. 3d 856, 874 (E.D. Tex. 2018). Thus, granting the temporary restraining order and temporary and permanent injunction would not adversely affect the public interest.

151.    John Saenz's actions now affect the public directly. Technology solutions that could have been available to the ██████████████ now will not be, with unknown potential consequences to the public. ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████

**M.    Bond**

152.    No bond should be required because the injunction ZroBlack's seeks would only require Saenz to return what does not belong to him. However, should a bond be required, ZroBlack respectfully suggests it should be equal to the value of the laptop computer, approximately $2,700.00.

## VI.   RELIEF REQUESTED

153.   For the foregoing reasons, the Plaintiffs request the Court to order the following:

1. Seizure of the laptop computer identified above or, alternatively, enter a temporary restraining order, preliminary injunction, and permanent injunction ordering Defendant John Saenz to return to laptop computer and trade secrets thereon;

2. A temporary restraining order and preliminary injunction ordering Defendant John Saenz to release to and assign the ZroBlack domain to ZroBlack, LLC, including the email server and webpage;

3. A temporary restraining order and preliminary injunction ordering Defendant John Saenz to return any trade secret and confidential information in his possession, custody, or control that is owned by Plaintiff ZroBlack; and

4. A temporary restraining order and preliminary injunction ordering Defendant John Saenz not to keep, maintain, use, or disclose any software code or trade secret belonging to ZroBlack.

## VII.   PRAYER

WHEREFORE, Plaintiffs pray that Plaintiffs be granted the relief requested herein, and all such other relief to which they may show themselves to be justly entitled at law or in equity.

Respectfully submitted,

THE VETHAN LAW FIRM, PC

By: /s/ *Joseph L. Lanza*

Charles M. R. Vethan
Attorney-in-Charge
Texas Bar No.  00791852
Steven A. Costello
Texas Bar No. 24062677
VETHAN LAW FIRM - HOUSTON
Two Memorial City Plaza
820 Gessner, Suite 1510
Houston, Texas 77024
Tel: (713) 526-2222
Fax: (713) 526-2230
Email: edocs@vwtexlaw.com


Joseph L. Lanza
Texas bar No. 00784447
VETHAN LAW FIRM – SAN ANTONIO
11459 Huebner, Suite 101
San Antonio, Texas 78230
Tel: (210) 824-2220
Fax: (713) 526-2230
Email: edocs@vwtexlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically filed with the Court on the 16th day of November 2020, and electronically served on the date reflected in the ECF system upon all parties registered to receive notice pursuant to the Court's CM/ECF system.

David A. Vanderhinder
State bar No. 24070787
DVanderhinder@dykema.com
Ryan J. Sullivan
State Bar No. 24102548
RSullivan@dykema.com
DYKEMA GOSSETT PLLC

112 East Pecan St., Suite 1800
San Antonio, Texas 78205

**Attorney for Defendant John Saenz**

George R. Spencer, Jr.
State Bar. No. 18921001
gspencer@langleybanack.com
Natalie F. Wilson
State Bar. No. 24067769
nwilson@langleybanack.com

**Attorneys for Defendants Gunn, Lee & Cave, P.C.**
**And Miguel Villarreal, Jr.**

/s/ *Joseph L. Lanza*

Joseph L. Lanza

5.