# PROFESSIONAL SERVICES AGREEMENT

**ZroBlack, LLC**
Legal Name of Service Provider

**1150 N Loop 1604 W., Ste. 108-259**
Address of Principal Place of Business

**San Antonio, Texas 78248**
City, State / Province, Postal Code/Country

Contact Person: JOHN SAENZ, CEO          Phone: 210-473-1694          Email: je@zroblack.com

Service Provider is incorporated in the state/country of: Delaware

"**Statement of Work**" means the document(s) attached as **Exhibit A** hereto, including any subsequent Statement of Work attached as Exhibit A-1, A-2, etc., which is signed by all parties and references this Agreement.

"**Effective Date**" means April 15, 2019.

The attached Terms and Conditions describe the terms and conditions under which ZroBlack, LLC ("Services Company"), Jonathan Villarreal ("Assigned Consultant," and together with Services Company, "Service Provider") and John Saenz agree to provide ████████ ("Client") the services described in one or more Statements of Work attached hereto (each a "Statement of Work"). Each Statement of Work executed by all parties that references this Agreement shall be governed by the Terms and Conditions attached hereto, unless otherwise agreed to by the parties in writing. The Terms and Conditions and the Statement(s) of Work attached hereto set forth the entire understanding of the parties with respect to the subject matter described herein and constitute the entire agreement ("Agreement") between the parties. By signing below, the parties agree to be bound by the terms and conditions of this Agreement.

**ZroBlack, LLC**

By: _John Saenz_
        139E0395E1D94D1...
                Signature

Name: _____John Saenz_____

Title: _____Chief Executive Officer_____

Address:   1150 N Loop 1604 W.
                Ste 108-259
                San Antonio Texas, 78248



PLAINTIFF'S
EXHIBIT

**7**

**Jonathan Villarreal**

By: _Jonathan Villareal_
        068DE9 Signature

Name: _____ Jonathan Villareal _____

Address: 1150 N Loop 1604 W.
            Ste 108-259
            San Antonio Texas, 78248


**John Saenz**

By: _John Saenz_
        139E0395E1Q84D1
                 Signature

Name: _____ John Saenz _____

Address: 1150 N Loop 1604 W.
            Ste 108-259
            San Antonio Texas, 78248

**THIS AGREEMENT CONSISTS OF:**
The attached Terms & Conditions
Statement(s) of Work executed and attached as Exhibit A, A-1, etc.

**TERMS AND CONDITIONS**

1.  Services; Deliverables; Acceptance.

1.1  Service Provider will use diligent efforts to perform the services and deliver the deliverables ("Deliverables") in conformance with the specifications and schedule specified in the relevant Statement of Work (the "Services"). The Client understands that Service Provider's performance is dependent in part on the Client's actions, and Client shall reasonably cooperate with Service Provider in connection with the Services. The Service Provider agrees to prepare and submit progress reports to Client and meet with Client on a regular basis detailing the progress being made by Service Provider in the performance of the Services. All Services will be provided by Assigned Consultant unless otherwise approved by Client in writing (which may be by email) and Client may disapprove any provision of Services other than by Assigned Consultant in its absolute discretion. All of Service Provider's subcontractors shall be bound by obligations consistent with the provisions of this Agreement, and Service Provider shall be responsible for all acts and omissions of each such subcontractor, as if each were "Service Provider" hereunder. Service Provider agrees that it has not violated and it will not (and will not permit others to) violate any agreement with or rights of any third party or, except as expressly authorized by Client in writing hereafter, use or disclose at any time Service Provider's own or any third party's confidential information or intellectual property in connection with the Services or otherwise for or on behalf of Client. In addition, Service Provider hereby confirms that it has not used or disclosed Service Provider's own or any third party's confidential information or intellectual property for or on behalf of Client.

1.2  When Service Provider considers a Deliverable completed, Service Provider will deliver such Deliverable to the Client. The Client will accept or reject the Deliverable within thirty (30) days after delivery based upon conformity with the relevant specifications described in the Statement of Work. If the Client rejects a non-conforming Deliverable, Service Provider will promptly correct the failures specified in the rejection notice and the provisions above shall be reapplied until the Deliverable is accepted, but after the second or any subsequent rejection or if the corrections are not made within thirty (30) days of the initial rejection, Client may terminate this Agreement (or any applicable SOW) upon fifteen (15) days' notice, subject to lack of acceptance during the notice period. Upon Client's written acceptance of each Deliverable specified in a Statement of Work, Service Provider shall invoice Client for the corresponding payment for such Deliverable described in the Statement of Work, unless such payment has been made by Client in advance of acceptance of such Deliverable.

2.  Compensation; Billing Procedures.

2.1  Subject to the terms of this Agreement, as the sole compensation for the Services, Client will pay Service Provider for Services performed in accordance with the relevant Statement of Work.

2.2  Client also agrees to pay Service Provider all pre-approved, actual and reasonable travel, lodging and other out-of-pocket expenses incurred by Service Provider in conjunction with the Services.

2.3  In addition to any compensation provided for in a Statement of Work, Client agrees to pay Service Provider a bonus of $1,000 for each patent granted by the United States Patent and Trademark Office on which Assigned Consultant is a named inventor.

2.4  Notwithstanding anything herein to the contrary and for the avoidance of doubt, in the event that Service Provider fails to perform hereunder, or materially breaches this Agreement or any Exhibit or Statement of Work attached hereto, then, in addition to any other legal or equitable remedies Client may have for such breach, Client shall be entitled to, in Client's full discretion, (i) recoup all or any portion of the amount paid to Services Company pursuant to this Agreement or any Exhibit or Statement of Work attached hereto, including any amounts distributed by Services Company to Assigned Contractor and/or Mr. Saenz, directly from Services Company, Assigned Contractor and/or Mr. Saenz, as applicable, and/or (ii) set-off all or any portion of the amount paid to Services Company pursuant to this Agreement or any Exhibit or Statement of Work attached hereto against any Earn-Out Obligation otherwise accrued and payable pursuant to this Agreement. Notwithstanding the foregoing, no recoupment or set-off pursuant to this Section 2.4 shall

2

affect any party's continuing obligations set forth in this Agreement. For the avoidance of doubt, in no event shall any recoupment or set-off permitted pursuant to this Section 2.4 function as a cap on Services Company's, Assigned Contractor's and/or Mr. Saenz's liability for any damages or losses under this Agreement.

3. Earn-Out.

3.1 For three (3) years following the date hereof, Client shall pay to Services Company the Earn-Out Obligation, as provided in this Section 3, if and to the extent earned.

3.2 The Earn-Out Obligation shall be equal to the sum of (i) fourteen and one-half percent (14.5%) of New Customer Revenue and (ii) fourteen and one-half percent (14.5%) of Existing Customer Growth, in each case, during a given Earn-Out Period (the "Earn-Out Obligation"). "New Customer Revenue" means payments Client receives from New Customers in respect of the sale of New Products only; for the avoidance of doubt, such amount shall not include payments Client receives from such New Customer in respect of the sale of product(s) that are not New Products, despite such product(s) being bundled and sold to the New Customer as a package that includes New Products. "Existing Customer Growth" means an increase by more than one hundred thousand dollars ($100,000) in a given calendar year in payments Client receives from Existing Customers in respect of sales of New Products only; for the avoidance of doubt, such amount shall not include payments Client receives from such Existing Customer in respect of the sale of product(s) that are not New Products, despite such product(s) being bundled and sold to the Existing Customer as a package that includes New Products.

3.3 Calculation of New Customer Revenue and Existing Customer Growth (i) will be in accordance with IFRS (except as set forth in clause (ii) below) and (ii) notwithstanding anything to the contrary under IFRS, will specifically exclude, without limitation: (A) existing or future products or services that are made, marketed or sold by Client Group; (B) except as provided in Section 3.2, products or services that are marketed or sold to Existing Customers (which, for the avoidance of doubt, includes any products or services that include or otherwise relate to the Technology); (C) products or services that are marketed or sold to New Customers that do not include or otherwise relate to the Technology; and (D) any products made or sold by Client Group on behalf of a third party.

3.4 As promptly as practicable (and in any event within ninety (90) days) after each of the six (6), twelve (12), eighteen (18), twenty-four (24), thirty (30) and thirty-six (36) month anniversaries of the date hereof (each such six-month period, an "Earn-Out Period"), Client shall prepare and deliver to Services Company a statement of the applicable Earn-Out Obligation for the applicable Earn-Out Period, if any (each, an "Earn-Out Statement"), including all supporting documentation thereto. If Services Company agrees with the calculations contained in an applicable Earn-out Statement, Services Company shall provide written notice to Client and such Earn-Out Statement shall become final and binding upon Services Company and Client. If Services Company does not accept the calculations set forth in an applicable Earn-Out Statement, Services Company may, within thirty (30) calendar days following receipt of such Earn-Out Statement, deliver a notice to Client specifying in reasonable detail all disputed items and the basis therefor, including all supporting documentation thereto. If Services Company fails to give such notice in such thirty (30) calendar day period, Services Company shall have irrevocably and unconditionally waived its right to contest the applicable Earn-Out Statement and such Earn-Out Statement shall become final and binding. If Services Company notifies Client of any objections to an applicable Earn-Out Statement within such thirty (30) calendar day period, Client and Services Company shall, within twenty (20) calendar days following the date of such notice, attempt to resolve their differences and any written resolution by them as to any disputed amount shall be final and binding for all purposes under this Agreement. If, at the conclusion of such resolution period Client and Services Company have not reached an agreement on any objections with respect to an applicable Earn-Out Statement, then all amounts and issues remaining in dispute shall be submitted to an independent accounting firm mutually acceptable to Client and Services Company (the "Accountant") for review and the Accountant's determination shall be conclusive and binding upon Client and Services Company. The fees, costs and expenses of the Accountant's review and report shall be allocated to and borne by Client and Services Company based on the inverse of the percentage that the Accountant's determination (before such allocation) bears to the total amount of the total items in dispute as originally submitted to the Accountant. For example, in the event that the items in dispute total in

3

amount to $1,000 and the Accountant awards $600 in favor of Client's position, 60% of the cost of its review would be borne by Services Company and 40% of the costs would be borne by Client.

3.5    Nothing contained herein shall in any way limit each member of Client Group's, or such member's respective successors, transferees or assigns, ability to manage, operate, run or control its respective businesses and Services Company hereby acknowledges and agrees that (i) from and after the date hereof, each member of Client Group has the right to operate its respective business (and all other components of such Client Group's business) in any way that such member deems appropriate in its sole discretion, (ii) no member of Client Group has an obligation to operate its respective business (or any other component of such Client Group's business) in a manner designed to achieve the Earn-Out Obligation, however, each member of Client Group will refrain from operating its respective business to intentionally avoid achieving the Earn-Out Obligation without any other good faith business purpose, (iii) no member of Client Group is obligated to operate its respective business in a manner consistent with the manner in which Services Company operates its business, (iv) the potential Earn-Out Obligation is speculative and subject to numerous factors outside the control of the members of Client Group, (v) no member of Client Group owes any express or implied duty to Services Company, including any fiduciary or implied duty of good faith and fair dealing and (vi) the parties solely intend the express provisions of this Agreement to govern their contractual relationship.

4.    Term/Termination.

4.1    This Agreement shall commence on the Effective Date and continue for one (1) year, unless terminated earlier as described in this Section 4, and may be renewed for up to two (2) additional one (1) year terms at Client's sole discretion.

4.2    If either party materially breaches this Agreement, the other party may terminate this Agreement by giving the breaching party fifteen (15) days written notice of such breach, unless the breach is cured within the notice period. Client also may terminate this Agreement at any time, with or without cause, upon thirty (30) days' notice. Any such termination may be limited to one or more Statements of Work, in which case, the consequences of termination will be limited to the subject matter of those Statements of Work. Sections 5, 6, 7, 8 and 9 shall survive any termination or expiration of this Agreement. Upon termination of this Agreement, (except if Client terminates this Agreement for a material breach by Service Provider, in which case Client shall have the right to recoup payments made to Service Provider pursuant to Section 2.4), Client agrees to pay Service Provider all amounts due or accrued as of the date of such termination in accordance with the applicable Statement of Work.

5.    Warranty and Disclaimer.

5.1    Service Provider represents, warrants and agrees: (a) to perform the Services in a professional and workmanlike manner by employees of Service Provider, including Assigned Consultant, having a level of skill commensurate with the requirements of this Agreement; (b) that the Deliverables will conform to the applicable specifications therefor and that none of the Services, Deliverables or Inventions nor any development, use, production, distribution or exploitation thereof will infringe, misappropriate or violate any intellectual property or other right of any person or entity; (c) Service Provider has the full right to allow Service Provider to provide Client with the assignments and rights provided for herein (and, to the extent applicable, has written enforceable agreements with all employees, contractors and other persons necessary to give Service Provider the rights to do the foregoing and otherwise fully perform this Agreement); (d) Service Provider shall comply with all applicable laws and Client safety rules and other policies in the course of performing the Services; (e) if Service Provider's work requires a license, Service Provider has obtained that license and the license is in full force and effect, and (f) that all software included within any Deliverable is, to the best of Service Provider's knowledge, (i) free of all viruses, worms, trojan horses and other infections or harmful routines, (ii) does not contain any "open source," "copy left," "public" or other similar code or anything derived from or based on any of the foregoing (unless approved by Client in writing), and (iii) is free from (and if distributed would still be free from) any requirement imposed by a licensor that recipients be entitled to source code or to modify or distribute any such software. Service Provider shall indemnify Client from any and all claims, damages, liability, losses,

4

settlement, attorneys' fees and expenses, as incurred, on account of any breach of the foregoing or this Agreement or any other action or inaction by or for or on behalf of Service Provider.

5.2    EXCEPT AS SET FORTH IN THIS SECTION 5, SERVICE PROVIDER DISCLAIMS ALL WARRANTIES, IMPLIED OR EXPRESSED, INCLUDING WITHOUT LIMITATION ALL IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.

6.    Ownership Rights; Licenses.

6.1    Client shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, sui generis database rights and all other intellectual property rights of any sort throughout the world) relating to any and all Deliverables and any other inventions (whether or not patentable), works of authorship, mask works, designations, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by or on behalf of Service Provider during the term of this Agreement that relate to the subject matter of, or arise in connection with, the Services, Deliverables or any Proprietary Information (as defined below) (collectively, "Inventions"). Service Provider will promptly disclose and provide all Inventions to Client and Service Provider hereby assigns to Client all rights, title and interest, in and to all Inventions; provided, however, that such assignment does not include any Underlying Service Provider Technology (as that term is defined below). "Underlying Service Provider Technology" shall mean (a) Service Provider technology, methodologies and intellectual property existing as of the Effective Date or otherwise arising outside of work under this Agreement, and (b) any intellectual property rights therein. Subject to the terms and conditions of this Agreement, to the extent any Underlying Service Provider Technology is incorporated into or otherwise reasonably necessary to use or otherwise exploit any Deliverables or Inventions, Service Provider grants to Client a non-exclusive, royalty-free, perpetual, irrevocable, sublicensable, worldwide license to fully exercise and exploit the Underlying Service Provider Technology and to make derivative works of the same in connection with the exploitation of the Deliverables and Inventions (and any modifications, improvements or derivatives thereof).

6.2    To the extent allowed by law, the assignments and licenses granted Client hereunder include all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like. Furthermore, Service Provider agrees that notwithstanding any rights of publicity, privacy or otherwise anywhere in the world, and without any further compensation, Client is hereby authorized to (and to allow others to) use Service Provider's name in connection with promotion of its business, products or services. To the extent any of the foregoing is ineffective under applicable law, Service Provider hereby provides any and all ratifications and consents necessary to accomplish the purposes of the foregoing.

6.3    Service Provider shall further assist Client from time to time at Client's request and expense, to further evidence, record, perfect, maintain, enforce and defend any and all of the foregoing rights. Each of Services Company and Assigned Consultant hereby irrevocably designates and appoints Client as its agents and attorneys-in-fact, coupled with an interest, to act for and on Service Provider's behalf to execute and file any document and to do all other lawfully permitted acts to further the foregoing with the same legal force and effect as if executed by Service Provider and all other creators or owners of any applicable Inventions.

6.4    In addition, in the event Service Provider incorporates in the Inventions or Deliverables information or materials to which third parties have any rights, whether by patent, copyright, trade secret or otherwise ("Third Party Materials"), unless otherwise specified in the Statement of Work, Service Provider agrees to obtain written permission to include such Third Party Materials, without any additional expense to Client. This written permission must be consistent with all the rights granted to Client under this Agreement. Service Provider shall provide Client with a copy of the written permission upon completion of the Services or otherwise upon request.

7.    Confidentiality.

7.1    Service Provider agrees that all Deliverables and Inventions and all other information (including, without limitation, computer programs, technical drawings, algorithms, know-how, formulas, processes, ideas, inventions (whether patentable or not), schematics and other technical, business, financial, customer and product development plans, forecasts, strategies and information) that Service Provider develops, learns or obtains in connection with the Services, constitute "Proprietary Information" of Client. Service Provider will hold in confidence and not disclose or, except in performing the Services, use any Proprietary Information. However, Service Provider shall not be obligated under this paragraph with respect to information Service Provider can document is or becomes readily publicly available without restriction through no fault of Service Provider.

7.2    Upon termination and as otherwise requested by Client, Service Provider will promptly return to Client all items and copies containing or embodying Proprietary Information (including, without limitation, all Deliverables and all work-in-progress). Any breach of this Section 7 or Section 6 will cause irreparable harm to Client for which damages would not be an adequate remedy, and therefore, Client will be entitled to injunctive relief with respect thereto in addition to any other available remedies.

8.    <u>Right of First Offer</u>.

8.1    Service Provider shall, on a quarterly basis, provide Client with an update on any ongoing or new developments related to Service Provider's Intellectual Property, meaning (i) United States and foreign patents, copyrights and mask works, registrations and applications therefor, and rights granted upon any reissue, division, continuation or continuation-in-part thereof, (ii) trade secret rights arising out of the laws of any and all jurisdictions, (iii) ideas, inventions, concepts, technology, software, methods, processes, drawings, illustrations, writings, know-how, show-how, and all rights therein and thereto, (iv) any other intellectual property rights, whether or not registrable, and (v) licenses in or to any of the foregoing, in each case, relating to the products, services and technology set forth on **Exhibit B** attached hereto.

8.2    The parties agree that Client shall have the exclusive right of first offer if either the Services Company or Assigned Consultant proposes to enter into any agreement, letter of intent, exclusivity agreement or similar agreement relating to a sale, lease, license, transfer or other disposition of Intellectual Property by means of any transaction or series of related transactions ("Acquisition"), including any proposed or contemplated Acquisition of Intellectual Property of either Services Company or Assigned Consultant ("Acquisition Proposal") or receives an Acquisition Proposal from a bona fide third party. The Services Company or Assigned Consultant, as applicable, shall provide Client with written notice (the "Notice") of any Acquisition Proposal as promptly as practicable. The Notice shall include a summary of the key terms of the Acquisition Proposal including, but not limited to (i) the Intellectual Property subject to the Acquisition Proposal; (ii) the name of the proposed counter party, if any; and (iii) the proposed purchase price. Client shall maintain the Notice provided in strict confidence.

8.3    Prior to Client's receipt of the Notice, and for a period of ninety (90) days thereafter (which time period may be extended by mutual written agreement between the parties hereto) (the "Review Period"), neither the Services Company nor Assigned Consultant shall permit, nor permit any of their respective officers, directors, employees, agents, representatives or other affiliates to (i) enter into any agreement that precludes the Services Company and/or Assigned Consultant from negotiating or completing an Acquisition with Client, or (ii) enter into any definitive agreements (including, without limitation, any no shop agreement, binding term sheet or transfer agreement) with respect to an Acquisition with any Person other than Client.

8.4    During the Review Period, the Services Company and/or Assigned Consultant shall provide Client access to facilities, personnel, management, documents and other information relating to the Services Company and/or Assigned Consultant and their respective businesses, products and technology, subject to the terms of a reasonable and customary confidentiality agreement, to enable Client to conduct a due diligence investigation customary in the context of a sale, lease, license, transfer or other disposition of a company's intellectual property assets.

8.5    During the Review Period, Client shall have the right, in its sole discretion, to acquire the Intellectual Property of the Services Company and/or Assigned Consultant proposed to be transferred, sold or otherwise acquired in any active Acquisition Proposal, on terms equal to or better than those set forth in

such Acquisition Proposal described in the Notice to Client, which right may be exercised by Client by delivery of written notice to the Services Company and/or Assigned Consultant (a "Client Exercise Notice"). Provided that the terms, including the purchase price, are equal to or better than those set forth in such Acquisition Proposal, the Services Company and/or Assigned Consultant and Client will have an additional 90 days from the date of such Client Exercise Notice (the "Acquisition Period") to proceed to execute and complete the Acquisition by Client on the terms set forth in the Client Exercise Notice, and provided that the agreement for the Acquisition shall include other customary terms and conditions for such an acquisition to the extent not set forth in the Acquisition Proposal.

8.6     If, during either the Review Period or the Acquisition Period, a Material Amendment (as defined below) is submitted to the Services Company and/or Assigned Consultant then (A) within five (5) days of receiving such amendment, the Services Company and/or Assigned Consultant shall provide Client with written notice, stating that such Material Amendment has been received, and include a summary of the key terms of the Material Amendment including, but not limited to (i) the name of the counter party in the Material Amendment and (ii) the proposed purchase price, and (B) the Services Company or Assigned Consultant and Client agree that in such event, the Review Period or the Acquisition Period, as applicable, shall equal the greater of (x) the number of days that remain in such Review Period or Acquisition Period, and (y) thirty (30) days. "Material Amendment" means (i) a change to the consideration payable under an Acquisition Proposal such that the total aggregate consideration payable to the Services Company and/or Assigned Consultant exceeds the total aggregate consideration payable described in the Notice, or (ii) during an ongoing Review Period or Acquisition Period, the submission of a new Acquisition Proposal by a new party with a proposed consideration amount that exceeds the total aggregate consideration payable to the Services Company and/or Assigned Consultant described in the Notice.

8.7     With respect to each Acquisition Proposal for which Client received a Notice from the Services Company and/or Assigned Consultant and for which the Services Company and/or Assigned Consultant complied with all of the applicable procedures and requirements of Section 8 (the "Noticed Proposal"), following the expiration of the applicable Review Period and/or Acquisition Period, the Services Company and/or Assigned Consultant shall be free for a period of ninety (90) days thereafter, to enter into a definitive agreement with respect to such Noticed Proposal on the terms and conditions set forth in the Notice or on such other terms and conditions not materially more favorable to the parties (other than the Services Company and/or Assigned Consultant) involved with such Acquisition Proposal than those specified in the Notice.

8.8     Unless the Services Company and Assigned Consultant shall have complied with all of the procedures and requirements of this Section 8, then any Acquisition Proposal which the Services Company or Assigned Consultant may accept, and any transaction it may purport to effect pursuant thereto, shall be void *ab initio*.

9.      <u>Restrictive Covenants</u>.

9.1     Each of Services Company, Assigned Consultant and Mr. Saenz (each, an "Interested Party" and collectively, the "Interested Parties") understand and agree that the transactions contemplated herein will result in an immediate and direct benefit to each such Interested Party, including the direct or indirect receipt of a portion of the consideration, including any Earn-Out Obligation, paid by Client.

9.2     In order to protect the value of the business of the Client Group as conducted on the date hereof (together with any other line of business proposed to be engaged in by Client as of the date hereof, the "Business"), for a period of five (5) years after the date hereof (the "Restricted Period"), the Interested Parties shall not in the United States of America or in such other geographic areas in which Client conducts business or proposes to conduct business as of the date hereof, directly or indirectly, and shall not cause or permit any Affiliate or other Person to, own, operate, manage, control, engage in, Participate in, invest in, act as employee of or consultant or advisor to, render services for (alone or in association with any Person), sell or license technology, intellectual property or any other assets to, or otherwise assist in any manner, or actively prepare to do any of the foregoing, any Person that engages in or owns, invests in, operates, manages or controls, any venture or enterprise which, directly or indirectly, engages in the development, marketing, sale, license, provision and/or maintenance of the products, services and/or technology set forth on **Exhibit C** attached hereto, or could do any of the foregoing through such Interested Party's assistance (a

"Competitive Business"). "Participate" includes any direct or indirect interest in any enterprise, whether as an officer, director, manager, employee, partner, sole proprietor, agent, representative, independent contractor, executive, franchisor, franchisee, creditor, owner or otherwise. Notwithstanding the foregoing, nothing herein shall prohibit either Interested Party from (i) being a passive owner of not more than two percent (2%) of the outstanding stock of any class of securities of a publicly-traded corporation engaged in a Competitive Business, so long as the Interested Party has no active participation in the business of such corporation, or (ii) performing any services for Client.

9.3     During the Restricted Period, no Interested Party shall directly or indirectly through another Person (i) induce, encourage or attempt to induce or encourage any employee or consultant of the Client Group (each, a "Business Associate") to leave the employ of or consulting relationship with the Client Group, or (ii) hire, employ or enter into a consulting relationship with any Business Associate during the time such Person is an employee or independent consultant for such entities, or for the six (6) months thereafter, or (iii) in any way knowingly interfere with the relationship between any vendor, licensee or business relation of the Client Group, including, without limitation, inducing such Person to cease doing business with the Client Group. Notwithstanding the foregoing, nothing in this Agreement shall prohibit any Interested Party or any other Person from making a general, public solicitation for employment, or using an employee recruiting or search firm to conduct a search, that does not specifically target employees or consultants of the Client Group or any of them, provided that this sentence will not serve to limit in any way the other restrictions contained herein, including but not limited to the restrictions set forth in clause (ii) of this Section 9.2.

9.4     During the Restricted Period, no Interested Party shall make, or direct any other Person to make, any statement or communicate any information (whether oral or written) that disparages, or harms the reputation, in any material respect, of the Business or the Client Group. Nothing in this Agreement shall prohibit or restrict any Interested Party from: (i) testifying under oath pursuant to legal process; (ii) providing information to, or otherwise assisting in any investigation or proceeding brought by any state or federal regulatory or law enforcement agency, legislative body, or the designated compliance or human resources officers of the Client Group; or (iii) making any disclosure of information required by law.

9.5     Each Interested Party acknowledges that Client would not consummate the transactions contemplated in this Agreement unless each Interested Party entered into this Agreement and agreed to be bound by the terms in this Section 9 and this Agreement was not in full force and effect and a binding and enforceable contract of each Interested Party as of the date hereof. Each Interested Party agrees that each of the covenants made in this Section 9 shall be construed as agreements independent of any other provision(s) of this Agreement and shall survive any order of a court of competent jurisdiction terminating any other provision(s) of this Agreement.

10.    General.

10.1    Publicity.  Neither party shall issue a press release or other public statement regarding the relationship of the parties or this Agreement without the prior written consent of the other party.

10.2    Relationship of Parties.  For all purposes under this Agreement each party shall be and act as an independent contractor and shall not bind nor attempt to bind the other to any contract. Service Provider will be solely responsible for its income taxes in connection with this Agreement and Client will be responsible for sales, use and similar taxes, if any.

10.3    Severability.  In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement shall continue in full force and effect and shall be interpreted so as reasonably to effect the intent of the parties hereto. The parties shall use their reasonable best efforts to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that shall achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

10.4    Governing Law; Disputes; Attorney's Fees.  This Agreement and any dispute arising hereunder shall be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions thereof.

Both parties consent to the sole and exclusive jurisdiction of the Court of Chancery of the State of Delaware with respect to any dispute arising hereunder. Each party to this Agreement agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by applicable law. Each party to this Agreement irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement, the transactions contemplated hereby or the subject matter hereof in any court referred to above, including the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. In any action or proceeding to enforce rights under this Agreement, the prevailing party will be entitled to recover reasonable costs and attorneys' fees.

10.5    <u>Waiver of Jury Trial</u>. Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement, the transactions contemplated hereby or the subject matter hereof (whether based on contract, tort or any other theory).

10.6    <u>Miscellaneous</u>. Neither party shall have the right to assign this Agreement to another party, except that Client may assign its rights and obligations without consent to a successor to all or substantially all of its relevant assets or business. The Terms and Conditions of this Agreement shall take precedence over and shall govern over any inconsistent or conflicting terms in the Statement of Work (even if signed), unless and solely to the extent that the parties expressly state in such Statement of Work that they intend to override the Terms and Conditions. No waiver, change, or modification to this Agreement will be effective unless in writing signed by both parties. Any notices in connection with this Agreement will be in writing and sent by first class US mail, confirmed facsimile or major overnight delivery courier service to the address specified on the cover sheet or such other address as may be properly specified by written notice hereunder. The parties agree that this Agreement may be signed by manual or facsimile signatures and in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. In this Agreement (including, for the avoidance of doubt, the Exhibits and Statements of Work attached hereto), the terms "Dollars," "USD" and "$" mean United States Dollars.

11.    <u>Definitions</u>.

11.1    "Affiliate" means with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such first Person. For such purpose, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or voting interests, by contract or otherwise, and the terms controlling and controlled have correlative meanings. A subsidiary of a party will be deemed to be an Affiliate of a party for all purposes hereunder.

11.2    "Client Group" means, collectively, Client and each of its parent entities and its subsidiaries.

11.3    "Existing Customer" means any Person that is a customer of the Client Group as of the date hereof, other than Aucnet.

11.4    "IFRS" means international financial reporting standards as in effect as of the date hereof.

11.5    "Person" means any individual, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity, or any governmental authority.

11.6    "New Customer" means any Person that is not a customer of the Client Group as of the date hereof.

11.7    "New Product(s)" means product(s) that incorporate the Deliverables.

**EXHIBIT A**
**STATEMENT OF WORK #1**

**The parties agree as follows:**

1. **INTRODUCTION**

 ███████ currently develops and markets a mobile device diagnostics and erasure solution targeted to high volume device processors that service the secondary mobile device market. A key selling proposition in the mobile processor market is the ability to diagnose, erase, and report on each mobile device as quickly and efficiently as possible. ZroBlack will provide consultancy services to improve the speed and efficiency of the ████████████ ██████████████████████.

2. **SCOPE OF SERVICES**

 ZroBlack shall perform the following Services:

 (a) **Education:** ZroBlack has acquired key knowledge in the areas of mobile device identification, diagnostics, data clearing, and validation. This agreement includes the passdown of this knowledge to the ██████ team through training.

 (b) **Software Development Best Practices:** ZroBlack has utilized varying techniques within software to communicate with mobile device components. This agreement includes consulting with the ████████ on software development best practices, coding techniques, and development of software utilities to communicate with mobile devices and components.

 (c) **Hardware Development Best Practices:** ZroBlack has utilized varying hardware devices and cables to communicate with mobile device components. This agreement includes consulting with the ████████ on hardware development techniques to communicate with mobile devices and components.

 (d) **Documentation:** The mobile device processor market relies on support for the wide variety of mobile devices that will be processed. This agreement includes consulting with the ████████ how best to organize and document the process of supporting ability to identify, diagnose, clear, and validate the devices covered in the scope of this consultancy agreement.

3. **DELIVERABLES**

 ZroBlack shall provide the following Deliverables:

 (a) **PHASE 1: Device Initialization**
 This phase includes the following deliverables:
 • Mobile device initialization – how data is passed to a device when connecting to a USB cable
 • Identifying hardware components within each target device to understand how the data is stored on chip
 • Understanding where device data is stored on specific components across various mobile devices

- Concepts about communication with device firmware on IC components
- Accessing device data on specific components through USB using software external to the device
- Device identification across various states of the device, including but not limited to turned on, turned off, locked, unlocked
- Initialization of devices, understanding how the device comes in and out, what are we looking for, how are we looking for it, we cannot get this one piece when the device comes in and out, what do we do next
- Teardown of Apple devices and Android devices
- Teardown of Apple OEM and Samsung OEM USB cables
- Identify components in the cables required to access the data on mobile components

(b) **PHASE 2: iOS Device Implementation**
This phase includes the following deliverables:
- iOS device identification, diagnostics, data clearing and validation
- Architect and build the iOS device information database
- Design and develop the software utilities required to query data from device components
- Document device data and transcribe into customer facing device identification and diagnostics
- Document, design and develop software to data clear and validate supported devices

(c) **PHASE 3: Android Device Implementation**
This phase includes the following deliverables:
- Android device identification, diagnostics, data clearing and validation
- Architect and build the Android device information database
- Design and develop necessary hardware components and cables to effectively query data from device components
- Design and develop the software utilities required to query data from device components
- Document device data and transcribe into customer facing device identification and diagnostics
- Document, design and develop software to data clear and validate supported devices
- Design and develop instant data erasure for Samsung devices

(d) **PHASE 4: Wearables, Streaming Media Devices and Other Device Implementation**
This phase includes the following deliverables:
- Wearable device identification, diagnostics, data clearing and validation
- Wearables include Apple Watch, Samsung Gear, Android WearOS devices, Apple Pencil, Apple AirPods, Apple TV and other streaming devices
- Architect and build the Wearables device information database
- Design and develop necessary hardware components and cables to effectively query data from device components
- Design and develop the software utilities required to query data from device components
- Document device data and transcribe into customer facing device identification and diagnostics
- Document, design and develop software to data clear and validate supported devices
**NOTE**: Smart TVs and Gaming Consoles are outside the scope of this agreement.

(e) **PHASE 5: Mobile Device Analytics**

This phase includes the following deliverables:
- Maintenance to support new devices entering the market
- Maintenance to support new versions of supported mobile device operating systems
- Architect and build system for collecting anonymized customer device data
- Implement Artificial Intelligence (AI) on collected device data to provide customer insights, ███ insights, and market insights
- Implement Alert systems to identify supported device issues

## 4. MILESTONES

ZroBlack shall achieve the following Milestones:

| | ████████████████████████████████████████████ |
|---|---|
| 1 | ████████ completes Phase 1 training. All training documented, including identification of key device components and ability to communicate with key components through USB. |
| 2 | ██████████████████████████████ product with updated support for iOS mobile device identification, diagnostics, data clearing, and validation. |
| 3 | ██████████████████████████████ product with updated support for Android mobile device identification, diagnostics, data clearing, and validation. |
| 4 | ██████████████████████████████ product with updated support for Apple Watch and Android wearable device identification, diagnostics, data clearing, and validation. |
| 5 | ████████ implements mobile device analytics based updated data collection architecture. |

## 5. DEPENDENCIES

Successful delivery of services depends on the following dependencies:

(a) ██████████████████████████████

(b) **Mobile devices for testing**
This includes sample devices for tear down and for testing purposes, such as the following:
- Apple iPhone smartphone

- Samsung Galaxy smartphone
- Apple Watch
- Other devices needed to test in order to support

(c) **PHASE 4: Wearables, Streaming Media Devices and Other Device Implementation**
This includes items typically used for mobile device repair, such as the following:
  - Microscope
  - Soldering iron
  - Mobile device screw kits
  - Dental picks
  - Other materials needed to effectively identify device components

**6.  ACCEPTANCE CRITERIA**

Unless otherwise agreed herein, the Services are deemed accepted upon review and acceptance by ███████ technical and business teams.

**7.  POINT OF CONTACT**

The following persons are designated as primary point(s) of contact of the respective parties for any matters concerning this SOW:

███████████ ███████████████

ZroBlack  :  **Jonathan Villarreal, jv@zroblack.com**

**8.  STAFFING AND LOCATION**

All services to be provided by Jonathan Villarreal.

During the first six (6) months of this SOW, Jonathan Villarreal shall travel to ██████████ no less than once per month for up to two (2) weeks at a time to meet and work with the ██████████ on a Full-Time, meaning at least forty (40) hours per week, basis to complete the Services.  During the remainder of the term of this SOW, Mr. Villarreal agrees to travel to ██████████ at ██████████ request, but in no event more than once per month for up to two (2) weeks at a time, to meet and work with the ██████████ on a Full-Time basis.

Mr. Saenz shall travel to ██████████ with Mr. Villarreal on Mr. Villarreal's first trip to ██████████ to meet and work with the ██████ ████. During the remainder of the term of this SOW, Mr. Saenz shall travel to ██████████ at ██████████ request, but in no event more than once per month for up to two (2) weeks at a time, to meet and work with the ██████████ on a Full-Time basis.

**9. COMPENSATION**

Subject to the conditions set forth in the ~~[redacted]~~ of $1,500,000 USD.

Client shall pay the travel, hotel, and fo~~[redacted]~~ rreal's spouse, in accordance with Client's travel policy.

This Statement of Work is entered into betwee~~[redacted]~~ ltant," and together with Services Company, "Service Provider") and John Saenz, ~~[redacted]~~ 9 and is subject to the Terms and Conditions described in the Professional Servic~~[redacted]~~ reement"). By signing below, the parties hereto, each acting under due and proper~~[redacted]~~ n the parties.

**ZroBlack, LLC**

DocuSigned by:

By: _John Saenz_
    ——139E0395E1D84D1——
    Signature

Name: _____John Saenz_____

Title: _____Chief Executive Officer_____

Address: 1150 N Loop 1604 W.
         Ste 108-259
         San Antonio Texas, 78248

Name: _____Matthew Jones_____

Title: _____Chief Executive Officer_____

Address: Stansted Business Centre Parsonage
         Road, Takeley Essex, CM22 6PU
         United Kingdom

By: _George Janssen_
    ——A0A80BC0C75449C——Signature

Name: _____George Janssen_____

Title: _____Director_____

Address: Stansted Business Centre Parsonage
         Road, Takeley Essex, CM22 6PU
         United Kingdom

**Jonathan Villarreal**

By: _____
DocuSigned by:

*Jonathan Villarreal*

068DE39BE9D1475...
Signature

Name: _____ Jonathan Villareal _____

Address: 1150 N Loop 1604 W.
Ste 108-259
San Antonio Texas, 78248

**John Saenz**

By: _____
DocuSigned by:

*John Saenz*

139E0395E4D94D1...
Signature

Name: _____ John Saenz _____

Address: 1150 N Loop 1604 W.
Ste 108-259
San Antonio Texas, 78248

**EXHIBIT C**

| BriX Core Logic<br>iOS, WatchOS, tvOS<br>AirPods | Foundational Logic for All Solutions<br>Device Identification<br>Data Clearing<br>Device Diagnostics<br>Validation<br>Restoration |
|---|---|
| AndroidOS | Device Identification<br>Data Clearing<br>Device Diagnostics<br>Validation |
| ADB Solutions | Auto-Enable ADB Solutions for specified OEM's and Carriers |
| Titan Cable | Wired Auto-Enable ADB proprietary Hardware. Prototypes and Schematics included. |
| Titan Adapter | Auto-Enable ADB proprietary Hardware – Micro USB & USB-C pluggable adapter (no wire). Prototypes and Schematics included. |
| Phoebe Cable | Proprietary wired cable, to interface with TizenOS, WearOS. Prototypes and Schematics included.<br>*Android, Samsung Wearables |
| Janus Cable | Proprietary wired cable to interface with watchOS. Prototypes and Schematics included. |

**EXHIBIT B**

- Device Processing and Secure Data Clearing technologies, including but not limited to:
    - Mobile Devices
    - Apple Laptops
    - Microsoft Surface Pro
    - Streaming Media Players
    - Watch Wearables
    - Smart TVs
    - Gaming Consoles
- Accessing devices in locked or damaged state (not interested in Data Extraction, but interested in accessing for purpose of diagnostics and erasure)
    - Passcode Locked Devices
    - MDM (Mobile Device Management) Locks
    - Damaged Logic Board
    - Damaged Data Port
- Technologies involved in efficiently processing devices throughout the Mobile Asset Lifecycle, including but not limited to:
    - Warehouse Processing
    - Mobile Retail
    - Mobile Buyback
    - Call Center
    - Insurance
- Foundational logic on the wireless connectivity to devices for purpose of diagnostics and erasure