# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **JONATHAN VILLARREAL,** | § | |
| **Individually and derivatively on behalf** | § | **CASE NO.  20-571-OG** |
| **Of ZROBLACK, LLC** | § | |
| **Plaintiffs,** | § | |
| **v.** | § | |
| | § | |
| **JOHN SAENZ, et al.,** | § | |
| **Defendants.** | § | |

**APPENDIX TO MOTION TO DISMISS WITH PREJUDICE ALL CLAIMS AND CAUSES OF ACTION AGAINST DEFENDANTS MIGUEL VILLARREAL, JR. AND GUNN, LEE & CAVE, P.C. PURSUANT TO FED. R. CIV. P. 12(b)(6)**

## I.     ALLEGATIONS FROM AMENDED COMPLAINT [DKT. 35 (REDACTED)]

| Paragraph | Allegation (relevant portions)[1] |
|---|---|
| 18. | "In October of 2018 Jonathan was negotiating with [Redacted, referred to herein as "Foreign Customer")], a subsidiary of [Redacted] for the licensing of the technology …." |
| 20. | "After speaking with [J. Villarreal] about his tech inventions in the last week of December 2018 John Saenz ("Saenz"), who is married to [J. Villarreal's] cousin, decided he wanted a piece of the action, stating to [J. Villarreal] in a text message, 'How can I ride this train.' Saenz … proposed forming a company as a vehicle to market the technology. That company was to be ZroBlack. … [J. Villarreal] agreed to form a limited liability company with Saenz to market the software to , with Saenz as CEO and [J. Villarreal] taking on the technology role." |
| 21. | "[J. Villarreal] paid the registered agent for the formation of ZroBlack LLC and for a year's worth of service for a post office box for ZroBlack, LLC . …. Since [J. Villarreal] purchased the registration and the first year of service at the post office box, Saenz agreed to purchase ZroBlack's domain name, www.zroblack.com, from GoDaddy…. Saenz had given [J. Villarreal] access to the GoDaddy account where the domain was being held, but that access was later revoked, and the password was |

---

[1] As required for purposes of Fed. R. Civ. P. 12(b)(6), the well-pleaded facts of the Amended Complaint are treated as true.  The Gunn Lee Defendants, however, do not admit that any of the factual allegations recited herein are indeed true or have been established for any other purposes, such as summary judgment or trial.  Internal citations to documents attached to the Amended Complaint are omitted.

| | |
|---|---|
| | changed once Saenz and [J. Villarreal] signed the Release." |
| 22. | "On January 14, 2019, [J. Villarreal] and Saenz formed ZroBlack, LLC, organized under the laws of the State of Delaware. They were its founding members and each owned fifty percent disregarding their original agreement. … Saenz was charged with client engagement and promoting the company." |
| 23. | "[J. Villarreal] and Saenz executed a Limited Liability Company Operating Agreement for ZroBlack, LLC ('Operating Agreement'). A key term of that agreement pertained to ZroBlack's ownership of property. Section 4.7 of the ZroBlack's Limited Liability Company Agreement states:<br><br>'Title to the Company's assets will be held in the Company's name or in the name of any nominee designated by the Members. The Members have power to enter into a nominee agreement with any person, and that agreement may contain provisions indemnifying the nominee, except for his or her willful misconduct.'" |
| 29. | "On March 15, 2019, ZroBlack and [Foreign Customer] executed a non-disclosure agreement ('NDA'). The purpose of the NDA was to allow ZroBlack to disclose trade secrets to [Foreign Customer] during contract negotiations while maintaining the secrecy of those trade secrets.   The trade secrets included the software code." |
| 30. | "ZroBlack and [Foreign Customer] entered into a Professional Services Agreement ('PSA') on April 15, 2019, wherein ZroBlack would pass down its knowledge of mobile devices, consult with [Foreign Customer] on its software development and coding, hardware development, and organize and document the process of supporting ability to identify, diagnose, clear, and validate certain devices." |
| 31. | "The [Foreign Customer] contract price was One Million Five Hundred Thousand Dollars ($1,500,000.00) up front and a fourteen and one-half percent (14.5%) earn out on new customer revenue and existing customer growth." |
| 35. | "ZroBlack retained the services of Gunn, Lee & Cave (hereinafter, "Gunn, Lee law firm") and specifically attorney [M. Villarreal] to advise them on the contract negotiations. Shortly before signing, on or about April 12, 2019, [J. Villarreal] emailed [M. Villarreal] discussing negotiations. In the mail, [J. Villarreal] stated:<br><br>'[Saenz] and I went through it last night, he had concerns, but at the end of our talks we worked out the logic behind the revenue sharing. I hope this closes today too, hard lessons have been learned for sure. If we sign today, it's basically as though we are getting a $750,000 salary each for 2019. Do you have a recommendation for an attorney that can setup a trust for me?'" |
| 43. | "Soon after ZroBlack executed the PSA with [Foreign Customer] however, [J. Villarreal] and Saenz came to cross purposes over Saenz's |

|  | lack of performance, misappropriation of company funds, and efforts to shop the tech to others in violation of the [PSA]." |
|---|---|
| 46. | "While Saenz talked big, he did little to help the company. After ZroBlack signed the contract with [Foreign Customer], Saenz took half of the upfront payment ($740,000) and failed to perform any more work for ZroBlack." |
| 47. | "Pursuant to Article VI Bookkeeping, Section 6.2 – Member's Accounts of the ZroBlack Company Agreement, Saenz is required to return all money paid in in advance by the company upon leaving the company." |
| 48. | "Saenz and [J. Villarreal] agreed to these provisions when they signed the LLC Agreement." |
| 49. | "May 2019, [Foreign Customer] required both [J. Villarreal] and Saenz to travel to [foreign country]. Saenz refused, but eventually showed seven-days late. Two days after arriving in [foreign country], Saenz sent [redacted] an email stating that [J. Villarreal] would take care of 100% of the technical and that he (Saenz) would no longer be attending morning meetings but would check up from time to time: <br><br> 'I wanted to send you a note to clarify my role on these calls.  I will be on from time to time as an observer and to offer guidance from ZroBlack's point of view. [J. Villarreal] can handle all the technical side of the conversations.'" |
| 50. | "[J. Villarreal] was required to return to [foreign country] during the week of June 8 to 15, 2019; Saenz refused to accompany him.  Saenz was also charged with completing tax returns and paying the quarterly business taxes; he did not." |
| 51. | "Rather than working to promote ZroBlack, Saenz was living the high life.  Upon information and belief, Saenz used most of the $740,000 he took from ZroBlack.   Saenz invested around $305,000 in the stock market." |
| 52. | "Saenz also sued around $423,850 in property renovations." |
| 53. | "As a result of Saenz's refusal to perform his work, on or about June 26, 2019, [J. Villarreal] notified Saenz by text message that he wished to dissolve ZroBlack.  In the notification, [J. Villarreal] took Saenz to task for not doing any work, stating: <br><br> 'You can't sit back and expect a paycheck.  You can't say you front loaded the contract then dip out.  Besides, I di da huge part ot close out the contract, I did the entire due diligence and put the entire BRIX document together.  I expected you to do work after we got paid, this isn't a free ride man. [Foreign customer] only wants to go forward with me for a reason and I don't know what happened to you.  I don't know why you stopped working after getting paid $750k.'" |
| 54. | "After [J. Villarreal] threatened to dissolve ZroBlack, Saenz got [M. Villarreal] further involved. … [M. Villarreal] undertook to represent both [J. Villarreal] and Saenz in negotiations to settle their dispute." |

| 57. | "Although Saenz initially agreed to perform services to each [sic, earn] the $740,000, he ultimately refused to perform his obligations to ZroBlack under the [Foreign Customer] scope of work." |
|---|---|
| 58. | "Nor would Saenz agree to steps to ensure his performance, despite being told by [M. Villarreal] during a meeting in [M. Villarreal's] office in July 2019 that he (Saenz) had breached his fiduciary duty to the company." |
| 59. | "On or about July 27, 2019, [M. Villarreal] suggested that [J. Villarreal] set tasks for Saenz (the putative CEO of ZroBlack)." |
| 60. | "Saenz refused to have the tasks incorporated into any agreement, sending a text message to [J. Villarreal] stating he would not 'tie a contract to daily tasks because that could be easily manipulated.'" |
| 61. | "[J. Villarreal] responded, "Seriously. Please dud.  That's not fair.  I literally have my work planned out for an entire year I'm asking you for one month.  Hello? How can I help you with it?" |
| 62. | "Saenz also refused [M. Villarreal's] suggestion that his CEO duties be incorporated into the company operating agreement.  Once he had $740,000 in his pocket, Saenz simply did not want to do any more work for ZroBlack or [Foreign Customer]." |
| 67. | "After [J. Villarreal] an Saenz disagreed on how to qualify his theft of $740,000 from ZroBlack, the two members decided it was time to part ways." |
| 68. | "The money that Saenz had stolen from the company was to be returned, on a basis to be structured by [the Gunn Lee Defendants]." |
| 71. | "Saenz began demanding that the $740,000 he took from ZroBlack be characterized as a 'gift' for tax purposes; this, [J. Villarreal] refused to do as it would violate the law. For example, in a text message July 27, 2019 Saenz offered to assign all interest in ZroBlack to [J. Villarreal] if the $740,000 would be characterized as a gift." |
| 72. | "[The Gunn Lee Defendants] eventually prepared a document titled 'Release.' The Release stated that Saenz would receive as consideration 2% (and ZroBlack 12.5%) of the 14.5% Earn-Out Obligation under the PSA." |
| 86. | "After Saenz agreed to leave ZroBlack, he refused to return the $740,000, which Saenz took as an advance on services to be performed for ZroBlack." |
| 87. | "When [J. Villarreal] stated this money was necessary for the company to operate, Saenz continued to want the advance he took against services from ZroBlack to be construed as a 'gift'." |
| 88. | "This was an ongoing dispute between Saenz and [J. Villarreal], who anticipated providing service to the United States federal government. [J. Villarreal] told Saenz that he ([J. Villarreal]) would never agree to qualify $740,000 Saenz embezzled as a gift." |
| 89. | "In fact, [J. Villarreal] gave Saenz an ultimatum: return the money, or face the harsh consequences. This was the same discussion he had with attorney [M. Villareal] and his law firm, Gunn, Lee." |
| 90. | "On August 15, 2019, [J. Villarreal] asked Saenz to release ZroBlack's |

| | webpage. Saenz said he would 'look into it.' Saenz had already deleted jv@zroblack.com on August 14th, 2019." |
|---|---|
| 91. | "[J. Villarreal] received an email from GoDaddy to his backup address showing that jv@zroblack.com has been deleted. [Saenz] had no intention of looking into anything or assigning anything over to ZroBlack or Jonathan." |
| 92. | "Despite multiple requests for over 16 months for return, Saenz continues to hold the domain name. Adding insult to injury, Saenz blackmailed ZroBlack over the domain name, webpage, and email server, offering to sell it back to ZroBlack for $7,000." |
| 93. | "Now, Saenz has taken the website down effectively terminating ZroBlack's ability to gain new clients." |
| 94. | "Saenz also deleted the email server, thereby destroying thousands of emails and documents supporting [J. Villarreal's] claims, ZroBlack's projects for [Foreign Customer] and other matters." |
| 95. | "Saenz currently holds ZroBlack's domain name hostage, so [J. Villarreal] has no access to the site and no opportunity to attempt to recover the webpage and emails. GoDaddy is the service provider." |
| 96. | "[J. Villarreal] asked Saenz to return the laptop computer belonging to ZroBlack. Saenz refused this request also. This computer contains proprietary code related to ZroBlack's phone security project." |
| 97. | "On September 13, 2019, [J. Villarreal] emailed [M. Villarreal] advising him that Saenz had deleted all his emails. Then, on September 13, 2019, [J. Villarreal] emailed [M. Villarreal] pleading for help: 'I'm beside myself right now, and really struggling with everything, I can't eat, I can't sleep, my anxiety and stress is so high, and for the next 3 years if I continue like this I'll end up losing my contracts and not be able to work. I have worked too hard to allow myself to slip like this. I need help Mike, this is not right. I've done nothing wrong. [Saenz] got $750,000 cash, and there has to be a way for me to stop this madness, get him to give up the 2%, get my company website, my company documents, and my company computer. Like I said, I have a company that pays real taxes, has 10 real employees, we have a real physical location, and I can't even put up my company website.' [M. Villarreal] continued to try to negotiate a resolution between [J. Villarreal] and Saenz." |
| 98. | "On or about September 19, 2019, [J. Villarreal] again emailed Saenz, copying [M. Villarreal], demanding the return of ZroBlack's property, including the laptop containing proprietary code, ZroBlack's web domain and webpage, and ZroBlack's emails." |
| 99. | "[J. Villarreal] also demanded return of the $740,000 Saenz misappropriated from ZroBlack." |

| | |
|---|---|
| 100. | "[J. Villarreal] sent a similar email to Saenz and [M. Villarreal] on September 20, 2019, explaining why he believed Saenz should return the $740,000 and other property of ZroBlack." |
| 101. | "On or about September 26, 2019, [M. Villarreal] tried to arrange a meeting between [J. Villarreal] and Saenz to discuss settling their disagreement and offered his offices as a place to have the discussions." |
| 102. | "[M. Villarreal] gave his available days and stated that 'we are trying to resolve your differences, not attempting to take advantage of each other. I appreciate you both willing to show good faith on both your parts in coming together and seeing if a resolution can be reached.'" |
| 103. | "Despite promises to appear for a meeting, Saenz kept putting it off with a litany of excuses until [J. Villarreal], fed up, stated he would not be attending a meeting and had decided to go in a different direction." |
| 104. | "As of the filing of the complaint, Saenz has not returned the money he took from ZroBlack, nor has he returned the web domain and webpage, emails, laptop, and proprietary information belonging to ZroBlack." |
| 105. | "Saenz continues to hold on to ZroBlack's property and refuses to return it, including the ZroBlack laptop that contains proprietary information and trade secrets belonging to ZroBlack. Saenz also threatened [J. Villarreal] that he would "muck up" his life if [J. Villarreal] did not turn over the company and assign it to him. [J. Villarreal] begged Saenz not to do this to him." |
| 159. | "After Saenz parted ways with ZroBlack, his authorization to use the laptop and access the information on it was revoked. Furthermore, the Release and assignment of all his rights in ZroBlack included the assignment of rights in ownership of the laptop and the proprietary code on that laptop. Saenz refused requests to return the laptop, and his continued possession is unauthorized. Saenz knew he used improper means to acquire the trade secrets, thus misappropriating the trade secrets. Those trade secrets included the software code created and maintained by ZroBlack and ZroBlack's login and password information for its GoDaddy account." |
| 181. | "The Release specifically recited that Saenz and [J. Villarreal] wished to memorialize the assignment of Saenz's entire interest in ZroBlack to [J. Villarreal]. Section 6 of the Release, titled 'Assignment' imposed on [J. Villarreal] and Saenz an obligation to execute a Unanimous Written Consent in Lieu of a Meeting of the Members of ZroBlack, LLC ('Consent'). That Consent itself showed the Members entered a resolution that Saenz was assigning his entire interest in ZroBlack, LLC to [J. Villarreal]. The Release and Consent were executed on the same day, and upon their execution, Saenz became obligated to release all rights he had in ZroBlack, including any rights to the ownership to ZroBlack property, including the laptop, proprietary code and information, and rights as ZroBlack's nominee in ZroBlack's domain name, which were the property of ZroBlack. Post-Release ZroBlack requested return of that property, and Saenz refused, thereby breaching the terms of the Release." |

| 183. | "Saenz also breached the Release by failing and refusing to return the $740,000 he took from ZroBlack. The Release specifically recited that Saenz was assigning all his interest in ZroBlack to [J. Villarreal]. The money paid to ZroBlack under the terms of the PSA was money belonging to ZroBlack. Once he assigned all his rights to ZroBlack to [J. Villarreal], Saenz was obligated to return the $740,000 that belonged to ZroBlack. Nor was the $740,000 consideration for the Release. Section 2 of the Release discusses the consideration, which is the 2% of the earnout from the contract Saenz was to receive. No mention is made of the $740,000. By failing and refusing to return the $740,000 Saenz breached the Release." |
|------|------|
| 202. | "It is undisputed the [Gunn Lee Defendants] provided legal representation to [J. Villarreal] in his dealings with … Saenz." |
| 203. | "It is undisputed that [the Gunn Lee Defendants] provided legal representation to ZroBlack with respect to … Saenz' departure from ZroBlack and transactions to memorialize such transactions." |
| 211. | "By failing to include an integration clause; by failing to clearly specify rights and responsibilities in the Release; by incorporating documents into the Release, the drafting created an ambiguity that invites parol evidence, multiple and inconsistent interpretations, and has led to the much of the underlying disputes in this case." |
| 212. | "Not only did they not look out for Jonathan Villarreal's interest and ZroBlack's interest, but they actively sought to enhance Saenz's position with respect to his negotiations to leave ZroBlack." |
| **213.** | "In their negligence, they did not protect ZroBlack to ensure that it recouped its money, trade secrets, URL, and confidential information." |
| 214. | "They either failed to take steps to understand the extend and value of [J. Villarreal's] trade secrets; the application it could have within the United States government; and the value of having ZroBlack's email server returned to ZroBlack when Saenz left the company." |
| 215. | "They were negligent in failing to advise [J. Villarreal] to sign incomplete agreements, including the Release; failing to obtain the trade secrets [J. Villarreal] had developed; and allowed Saenz to abscond with $740,000 which ZroBlack desperately needed for its operations." |
| 216. | "The breach of [the Gunn Lee Defendant's] legal duty to Jonathan Villarreal and ZroBlack proximately and directly caused damages to each, for which relief is sought." |
| 218. | "[The Gunn Lee Defendants] breached the duty owed to Plaintiff by taking actions an ordinarily prudent attorney would not have taken under the same or similar circumstances. Here, the [Gunn Lee Defendants] failed to:<br><br>a. Include a carve-out provision in the Release that except from the Release Saenz's ongoing obligations to preserve the confidentiality of ZroBlack's trade secrets; |

|  |  |
|---|---|
|  | b. Include a requirement in the Release that Saenz return all intellectual property to ZroBlack;<br><br>c. Include a requirement in the Release that Saenz return all of ZroBlack's physical personal property, including the laptop computer;<br><br>d. Include a requirement that Saenz released to ZroBlack the ZroBlack domain name, web page, and email server; and<br><br>e. Include a requirement in the Release that Saenz return the $740,000 he took from ZroBlack." |
| 219. | "The Gunn Law Defendants'] breach proximately caused Plaintiff injury." |
| 220. | "Had [the Gunn Law Defendants] included the above provisions, the laptop, code, domain, and $740,000 would have been returned to ZroBlack and Saenz would have been prevented from attempting to sell and market the software. Plaintiff has incurred unnecessary attorney's fees in obtaining the undersigned counsel to file the lawsuit." |
| 221. | "ZroBlack's damages from [the Gunn Law Defendants'] breach include the $740,000.00 they allowed to be embezzled from the company, the value of ZroBlack's proprietary information, the laptop computer Saenz refuses to return, and ZroBlack's domain name for its webpage and email server." |
| 222. | "[The Gunn Lee Defendants] owed a formal fiduciary duty to its clients, Saenz, Jonathan, and ZroBlack." |
| 223. | "[M. Villareal] is an agent of the Gunn, Lee law firm, and acted in the course and scope of his agency at all times material to this action." |
| 224. | "At all times material to the events giving rise to his claim, [M. Villareal] was an attorney with the Gunn, Lee law firm, and represented himself to be backed by the knowledge and expertise of the Gunn, Lee law firm." |
| 225. | "Any malfeasance or wrongdoing found against [M. Villareal] was done under the supervision or in conjunction with his role at the Gunn, Lee law firm. His actions are therefore attributable to the firm under both *respondeat superior* and as an agent of the Gunn, Lee law firm. The Gunn, Lee law firm is fully liable for all damages assessed against [M. Villareal]." |
| 226. | "[The Gunn Lee Defendants] owed a formal fiduciary duty to [J. Villarreal] and ZroBlack." |
| **227.** | "The duty, the highest recognized law, required the attorney and law firm to put the interest of its clients, [J. Villareal] and ZroBlack, ahead of itself, or not take on representation of another client that would directly and adversely affect the representation of [J. Villareal] and ZroBlack." |
| 228. | "[The Gunn Lee Defendants] … negotiated agreements between [J. Villarreal] and Saenz and ZroBlack that put the Plaintiffs in a worse position than they were in prior to the agreements." |
| 229. | "They chose to represent one client's interest – Saenz's – over the other two." |

| 230. | "The attorney and law firm also ignored the discussions between the members of ZroBlack with respect to qualifying the $740,000 that Saenz wrongfully took from the business." |
| 231. | "[The Gunn Lee Defendants] were clearly aware of Saenz's position with ZroBlack and they knew or should have known about the fiduciary duty that Saenz owed ZroBlack." |

## II.    ALLEGATIONS FROM ORIGINAL COMPLAINT [DKT. 1]

| Paragraph | Allegation (relevant portions)[2] |
|---|---|
| 32. | "In about July 2019[, J. Villarreal] and Saenz decided it was time to part ways.  The money that Saenz had stolen from the company was to be returned, on a basis to be structured by [the Gunn Lee Defendants].  Although [M. Villarreal] represented both [J. Villarreal] and Saenz and issued a waiver of conflict letter, no reasonable lawyer could believe that such representation of each client would not be materially affected.  Moreover, [M. Villarreal] did not advise [J. Villarreal] or ZroBlack as to the consequences of what they were doing and structured an agreement that hurt both [J. Villarreal] and ZroBlack." |
| 35. | "[The Gunn Lee Defendants] eventually prepared a document titled 'Release.'  The Release stated that Saenz would receive as consideration 2% (and ZroBlack 12.5%) of the 14.5% Earn-Out Obligation under the PSA." |

---

[2] As required for purposes of Fed. R. Civ. P. 12(b)(6), the well-pleaded facts of the Complaint are treated as true.  The Gunn Lee Defendants, however, do not admit that any of the factual allegations recited herein are indeed true or have been established for any other purposes, such as summary judgment or trial.